## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

CONVERGED COMPLIANCE SOLUTIONS, INC., CIVIL ACTION NO.:

       Plaintiff,    **VERIFIED COMPLAINT**

   -against-        **JURY TRIAL DEMANDED**

XOP NETWORKS, INC, XOP NETWORKS
LATVIA, SIA, XOP NETWORKS INDIA, PRIVATE
LIMITED, ALL AFFILIATES OF THE
FOREGOING, SUDHIR GUPTA and DAVID
HARDING,

         Defendants.

-----------------------------------------------------------------X

   Plaintiff Converged Compliance Solutions, Inc. ("CCS"), by and through its undersigned

counsel, as and for its Complaint states and alleges with knowledge as to all facts concerning itself,

and upon information and belief as to all others, as follows:

## <u>NATURE OF THE ACTION</u>

   1.  This action concerns the business aspirations, plans, and products of the Plaintiff, a

company that sought to solve communications technology problems on stock trading floors.

Through the delivery of unique, customizable, and flexible voice conferencing, routing, bridging,

and delivery solutions specifically designed to meet the needs of financial institutions, CCS was

poised to transform trader voice integration to telephony solutions and the networks that support

present-day stock trading voice collaboration.

   2.  As the facts below demonstrate, Plaintiff's principal McDonough successfully laid

the groundwork for new hardware and software solutions that would address the instant voice

communication challenges faced by the global institutional financial trading industry. Defendants, presumably seeing the value in Plaintiff's product, upon information and belief, manipulated Plaintiff's principals and then misappropriated Plaintiff's trade secrets and confidential business information, eventually using it to enter into at least one high-value deal.

3.      CCS seeks, in these claims: (i) judgment against Defendants for the claims enumerated herein, in an amount to be determined, but, in any event, in excess of $11.2 million; (ii) a declaratory judgment by this Court of CCS's ownership of certain confidential business information, including trade secrets; (iii) injunctive relief to halt any and all further distribution of CCS's confidential business information and trade secrets; (iv) compensation from Defendant Harding to fairly recompense for his breaches of fiduciary duty; and (iv) indemnification by all Defendants for the costs, expenses and fees, including reasonable attorneys' fees, of this action.

4.      Because of the highly technical nature of CCS's claims, a glossary of certain abbreviations and terminology has been provided as Exhibit A hereto.

## **PARTIES**

5.      Plaintiff CCS is a corporation organized under the laws of the state of New York and having a principal place of business at 33 Irving Pl., 3rd floor, New York, NY 10003. ("CCS").

6.      Upon information and belief, Defendant XOP Networks, Inc. is a corporation organized under the laws of the state of Delaware and having a principal place of business at 17218 Preston Road, #2400, Dallas, TX 75252 ("XOP").

7.      Upon information and belief, Defendant David Harding is an individual residing at 50 Cortland Lane, Glastonbury, CT 06033 ("Harding").

8.      Upon information and belief, Defendant Sudhir Gupta is an individual residing at 5213 Seascape Lane, Plano, TX 75093 ("Gupta").

9.     Upon information and belief, Defendant XOP Networks Latvia, SIA, is a limited company organized under the laws of Latvia and having a principal place of business at Rīga, Kalnciema iela 40, LV-1046, Latvia ("XOP Latvia").

10.    Upon information and belief, Defendant XOP Networks India, Private Limited, is a private limited company organized under the laws of India and having a principal place of business at 4/18, Block 4 Roop Nagar Delhi North Delhi Dl 110007 India ("XOP India").

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1332 because it is a civil action between citizens of different states and the amount in controversy exceeds $75,000.00.

12.    This Court has federal question subject matter jurisdiction under 2835 U.S.C. § 1331. This Court has original jurisdiction over this controversy for misappropriation of trade secrets claims pursuant to 18 U.S.C. § 1836(c). This Court has supplemental jurisdiction over the controversy for all other claims asserted herein pursuant to 28 U.S.C. § 1367.

13.    This Court has personal jurisdiction over XOP, Gupta and Harding in accordance with FRCP 4(k)(1)(a) because a New York State court would have jurisdiction over the Defendants pursuant to CPLR § 302 as follows:

    a.  subpart 1: transacting business in New York State: Harding was a shareholder and director of CCS; XOP and Gupta regularly engaged with CCS in regard to business.

    b.  subpart 3: committing a tortious act outside New York State that caused injury to person or property within the state, and engaging in a persistent course of conduct in the state: Harding, from Connecticut, served as an intermediary for CCS in conducting business with the other defendants, and breached his fiduciary duties to

CCS while doing so; XOP and Gupta from Texas breached their non-disclosure agreements with CCS, stole CCS's confidential information and trade secrets, and wrongly profited from their sale. Upon information and belief, XOP Latvia and XOP India are believed to be affiliates of XOP that have made use of stolen information and trade secrets belonging to CCS.

14.     Furthermore, Defendants XOP and Gupta continue, upon information and belief, to do substantial and pervasive business in New York in violation of their contracts with CCS.

15.     This Court also has personal and subject matter jurisdiction over XOP and Gupta pursuant to the designation of exclusive jurisdiction of the federal or state courts of New York in the contracts attached hereto as Exhibits B and C, the breach of which is in part the subject matter of this case. Additionally, XOP and Gupta, in Exhibits B and C respectively, waive all jurisdictional objections. *See* ¶ 14.

16.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in New York. CCS is a New York Corporation. Defendant Harding was a member of CCS's board of directors as well as a shareholder and employee of CCS at the time that the claims against him arose. He traveled to New York frequently to carry out his responsibilities as a shareholder, director and employee of CCS. By reaching into New York to do business with CCS and pursuant to the contracts attached hereto as Exhibits B and C—the breach of which is in part the subject matter of this case—which designate exclusive jurisdiction in the federal or state courts of New York, Defendants XOP and Gupta are subject to this Court's jurisdiction.

## FACTUAL BACKGROUND

### CCS is Founded to Solve Communications Technology Problems

17.     CCS was formed in April of 2015 by Terence McDonough ("McDonough"), a classic entrepreneur who saw a problem and figured out a solution; and David Harding, an individual to whom McDonough was introduced by a third-party consulting firm that specialized in voice trading technologies. Harding was introduced to McDonough as a prospective partner to help CCS build a voice trading turret system where McDonough had identified a need for an additional CCS product to support the current trading turret voice systems and the voice trading turret system CCS intended to build. The voice trading turret system effort never came to fruition and the additional CCS product did.

18.     McDonough is a 20-year veteran of the trader voice telecommunications sector. His career led him to work across North America, South America, Europe, Asia Pacific, and the United Kingdom. He has worked with diverse global teams that have designed, built, supported, or sold almost every major trader voice solution in the world.

19.     As a result of his incomparable experience, and because all financial institutions' trading floors use similar voice technologies or a mix of the available technologies that allow our global markets to communicate and trade via voice, McDonough has extensive general knowledge of market challenges and often knows the customer's infrastructure better than their existing staff.

20.     McDonough also began his career installing and supporting trading turret voice systems; telephony bridging and connectivity systems for private wire and Hoot networks, and integrating PBX phone systems and intercom systems. McDonough installed, engineered, and supported these systems for small, medium, and large financial institutions. As technology evolved, McDonough grew with the technology through trainings on and certifications in various

technologies that, as a whole, make up the trader voice ecosystem. McDonough worked with everyone from small trading system telecom companies to major incumbent manufacturers of voice trading technologies.

21.     Given his specialized industry experience and qualifications, McDonough was attuned to the communications challenges facing stock trading floors. This allowed him to become a several-year veteran of a major investment bank's (hereinafter, "Corporation One"[1]) sales and trading voice services engineering group, which developed and vetted all products that touched the trading floor at Corporation One, including communications bridges. Several years after leaving Corporation One, McDonough formed CCS to continue to solve communications technology problems as a new era of voice trading technology emerged on trading floors.

22.     Specifically, the extant communications problems that McDonough formed CCS to solve were delays and single points of failure in CAS TDM/analog trading turret systems. While specifying the needs for the trading turret system CCS intended to build, McDonough identified a need to address the extant communications problems that existed in the telecommunications bridging systems to solve interoperability, single points of failure and barriers to entry bringing a new trading turret system to market and bridging it to the legacy CAS TDM/analog telecommunications bridge offerings. These bridging systems were crucial for trader voice communications and connectivity to private wires and Hoots on diverse voice-trading platforms. Specifically, certain manufacturers' equipment would be nearing its end of life and/or end of support; the outdated technology necessitated replacement, lest the system fail and be unable to be brought back up. McDonough sought to create a software replacement combined with hardware manufactured by third parties that would fit the current technological needs of the trading floor.

---

[1] Due to extant non-disclosure agreements, the names of several third parties are redacted in this Complaint.

**CCS Designs an All-Encompassing Communications Technology Solution**

23.     The Converged Unified Conference Solution (cUCS), as envisioned and created by McDonough, is a secure, dependable platform with all the user friendly, multi-media communications features that a sophisticated party would expect from the latest conferencing suite, but cUCS stands out by going far beyond the industry standard in introducing a new degree of system integration. The cUCS solution was intended to help usher in a new generation of packet-switched, interoperable unified communication environments for the trading floor.

24.     Specifically, the cUCS system allows for the integration of varied platforms, without complex engineering and the limitations inherent in such engineering. The cUCS enables improved productivity to the trader voice community by providing multiple value-added service applications on a single carrier-grade platform. The primary function of this multi-application trader voice platform is to unify legacy trading systems with the new-age trader voice systems, introducing a new level of functionality during Business Continuity Plan/Disaster Recovery ("BCP/DR") events that could jeopardize financial markets' ability to trade with their current systems, which use private wires and Hoots.

25.     The cUCS was designed to offer users the option to be shipped with time division multiplexing-based CAS T1-E1 or analog hardware cards for audio support (TDM/analog) only, voice over internet protocol-based (VoIP), SIP, WebRTC, Multicast audio conference bridges (collectively, "VoIP") only, or TDM/VoIP mixed mode configurations for trader voice private wires. This variability would facilitate the product's integration into any organization's plans to migrate from the legacy TDM/analog or circuit switched environment to next generation packet-switched VoIP environments such as Session Initiation Protocol (SIP), Multicast (a group communication protocol in which data transmission is addressed to a group of destination

computers simultaneously), or WebRTC (an open framework for the internet that enables Real-Time Communications (RTC) capabilities in a web browser) specifically for trader voice.

26.     This superb level of integration would allow users to: (i) achieve private wire point-to-point distribution and private wire call forking with common supervision (lamping) across disparate SIP, TDM trader voice, unified communications platforms, and enable the ability to barge in; (ii) allow sharing of private wires between turret (front-office) and back-office phone users without the need for proprietary hardware; (iii) mitigate risk during relocations, system upgrades, and changes using cUCS on a Transformation as a Service (TaaS) basis; (iv) allow sharing of private wires to a secondary site without purchasing a second premium phone system or having to overcome issues with proprietary protocols; (v) turn a BCP/DR facility (the BCP consists of a business impact analysis, risk assessment, and an overall business continuity strategy; the DR plan includes evaluating all backups and ensuring any redundant equipment critical to recovery is up-to-date and working—essentially a backup trading floor) into a production site by bridging private wires from the primary trading floor to the BCP site with, at a minimum, dual presentation of private wires and Hoots for a minimal investment; (vi) use High Availability-(HA) enabled cUCS to eliminate the single points of failure that exist today in trader voice; and (vii) include Lightweight Directory Access Protocol (LDAP—a lightweight client-server protocol for accessing directory services) integration for real-time synchronization of corporate directories to facilitate Single Sign On (SSO) for security and ease of administering the solution.

27.     More specifically, the cUCS has extensive applications specific to trader voice: (i) private wire conference; (ii) Hoot and Holler conference; (iii) WebRTC conference; (iv) enterprise audio conference; (v) web conference; (vi) blast notify hot market trends; (vii) enhanced group dial conference; and (viii) enhanced voicemail.

28.     Each of the aforementioned applications of cUCS provides specific benefits as described below.

29.     Private wires today cannot be natively shared across multiple turret system brands and there is a strong demand for private wires to be shared with the variety of new VoIP trading systems that exist in the market today. CCS's cUCS platform offers a carrier-grade level of reliability and the versatility to offer private wire sharing across all trading voice systems and Private Branch Exchanges (PBX—a private telephone network used within a company or organization systems). The cUCS platform's Private Wire Conference application (Automatic Ring Down (ARD) / Manual Ring Down (MRD)—when a telephone at one end of a wire goes off-hook or manually signals, the phone at the other end instantly rings; no dialing is required) allows for the following:

- Supports Call Forking with Common Lamping across disparate systems (CAS TDM or VoIP);

- Shares private wires between voice trading systems (including IPC/BT/Speakerbus/Etrali/IPTrade/enepath/Cloud9 Technologies), UC systems, and PBX endpoints;

- cUCS Appliance converts existing CAS TDM T1/E1 private wires to VoIP and can "Bridge" or "Fork" to any number of TDM or VoIP systems (Channel-associated Signaling ("CAS") is a telecommunications digital signaling method per channel of a T1/E1. Its purpose is to route voice to its destination. With CAS, this routing information is encoded and transmitted in the same channel as the payload itself.).

- Common Endpoint Supervisory allows users to identify the status of all callers who are sharing a line/private wire;

- Supports Barge conferencing between the disparate voice systems;

- Using the Web Portal, a supervisor can:

  - see the "presence" of each participant in a given private wire conference;

  - monitor audio from different private wire conferences;

  - provide fault isolation in Real time;

  - barge into a given private wire conference; or

  - dial out and pull in additional participants into a given conference;

- Offers regulatory-compliant voice recording with the ability to make separate audio recordings—at the individual Hoot conference or private wire level and at the supervisor level; and

- Provides usage reporting and call detail reporting logs with date/time stamp.

30.     Hoot and Holler networks provide "always on" multiuser conferences without requiring that users dial into the conference. Hoot and Holler conferences are typically used for intra-company mass communication. The cUCS Hoot and Holler conference application provides for the following:

- Supports Hoot and Holler conferencing across TDM and VoIP networks;

- Integrates with legacy squawk boxes and voice trading systems, next generation IP phones, and soft phones;

- Using the Web Portal, a Supervisor can:

  - see the "presence" of each participant in a given Hoot conference;

  - monitor audio from different Hoot conferences;

  - provide fault isolation in Real time;

  - barge into a given Hoot conference; or

      o   dial out and pull in additional participants into a given conference;

- Offers regulatory-compliant voice recording with ability to make separate audio recordings—at the individual Hoot conference level and at the supervisor level; and

- Provides usage reporting and call detail reporting logs with date/time stamp.

31.     cUCS supports native WebRTC private wire bridging that allows secure PC to PC voice and video communication across a public or private network. The cUCS platform leverages standards-based SIP bridging at the core, enabling interoperability across other cUCS WebRTC users who are on the bridge or with any other voice systems that are connected to the bridge, such as mobile phone users, PBX users, soft turret clients, or physical turret system users. The cUCS WebRTC client works on any Google Chrome, Firefox, Opera, Android, or iOS browsers, offering an unparalleled level of interoperability, flexibility, and sophistication. The WebRTC conference application provides for the following:

- Supports CAS TDM/SIP over WebSocket's private wires to bridge legacy private wires for Turret to PC based WebRTC soft trading application;

- Allows for private wire call forking and common lamping across the cUCS WebRTC client and legacy trading systems;

- Common Endpoint Supervisory allows users to identify the status of all callers who are sharing a line/private wire;

- Provides a Web Portal that emulates the functions of legacy key sets and turrets;

- Using the Web Portal, a supervisor can:

      o   instantly add new users to the system;

      o   see the "presence" of each participant in a given conference;

      o   monitor audio from different conferences;

- o  provide fault isolation in Real time;

- o  barge into a given private conference; or

- o  dial out and pull in additional participants into a given conference;

- Offers regulatory-compliant voice recording with ability to make separate audio recordings—at the individual Hoot conference or private wire level and at the supervisor level; and

- Provides usage reporting and call detail reporting logs with date/time stamp.

32.  Enterprise audio conferencing using cUCS is a clear, feature rich experience that provides for the following:

- Support for both ad-hoc and reservation-based conferences;

- Customized conference rooms fitting user requirements, e.g., specify entry tones, memorable vanity PINs, recording on/off, noise thresholds, participant specific security pins, etc.;

- Schedule recurring audio conferences via the Web Portal. Use the Microsoft Outlook iCalendar application to send invitations to desired participants;

- See a real time view of a running conference via Web Portal. Participants can be seen by name or caller ID;

- Display loudest speaker;

- Exercise multiple in-conference controls via phone key presses or the Web portal;

- Merge two or more conferences into one without dropping any calls and/or transfer participants between conferences;

- Send a detailed "end of conference" summary report and post the conference recording in the moderator's account after a conference is over;

- Forward usage data and associated CDRs to an external billing system via TCP/IP based interface; and

- Playback recordings via web portal or via DTMF driven IVR.

33.     The web conference application for cUCS is designed to significantly boost meeting productivity, and provides for the following:

- Web-based use; no software download required;

- Designed to run across the internet or a private data network without requiring any changes to firewalls. Running behind a secure private data network ensures that your web conference content cannot be compromised; and

- Can be used standalone or in conjunction with CCS's Enterprise Audio Conferencing application. When used together participants can collaborate in real-time and achieve desired end results quickly without exchanging multiple emails.

34.     The blast notify hot market trends application is a mass notification application for the cUCS that is designed to send multi-modal, preconfigured messages for daily trading positions from research analysts to thousands of clients. It provides for the following:

- Select communication medium to be used for message delivery (voice only, email only, voice and SMS, etc.);

- Use built-in "Find-you" capability to increase the probability of delivering a message;

- Send Caller-ID of your choice that can be used by cell phones to display associated "caller name" (e.g., "Security Alert"), leading to a higher percentage of people picking up a message;

- Schedule recurring dial outs;

13

- Preconfigure "preset" groups that can be instantly accessed;

- Control the speed of dialing out;

- Display real-time call activity and a progress bar on a Web Portal; and

- Provide summary and detailed reports on call completions (busy, no answer, answering machine, etc.).

35.     Traditional Group Dial Conference or out dialed conferencing is used to inform and bring groups of people into an audio conference quickly. These systems require dedicated phone lines that terminate on the central office switch of a phone company. The EGDC application resides on the cUCS that is deployed on the trunk side of the switch. The enhanced group dial conference application provides for the following:

- Send calls to any landline or cellular phone;

- Select communication medium to be used for message delivery (voice only, email only, voice and SMS, etc.);

- Use built-in "Find-you" capability to increase the probability of finding a recipient;

- Send Caller-ID of your choice that can be used by cell phones to display associated "caller name," leading to higher percentage of recipients picking up the phone;

- Display real-time call activity on a Web Portal;

- Schedule recurring dial-out calls;

- Bulk uploading of subscribers using CSV files; and

- Provide summary and detailed reports on call completions (busy, no answer, answering machine, etc.).

36.     Current voicemail systems only allow sequential access to voicemails. CCS's Enhanced Voicemail Application allows stored voicemail messages to be accessed in random

14

order from a Web portal. The Web portal can be accessed via PC or smart phone. By a simple click, a user can hear the stored message through the secure, built-in media player. The cUCS-enhanced voicemail application provides for the following:

- From 100 to 10,000 secure Voicemail boxes per chassis;

- One Number service—specify up to 6 numbers and their order based on ToD (time-of-day) or DoW (day-of-week) that will be tried before a caller is taken to a voicemail box;

- Subscriber Web portal for managing the Voicemail configuration, One Number Service, Greetings, etc.;

- Support for TDM and VoIP/SIP trunks;

- Support for multiple Message Waiting Indication types—SMDI, SIP Notify, and MF T1 Dial back;

- Bulk uploading of subscribers using CSV files; and

- View voicemail activity in real time on a Web Portal.

37.    McDonough's vision for the cUCS was comprised of a specific, cognizable set of requirements, as described above. With these specifics in mind, CCS sought a partner to help create the software and hardware needed to support the envisioned trader voice conference bridge.

**XOP and Gupta Access CCS's Intellectual Property**

38.    In January, 2016, Harding introduced CCS's McDonough to Sudhir Gupta ("Gupta"), the principal of XOP Networks, Inc. ("XOP"), a communications technology provider.

39.    Having determined that they had a mutual desire to collaborate, Gupta individually entered into a non-disclosure agreement (an "NDA") with CCS dated February 9, 2016. XOP and CCS also later signed a non-disclosure agreement that XOP voluntarily backdated to February 1,

2016 (collectively, the "NDAs", attached hereto as Exhibits B and C). At the time that Gupta entered into the NDA, XOP only had a traditional voice conference bridge product (both TDM-PRI and VoIP) that did not support trader voice or SIP private wires.

40.     The NDAs were extremely broad in their coverage: they prevented the use or dissemination of Confidential Information (¶2), and they limited the use of the Confidential Information to the furtherance of the stated purpose (¶3); they did not transfer any ownership interest in the Confidential Information (¶4); and they prohibited the alteration, modification, or reverse engineering of the Confidential Information (¶5). The NDAs also included provisions for the return and destruction of any transferred Confidential Information, and recognized the potential liability for any improper use, possession, or conversion of the Confidential Information (¶6). Notably, the NDAs have provisions allowing for the recovery of attorneys' fees (¶11).

41.     The central focus of the engagement, and, in fact, its stated purpose, was limited to "identifying and evaluating business opportunities of mutual interest and potential business cooperation transactions, including discussions around potential business opportunities in Financial Markets. Activities may include the evaluation of each party's technologies to determine suitability and complimentarily functions and capabilities among products and technologies." (NDAs, Exhibits A thereto).

42.     In accordance with the NDAs, the companies' shared goals were to build a digital VoIP communications bridge together that would leverage XOP's products and CCS's skills and knowledge, and eventually create other products for financial markets. More specifically, the purpose of the engagement between CCS and XOP was to have XOP develop a voice communications product for CCS. CCS owned the intellectual property underlying the product and intended to use XOP's hardware and software for enterprise audio conferencing, but have it

16

tailored for voice trading private wire support. XOP and CCS agreed in principle that XOP would receive 20% of each license fee, essentially getting a royalty from each sale.

43.     A deal with Corporation One was expected to bring in approximately $3.4 million. A deal with IPC, based on a press release XOP issued stating that it would run thousands of ports for months, would have brought in approximately $11.3 million. Therefore, the total value of the deals that CCS rightfully anticipated was in excess of $14 million, with XOP's share being only 20% of the revenues.

44.     At the time the companies were introduced, XOP had an enterprise audio conferencing bridge, a traditional video conferencing system, a web conference application, a traditional group dial conference, a voicemail system, and a blast notify application that it offered to customers. But none of these products were adapted for use by financial markets. Notably, XOP did not, at this time, offer TDM CAS/SIP private wire bridging/conferencing/forking, TDM CAS private wire Hoot and Holler conferencing that allowed for integration to voice trading systems, WebRTC private wire bridging/conferencing/forking, or native integration with VoIP trader voice solutions for private wire access.

45.     On February 9, 2016, when signing the NDA, Gupta asked CCS to provide XOP with a business plan laying out the potential opportunity in financial markets. The business plan was to include technical requirements as well as detailed examples of potential uses by trading floors, and projected market sizes and values of the various product features. CCS believed at the time that Gupta wanted this information so XOP could appropriately value its share of the licensing fees.

46.     McDonough provided multiple documents with confidential and proprietary information requested by Gupta, including a document sent on February 27, 2016, entitled "CCS

Supervisories TR v1.3". In addition, McDonough also described in a detailed email what equipment was in-scope to be replaced by the CCS product being developed, with rough order-of-magnitude pricing for the opportunity.

47.     After signing the NDA and receiving the information Gupta requested, XOP, Gupta and CCS continued negotiations and discussions related to the development of product specifications and marketing materials for the product XOP was supposed to develop for CCS. Notably, Gupta reached out by telephone and email numerous times between February and May of 2016 to request ever more detailed and highly proprietary customer, technical, and market research information from CCS, all of which was subject to the NDAs.

48.     Specifically, on March 1, 2016, Gupta asked CCS to provide connectivity and use case slides. System use case slides specify the requirements of a system to be developed. They identify in their detailed description not only the interactions with the actors but also the entities that are involved in the processing. They are the starting point for further analysis models and design activities. Business use cases focus on a business organization instead of a software system. They are used to specify business models and business process requirements in the context of business process reengineering initiatives. The type of information Gupta wanted—and the type CCS provided—were a combination of both system and business use case slides.

49.     Specifically, on March 3, 2016, CCS provided XOP this information in a confidential and proprietary document entitled "Line Sharing Overview v1.0". The document contained both general information and information highly specific to an existing system and its requirements, including, but not limited to, use cases and the types, nature, and extent of the equipment then in use. The document depicted various use cases and how CCS's new bridge product, which XOP was being hired to develop, would meet those needs. Only McDonough was

18

able to provide this specific information, and only because of his tenure in the industry. Accordingly, the Line Sharing Overview document was clearly labeled "Confidential and Proprietary".

50.     After receiving CCS's production of information, Gupta sought to confirm with McDonough the type of equipment that needed replacing. Again, only McDonough was able to provide this information because of his tenure in the industry. Gupta/XOP and CCS agreed that there was an initial opportunity to leverage one of the existing features of the XOP product to get into Corporation One and upsell to cUCS once the business was awarded.

51.     On March 4, 2016, Gupta requested that CCS update certain icons in the confidential and proprietary Line Sharing Overview v1.0 slides. On several other dates, Gupta requested updates to the document, and CCS provided Gupta with all his requested updates. Gupta then asked CCS if it had access to hardware so he could do some development and testing work with and on it.  CCS confirmed that it had an ITS trader voice test system XOP could use. Gupta was not well versed in ITS systems or trading systems in general, and again asked for additional information.

52.     Because Gupta stubbornly refused to continue the negotiations unless and until he received all of the information he demanded, CCS provided all information requested by Gupta each and every time he made a request. CCS had no knowledge at this time that XOP, Gupta and Harding were acting in bad faith and, upon information and belief, intended to steal CCS's intellectual property assets.

53.     CCS tried to move the development process along: on March 22, 2016, CCS asked Gupta for next steps to kick off the development effort and asked for XOP to provide it with an original equipment manufacturer (OEM) agreement to review.

54.     Gupta's response was to ask CCS if it had thought of specific customers along with sales and marketing strategies to close those deals, allegedly for a proof of concept (POC). CCS explained that their targets included Corporation One, another major investment banking firm (hereinafter, "Corporation Two"), and smaller companies that had existing vendor relationships with Corporation One. Defendants Gupta and XOP also later requested and received highly specific and proprietary technical information relating to features that would be of interest to another financial services company (hereinafter, "Corporation Three").

55.     In fact, Gupta and XOP were mining CCS for information from the beginning of the engagement: Gupta asked for detailed technical information; demanded connectivity and use case slides; needed comprehensive explanations of the use cases described by CCS, both for the product in general and for Corporation One specifically; and even needed access to CCS's physical equipment for development/testing, as well as coaching on how the equipment worked.

56.     During this time, XOP provided little in return: on April 21, 2016, Gupta sent CCS a brief overview presentation of their product customized to suit the financial services market. Gupta sent this information to CCS so that McDonough's team could use it to create marketing materials.

**XOP and Gupta Disappear, aka, "Take the Money and Run"**

57.     On April 26, 2016, after a request from XOP, CCS issued a purchase order for $25,000 with supporting technical use case slides to XOP for development of the CCS minimum viable product ("MVP"). CCS also asked XOP for its technical documentation on the MVP and, again, for the OEM agreement. Gupta confirmed receipt of the purchase order but failed to provide CCS with any technical documentation on the development effort.

58.     On May 3, 2016, CCS provided XOP with additional technical specifications for the product development. Perhaps predictably, Gupta requested even more information. CCS again provided the requested information.

59.     On May 6, 2016, CCS sent a confidential and proprietary document entitled "PW State.doc" to XOP to help with SIP information to CAS mapping to support private wires.

60.     On May 9, 2016, at XOP's request, CCS sent a confidential and proprietary document entitled "CCS cUCS Business Case v1.0" to Gupta. There were additional iterations of this document sent to XOP/Gupta, and the document included market problems and solutions overview, volumetrics, market opportunity specifications, and a competition overview including Sycamore/Coriant, all of which were intended to assist Gupta in creating an internal marketing research document for XOP. The document was labeled "Confidential" and "In Strictest Confidence", and included the following warning against disclosure:

> This document and the information contained in it is confidential and proprietary information of the Company [Converged Compliance Solutions, Inc.]. No person other than a recipient authorized by the Company may possess or use the same for any purpose except as approved by the Company in advance. The reproduction, dissemination or disclosure of this document or the information contained in it is expressly prohibited without the prior written authorization of the Company.

p. 3.

61.     Again, the purpose of all of this negotiation and development of product specifications and marketing materials was to help XOP develop a product for CCS, not the other way around.

62.     On May 13, 2016, for the first time and after months of work by CCS, XOP expressed concern that CCS using their platform to build their product would jeopardize business XOP was allegedly conducting or proposing to conduct with IPC Systems, Inc. ("IPC"). IPC was the dominant competitor in the U.S. market and acquired many of the companies McDonough

worked with earlier in his career, and McDonough had also worked at IPC prior to forming CCS. Astonishingly, XOP asked CCS to speak with IPC and get permission to develop a Sycamore SPS-1000 replacement on XOP's behalf. CCS refused and said that it was not its place to speak with IPC, a company it, at the time, had no relationship or business with.

63.     Shortly thereafter, XOP started pulling back from the negotiations.

64.     Yet, on May 20, 2016, XOP put some basic slides together to confirm that what it envisioned aligned with CCS's desired end result, specifically for Corporation One. As with XOP's prior work, CCS had to correct these slides.

65.     Frustrated by XOP's delay with the OEM agreement, CCS explained that it could not sell the product without the OEM agreement in place, and again asked Gupta to expedite its drafting.

66.     Gupta knew an OEM agreement was necessary: on May 24, 2016, Harding confirmed to McDonough that Gupta agreed in a phone call with Harding to brand the system they were developing as a CCS product.

67.     Gupta informed CCS that XOP was having some problems with programming errors being generated, so CCS temporarily reduced the requirements of what it demanded in the product.

68.     On or about May 27, 2016, XOP finally provided CCS with a version of the OEM agreement, but it was not in line with the discussions that CCS and XOP had been having. Rather than being an OEM agreement, what XOP provided was just a sales reseller agreement. It also was not mutual, meaning it was not at all favorable for CCS, and therefore it did not accurately represent the relationship previously discussed by XOP and CCS.

69.     Between June and August 2016, the parties continued to negotiate the OEM agreement, but XOP did not negotiate in good faith and would not stand by the basic representations which it had been making from the outset of the relationship—representations that had induced CCS to do all of the work and provide all of the information which it had provided to XOP to that point.

70.     After sending a marked-up version of the OEM agreement on August 3, 2016, Defendants Gupta and XOP ceased all communications with CCS, and on September 29, 2016, CCS cancelled the purchase order due to total failure by XOP to communicate.

**Gupta's Company, XOP, Sells CCS's Technology**

71.     Upon information and belief, prior to engaging with CCS, XOP had no particular competitive advantage or specialized knowledge of the needs of the institutional voice trading industry.

72.     And yet today, XOP is a manufacturer of CAS TDM and VoIP systems, including the Universal Service Node (USN), a converged communications platform enhanced for the financial services trader voice industry that is, upon information and belief, substantially derived from Plaintiff's intellectual property and the cause of the instant litigation. USN for trader voice private wire bridging is the result of the application of CCS's modifications and use cases for financial systems/trader voice networks applied to XOP's platform.

73.     On or about June 12, 2018, XOP issued a press release entitled "IPC Selects XOP Networks for Evolution of its Trader Voice Network", stating that IPC was incorporating the XOP voice bridge product into its core offerings for financial institutions. Upon information and belief, the XOP product to which IPC's press release refers (the USN product) fully incorporated

Plaintiff's trade secrets and intellectual property produced during the negotiations in 2016 pursuant to the NDAs.

74.     That press release described XOP's products as "allow[ing] customers to seamlessly transition their value-added services from legacy circuit switched networks to VoIP based packet switched networks." This type of product is exactly what CCS asked XOP to create following the exchange of the NDAs.

75.     On or about March 26, 2019, XOP issued a press release entitled "Looking for Sycamore's SPS-1000 Replacement – XOP Networks has the Answer". Gupta had never heard of there being a need to locate a replacement system for Sycamore/Coriant's manufacturing discontinued Signal Processing System (SPS) SPS-1000 prior to speaking with CCS. CCS had explained to Gupta that a software replacement was necessary as the SPS-1000 is widely deployed in the financial services trader voice sector, and by trader voice network service providers networks, voice trading system manufacturers, commodity brokerage, capital markets firms, and inter-dealer brokers. Once Gupta, and therefore XOP, had this information, upon information and belief, XOP began covertly developing CCS' product and subsequently publicized its despicable, illegal act by issuing a press release, which stated that XOP had a product available which appeared to and did, upon information and belief, fully incorporate CCS's intellectual property and trade secrets.

76.     Upon information and belief, XOP in fact had no such product at the time, but the product it advertised—and eventually developed—was based on confidential information provided to it and Gupta by CCS.

77.     cUCS for trader voice SIP Private wires encompasses 41 main requirements, including system TDM interfaces, media gateway support for SIP private wires, IP interfaces,

TDM protocols, TDM protocols for SIP private wires, IP protocols, network management, usage measurements, and turret profiles for SIP private wires. At the time of engagement, upon information and belief, XOP's products supported only 18 of these main requirements as a standard audio conference bridge that was not specific to trader voice. This information is based on the USN datasheet Gupta/XOP provided to CCS in April 2016. Additionally, the XOP website up until late May or mid-June, 2021 did not reflect support for financial markets, private wires, and Hoot, specifically ARD, MRD, Hoot.

78.     Of the requirements supported by XOP at the time of engagement, on information and belief, there were no media gateway supports for SIP private wires, no TDM protocols for SIP private wires, only two of five IP protocols, and no turret profiles for SIP private wires. The cUCS main requirements that XOP supported prior to its interactions with CCS were for dial-tone conferences (TDM PRI, analog FXO/FXS, and SIP telephone numbers) where you dial a number and enter a pin/passcode to enter the conference. However, 99% of the requirements to support SIP private wires were not part of XOP's standard product and none of the Turret Profiles for SIP private wires existed as far as CCS knew based on information provided and conversations had.

79.     On or around June 27, 2016, Corporation One invited CCS to participate in a request for proposal regarding CCS's cUCS product. The request for proposal was to replace the legacy communication bridges supporting Corporation One's Hoot and Holler network. When CCS initially engaged Gupta and XOP to develop the product for CCS it rightfully did not expect that CCS would have to compete with XOP to win the business for Corporation One because XOP did not have a product that met Corporation One's needs or even have a basic understanding of Corporation One's needs.

80.     In April of 2018, another major corporation confirmed to McDonough that Harding, Gupta, and XOP had managed to get XOP's USN for trader voice into the corporation's development lab for testing and were pushing sales hard in 2017 *for the product functionality and use cases CCS had engaged XOP to develop for them.*

81.     On or around September 1, 2020, CCS was shocked and enraged to learn that XOP was awarded a major contract by Corporation One for the equivalent of cUCS—the converged unified conference solution created by CCS—which incorporated CCS's trade secrets and intellectual property. The contract was for the replacement of the exact bridges CCS educated XOP about in 2016 pursuant to the NDAs.

82.     Upon information and belief, XOP has entered or is about to enter into lucrative business agreements with multiple companies including IPC Systems, Inc. and Corporation One, in which the majority of the value created is based on illegal use of Plaintiff's intellectual property.

83.     The intellectual property that forms the basis of the USN for trader voice private wire support resulted from McDonough's years of highly specialized experience in communications bridges and trader voice technology specifically for financial markets. XOP simply did not have the experience, knowledge, or skills to develop the technology on its own.

84.     In all of the documents CCS provided to XOP/Gupta, the common theme is transitioning trader voice from TDM to SIP supporting ARD, MRD, and Hoot private wires. CCS described the equipment that IPC and all private wire carriers currently had in their legacy trader voice network including Sycamore SPS-1000, DNX, and other switching devices that need to be replaced by the USN. In the CCS cUCS Business Case given to Gupta/XOP, a closing paragraph is: "CCS' seasoned leadership team will revolutionize the unified communications industry for financial markets. By leveraging, with exclusivity, the significant investments made by a team at

XOP Networks, CCS will work to create 'The' platform that the future of trader voice will be built on."

85.     In addition, CCS created a marketing document based on its solution using XOP's USN. This confidential and proprietary document is titled "CCS – Converged Unified Conference Solution.pdf." The Product Summary is exceedingly similar to what IPC selected XOP for, including the migration towards packet-based technologies SIP/VoIP. It also covers Private Wire Conference for ARD, Hoot and Holler, and WebRTC. All of these use cases are, upon information and belief, planning to be or are used by IPC.

86.     The IPC Press Release quotes Gupta as follows: "'XOP Networks' platforms have been running thousands of audio conferencing ports non-stop for months without any issues in support of our trader voice services such as Hoots and Automatic or Manual Ring Downs (ARD / MRD) which are crucial to voice trading activity. IPC's trader voice network is used daily by tens of thousands of traders worldwide. We feel privileged to have been selected for providing our SIP/VoIP based conference bridges as part of IPC's network migration towards packet-based technologies,'" said Sudhir Gupta, CEO of XOP Networks."

**Summary of XOP's Wrongful Profit From Fraud**

87.     CCS is a small communications technology company that delivers unique, customizable, and flexible voice conferencing, routing, and delivery solutions, and specializes in financial institutions.

88.     CCS developed in-depth specifications, market research and other proprietary materials capable of revolutionizing trading floors around the world by enabling them to take advantage of VoIP and other digital communication technologies to achieve critical additional capabilities at substantially lower prices than they were currently paying.  Specifically, CCS

designed a unified communications bridge for the trader voice ecosystem to replace the widespread legacy TDM/analog bridges that were quickly becoming outdated.

89. When a TDM bridge fails, it requires a physical cable swap, hardware swap, or flip of a switch to repair the network. For the last twenty years, TDM/analog audio bridges were the standard throughout the industry, and many audio networks today still rely heavily on TDM technology.

90. CCS engaged XOP to develop a product based on its proprietary and confidential business information, including trade secrets.

91. Prior to CCS's engagement, upon information and belief, XOP had no knowledge of the type of product and use cases developed by CCS.

92. Over the course of their engagement, XOP misled CCS into providing it with product specifications; marketing materials; a business plan for financial markets that would include potential uses by trading floors and private wire carriers; projected market sizes, values of the various product features; specific customers CCS wished to target; sales and marketing strategies to close deals with the customers; proof of concept work use cases, and the types, nature, and extent of the equipment installed in existing environments; connectivity and use case slides; access to Plaintiff's physical equipment so XOP could do development/testing; as well as coaching in how such equipment worked.

93. XOP suddenly refused to communicate with CCS and subsequently developed and sold a product that incorporates material directly from the materials provided by CCS to XOP. Upon information and belief, XOP lacked the knowledge and skills to accomplish this on its own.

**David Harding's Theft and Fraud**

94.     In early 2021, CCS discovered that Harding's breaches of fiduciary duty began as early as 2015, and continued through his separation from CCS in March, 2017.

95.     Specifically, David Harding's own company, The Cortland Group, began working as a sales agent and/or reseller for Sonexis Technology, Inc., a Pennsylvania corporation, beginning in January of 2014, selling Sonexis products and services to IPC. At no time did Harding disclose this conflict of interest to CCS. By February 22, 2016, Harding was also working for Intracom Systems, LLC. In addition, as of August 3, 2016, Harding held a position with LMC Systems, LLC. At the same time, he began a project on Kickstarter. Divided loyalties were the least of Harding's problems—he simply did not have time to fulfill his obligations to CCS with all of obligations he had to these other companies.

96.     Harding's work for a few of these companies was as a sales agent selling conference solutions, meaning products directly competitive with CCS's products. Notably, his position as an agent for certain authorized sales territories included systems procured by IPC Systems Inc. for the term of his agency agreement regardless of the extent of his involvement. These agency positions directly conflicted with Harding's fiduciary duties to CCS.

97.     Additionally, though Harding had agreed to transition out of his role as President at his prior company, Essential Trading Systems Corp. ("ETC"), in order to work for CCS, he failed to do so, and appears to continue to work for ETC even today.

98.     Eventually, McDonough came to believe that Harding had conflicts of interest and was not acting in good faith. As a result, CCS had Harding step down from his position as Chief Operating Officer ("COO") of CCS and was instead given the position of Chief Product Officer ("CPO") in January 2017. Harding then shut down CCS credit cards and a CCS line of credit, upon

information and belief, in retaliation for not being updated on a live proof of concept being conducted by CCS.

99.    Prior to Harding's removal, however, he liberally used CCS's credit line to indulge in luxuries for himself, including payments to multiple hotels and a liquor store. Upon information and belief, none of Harding's charges, which amounted to thousands of dollars, were appropriate company expenditures.

100.    By virtue of Harding's engagement on behalf of other companies, for the sales of products directly competitive with CCS, and because of his clear misuse of company funds, Harding breached his fiduciary duties of care, and of loyalty, to CCS.

**As and for a**
**<u>FIRST CAUSE OF ACTION</u>**
**Breach of Contracts as against Defendants XOP and Gupta**

101.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 100.

102.    In February of 2016, Gupta individually entered into a non-disclosure agreement with CCS.

103.    On or around April 9, 2016, XOP and CCS signed a non-disclosure agreement that XOP backdated to February 2016.

104.    Both of the NDAs contained the same stipulations requiring the signatories to hold in strict confidentiality:

> The subject matter and content of any discussions or communications…which relate to, concern or contain information with respect to the Company's or Exchanging Party's business plans, business relationships, customer list(s), prospective or potential business prospects, negotiations, discussions or agreements with third parties, finances or financial performance, proprietary technologies and/or intellectual property, whether owned or licensed, including patents, patent applications, computer software programs, source and/or object code, know how,

30

inventions, systems, and methods (the "Subject Matter") shall not be disclosed by the receiving party (the "Recipient" or "Receiving Party") to any third party or person for any reason whatsoever, without the prior written consent of the other…

Exhibits B and C, ¶ 1.

105.     Paragraphs 2 and 3 of the NDAs, along with Exhibit A of the NDAs, prohibit each party from using the Confidential Information of the other party for any purpose other than to identify and evaluate business opportunities that the parties might be able to jointly pursue.

106.     Paragraph 4 of the NDAs directly states that the Disclosing Party shall retain all "right, title and interest to its Confidential Information…"

107.     The NDAs specifically state that the transfer of Confidential Information (as defined in the NDAs) is not accompanied by any right, title, or interest to the information. Exhibits B and C, ¶¶ 4, 6.

108.     Paragraph 5 of the NDAs prohibits the Receiving Party from altering, modifying, breaking down, disassembling, or reverse engineering any portion of the Confidential Information.

109.     Paragraph 6 of the NDAs requires the Receiving Party to destroy all Confidential Information provided by the Disclosing Party within 10 days of a written demand and makes clear that by terminating the Receiving Party's right to access the Disclosing Party's Confidential Information, the Disclosing Party does not forfeit any rights and the Receiving Party does not retain any rights.

110.     In reliance on the specific language contained in the NDAs signed by XOP and Gupta, and in reliance on XOP and Gupta's continuous representations that they were seriously evaluating the technology and the market for voice communication technology optimized for the financial trading industry in order to enter into an OEM arrangement with CCS, CCS provided most or all of its intellectual property to XOP.

111.    Specifically, for nearly a year, XOP and Gupta deceived, coerced, pressured, and persuaded CCS to produce a series of highly in-depth, original, and extremely proprietary documents which, upon information and belief, provided XOP and Gupta with most or all of the information that XOP and Gupta needed to covertly build the product that they allegedly intended to build for CCS's and XOP's mutual benefit.

112.    The aforementioned documents included CCS Supervisories TR v1.3, Line Sharing Overview v1.0, PW State.doc, and CCS cUCS Business Case v1.0, among others.

113.    These documents provided in painstaking detail the technical specifications that a successful voice bridge must have to succeed in the financial voice trading industry, as well as market analyses and use cases for the technology and even comprehensive analyses of the specific requirements of certain sizeable consumers of the product.

114.    Most or much of the aforementioned intellectual property is believed to have been converted by XOP and Gupta during the period that they were negotiating with CCS and thereafter. Upon information and belief, Gupta and XOP directly and deliberately breached the contractual confidentiality obligations in the NDAs when they illegally incorporated CCS's intellectual property into XOP's products by modifying their Universal Service Node (USN), a converged communications platform, and enhanced it for the financial services trader voice industry that is, upon information and belief, substantially derived from Plaintiff's intellectual property and the cause of the instant litigation. USN for trader voice bridging is, upon information and belief, the result of the application of CCS's modifications and use cases for financial systems and trader voice networks applied to XOP's platform.

115.    The grand finale of Gupta and XOP's absolutely fraudulent and illegal scheme to steal CCS's hard-earned and immensely valuable confidential information came when they began

striking lucrative deals with major players in the financial communications space to market XOP-branded technology which was, to a large degree, upon information and belief, directly stolen from CCS.

116.    On or about June 12, 2018, XOP issued a press release entitled "IPC Selects XOP Networks for Evolution of its Trader Voice Network", stating that IPC was incorporating the XOP voice bridge product into its core offerings for financial institutions. Upon information and belief, the XOP product to which IPC's press release refers (the USN product) fully incorporated Plaintiff's trade secrets and intellectual property produced during the negotiations in 2016 pursuant to the NDAs.

117.    As a result of Gupta and XOP's breaches, CCS has incurred extensive harm, including the loss of business in an amount to be determined at trial, but in any event, no less than $75,000.

**As and for a**
**SECOND CAUSE OF ACTION**
**Conversion as against Defendants XOP and Gupta**

118.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 117.

119.    Upon information and belief, Gupta and XOP entered into the NDAs with CCS knowingly falsely representing that XOP would perform certain actions.

120.    In September 2020, Gupta effectuated a sale of what is, upon information and belief, CCS's intellectual property and proprietary technical knowledge, to Corporation One, and possibly others.

121.    By failing to segregate from the net income and other gains of the business CCS's 80% share and presumably using those funds for other purposes, XOP and Gupta have converted

a significant but unknown amount of Plaintiff's money and have been unjustly enriched by such conversion.

122.    By reason of the foregoing, XOP and Gupta, intentionally and without authority, assumed or exercised control over Plaintiff's share of the proceeds of its sales, in derogation of Plaintiff's possessory rights or interest in its property.

123.    By reason of the foregoing, Defendant is liable in an amount in excess of $75,000 plus interest/attorneys' fees/costs as appropriate, as well as additional equitable relief as set out herein.

**As and for a
THIRD CAUSE OF ACTION
Unjust Enrichment as against Defendants XOP and Gupta**

124.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 123.

125.    XOP has been enriched by its deals with Corporation One, IPC, and possibly others, and was only so enriched because of the intellectual property that XOP and Gupta, upon information and belief, obtained from CCS and wrongfully used.

126.    By actively excluding CCS so that it would not have to share its fees for the license of the communications bridge sold to Corporation One, as well as others, Defendants XOP and Gupta, as Chief Executive Officer of XOP, have been unjustly enriched at CCS's expense.

127.    By retaining CCS's rightful interest in the licensing fees, XOP and Gupta have been unjustly enriched at Plaintiff's expense.

128.    By reason of the foregoing, equity and good conscience require that Defendants return to CCS an amount to be determined at trial, but in any event, no less than $75,000 plus

interest/attorneys' fees and costs as appropriate as well as additional equitable relief as set forth herein.

**As and for a**
**FOURTH CAUSE OF ACTION**
**Declaratory Judgment as against Defendants XOP and Gupta**

129.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 128.

130.    XOP and Gupta entered into contracts with CCS that provided for the non-disclosure of certain confidential and proprietary information belonging to CCS.

131.    XOP and Gupta wrongly used CCS's confidential and proprietary information they received pursuant to the NDAs to develop the USN for trader voice.

132.    Accordingly, CCS has a rightful ownership interest in the USN for trader voice, as well as any other products developed by XOP and Gupta that stem from information exchanged pursuant to the NDAs.

133.    CCS's cause of action for breach of contract is an insufficient remedy in this matter as XOP continues to use CCS's intellectual property to grow its business and, as a result, generates continual harm to CCS's business.

134.    In light of the foregoing, CCS seeks a declaration from this Court of CCS's rightful ownership of its intellectual property, which has been incorporated into the USN.

**As and for a**
**FIFTH CAUSE OF ACTION**
**Injunctive Relief as against all Defendants**

135.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 134.

136.    In the absence of an injunction, CCS is likely to incur irreparable injury in that monetary compensation cannot be adequate compensation for the harm to CCS as its business and its reputation are further undermined.

137.    The highly confidential technology specified by CCS and communicated to Defendants XOP, Gupta, and Harding in a series of oral and written communications which included CCS Supervisories TR v1.3, Line Sharing Overview v1.0, PW State.doc, and CCS cUCS Business Case v1.0, is transformative, groundbreaking, and revolutionary in multiple respects.

138.    Through these communications and documents McDonough specified in painstaking detail the plans for a new digital VoIP communications bridge which would represent a quantum technological leap from the antiquated TDM/analog systems currently in use by the world's largest institutional financial traders. The strategy for making this "leap" is in no way obvious and it could only have been accomplished by an entrepreneur who understood digital voice communications technology, analog voice communications technology, VoIP communications technology, and, most importantly, the exacting and highly specialized voice communication needs of global institutional financial traders and consumers of trader voice technologies. At the time McDonough entered into discussions with XOP and Gupta, there were plenty of companies in the digital voice communications industry but none that could meet the needs of the institutional financial trading market because it is simply too complex and specialized.  It is quite literally the fruit of McDonough's entire career, which has been strategically focused on managing communications technology in the institutional financial trading industry.

139.    There is no economic solution that could fully right the grievous injustice and horribly wrong message it would send to permit Defendants to elevate themselves from complete obscurity to the dominant players in the global institutional financial trading voice technology

market by stealing the fruits of McDonough's lifetime of hard work and entrepreneurship in such an obviously illegal way that it makes a mockery of our legal system.

140.    Major financial institutions, as a whole, are risk averse.  They need to make a profit, but their first concern is avoiding uncertainty. For that reason, they place an extraordinarily high value on trusted relationships. They will pay higher prices to vendors they know and trust selling voice equipment the institutional trader is confident in rather than experiment with multiple vendors and technologies, risking financially costly and reputationally catastrophic downtime and other potential malfunctions.

141.    At this point in time, the advantages of adopting VoIP voice communications technology outweigh the risks inherent in change due to the new generation of VoIP voice communications bridges uniquely designed for institutional financial traders by CCS and its principal, Terence McDonough.

142.    The Universal Service Node (USN), which is Defendants' version of the product specified by Plaintiff in a series of highly confidential documents and communications which are covered completely by the NDAs, would be an outdated, basic communications bridge with little or no appeal to the institutional financial voice trading community if not for all of the brand new, cutting edge and highly complex technologies painstakingly specified by Plaintiff's principal McDonough based on his lifetime of experience, hard work and continuing education, which Defendants misused. For this reason, there is no possible way to fashion an order requiring Defendant to only remove Plaintiff's intellectual property and otherwise leave the USN product intact, or ultimately to grant Plaintiff restitution just for the portion of Defendants' USN product which constitutes Plaintiff's intellectual property. The entire product is inseparably based on and

intertwined with Plaintiff's confidential intellectual property. Without all of Plaintiff's specifications, the Defendants' USN would just be a conventional communications bridge.

143.    Separate and apart from the fact that an injunction would be just and fair because Defendants misused and are now illegally manufacturing Plaintiff's product is the equally serious concern that Defendants are in the process of seizing from Plaintiff the first-mover advantage, and, upon information and belief, are mere weeks away from reaching "breakout" in which their products will be installed on trading floors around the world. Once that happens, there will be long-term, high-value sales and maintenance contracts in place covering their product and service offerings. Ordering them to stop manufacturing, installing, and supporting products that the world's largest institutional traders and consumers of voice trading technology will at that point be relying on would be an impossibility.

144.    Upon information and belief, when this court rightfully issues an injunction, it should not meaningfully slow down or inconvenience any institutional trading customers. CCS was able to work with a different, more honest manufacturer following XOP's theft, and CCS currently has available the product that McDonough designed and developed. CCS is far more capable of providing the customers with the same or better quality and support at the same or a more competitive price point. Additionally, institutional trading customers can revert to the prior communications bridges.

145.    What is metaphorically and economically killing Plaintiff right now is not technology issues, it is the first-mover advantage that Defendants have achieved by rushing to secretly manufacture and sell Plaintiff's product while delaying Plaintiff's own efforts by pretending to be fruitfully and productively negotiating a manufacturing agreement with Plaintiff. This is the very definition of "likely irreparable harm" required to obtain an injunction, particularly

when combined with financial and other harms as set out in the paragraphs above. Defendants' behavior is beyond unethical, entirely illegal, and, in a business context, unconscionable. If there was ever a case that cried out for injunctive relief, this is it.

146. Additionally, Plaintiff requests this Court take notice of the series of press releases and blogs published on Defendant XOP's website which documents the extreme nature and severity of the Defendant's intellectual property crimes, as set forth below.

147. On or about June 12, 2018, XOP issued a press release entitled "IPC Selects XOP Networks for Evolution of its Trader Voice Network", stating that IPC was incorporating the XOP voice bridge product into its core offerings for financial institutions.

148. On or about March 26, 2019, XOP issued a press release entitled "Looking for Sycamore's SPS-1000 Replacement – XOP Networks has the Answer." This press release essentially states that XOP has a product available which appears to and does, upon information and belief, fully incorporate CCS's intellectual property and trade secrets.

149. CCS also is likely to succeed on the merits—or there are sufficiently serious questions going to the merits to make them fair ground for the litigation—plus there are a balance of hardships tipping decidedly in CCS's favor, as detailed throughout this complaint.

150. Prior to entering into discussions for Defendant XOP to manufacture a product to the specifications provided by Plaintiff, Plaintiff's principal McDonough was one of a mere handful of highly experienced specialists in the voice communication strategies and equipment utilized by major global institutional financial traders. Upon information and belief, Defendant XOP was a minor, relatively unknown manufacturer of mainstream converged communications appliances and had no products specifically tailored to the global trader voice market.

151.    McDonough saw an opportunity to apply his deep and highly specialized expertise to the needs of major global financial trading institutions and thereby revolutionize their digital voice communication technology by designing his own converged communications bridge product. In furtherance of his plan, he formed the company which is the Plaintiff in the instant case and created a series of in-depth product plans and specifications, in addition to market analyses, customer use cases, and even hardware to test and experiment on.

152.    Defendant Harding introduced McDonough to Defendants XOP and Gupta, allegedly so they could manufacture CCS's product envisaged and specified by CCS's principal McDonough.  McDonough would not have provided his most prized and highly confidential information unless the NDAs were signed, and, in fact, they were.

153.    Due to the extremely small number of major banks with trading floors and the highly secretive nature of the industry, the information provided to XOP and Gupta by McDonough was completely unknown and unknowable to anyone except for a handful of people who worked with major financial institutions on their trading floor voice technologies.

154.    For that reason, the NDAs were extremely broad in their coverage: they prevented the use or dissemination of Confidential Information (¶2), and they limited the use of the Confidential Information to the furtherance of the stated purpose (¶3); they did not transfer any ownership interest in the Confidential Information (¶4); and they prohibited the alteration, modification, or reverse engineering of the Confidential Information (¶5). The NDAs also included provisions for the return and destruction of any transferred Confidential Information, and recognized the potential liability for any improper use, possession, or conversion of the Confidential Information (¶6). Notably, the NDAs have provisions allowing for the recovery of attorneys' fees (¶11).

155.    Under the guise of needing to determine whether there was truly a market and a need for this new technology in the financial trading community that would justify the necessary investment, XOP and Gupta deceived, coerced, pressured, and persuaded CCS into producing and delivering to them far more comprehensive and highly proprietary marketing and customer information than would otherwise be needed to develop the product specified by Plaintiff.

156.    Defendants realized the value of Plaintiff's product and deliberately misused Plaintiff's intellectual property in violation of the NDAs while gaining a first-mover advantage and delaying Plaintiff's own development efforts by pretending to be engaged in serious and promising negotiations while racing to build and market Plaintiff's product for themselves. This violates the NDAs, and there is a clear public interest in protecting innovative entrepreneurs such as Plaintiff against such damaging thievery. If corporations are enabled to profit from the deceptive acts and practices as alleged against Defendants herein—which occurred despite Plaintiff's clear efforts to protect its proprietary information from such theft—innovators and budding entrepreneurs will have no incentive to bring forward the next generations of technology that will keep this country competitive in the decades to come. Plaintiff is clearly entitled to injunctive relief.

157.    It would be ridiculous for Defendants to claim that they did not utilize Plaintiff's confidential information in their USN product because most or all of its features which make it attractive to the consumers of trader voice technology comes straight from Plaintiff's plans and specifications. But just as importantly, the NDAs that Gupta and XOP signed leave nothing to the imagination. These Defendants waived any and all rights to do the exact thing that they went ahead and did anyway – use Plaintiff's information against it and try to gain a first-mover advantage,

making deals, raising capital, and attempting to hobble CCS before its case could see the light of day.

158.    It is unclear the extent to which Defendants have further compromised the confidentiality of Plaintiff's intellectual property, but Defendant XOP is clearly manufacturing and selling products which incorporate Plaintiff's intellectual property and, by virtue of necessity, must be sharing it to some degree with subcontractors, contractors, employees, officers, directors, clients, and business partners with whom they have no business sharing it. *See* the press releases referenced above.

159.    Additionally, pursuant to Exhibits B and C hereto, no bond or other surety may be required. *See* ¶ 15.

160.    Upon information and belief, XOP Latvia and XOP India are believed to be affiliates of XOP that have used and/or are using stolen information and trade secrets belonging to CCS.

161.    Wherefore, Plaintiff demands an injunction ordering Defendants to cease and desist manufacturing, selling, and supporting the USN product or any product by any other name that provides functionality substantially similar to the cUCS to clients for the purpose of financial trading or entering into any deals or partnerships relating to voice communication technology for the financial trading community.

162.    Furthermore, Plaintiff demands an injunction ordering Defendants to cease and desist systems integration testing, on-going installations, and related projects that have not yet been deemed for production but rely on or incorporate CCS's confidential information and trade secrets.

**As and for a**
**SIXTH CAUSE OF ACTION**
**Accounting as against Defendant XOP**

163.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 162.

164.    CCS's damages are not precisely calculable until it has access to XOP's books and records for a determination of the amount of profit to which it would be entitled had XOP fully performed, but believes they are at least $75,000.

165.    In accordance with the agreement between CCS and XOP, CCS should receive 80% of the licensing fees.

166.    CCS is entitled to an accounting of XOP's books and records with respect to its USN for trader voice project, as well as any other projects that have unlawfully benefitted from CCS's confidential information. XOP is in the best position to know the true and correct amount of royalties, licensing fees, income from the sale of CCS's assets, and other revenues due to CCS because the books and records necessary to make such determinations are in the exclusive possession, custody, and control of XOP.

167.    CCS believes that the accounts related to the funds due to CCS are so complicated that alleging a fixed sum is impracticable at this time. The true and correct balance due to CCS can only be ascertained by an accounting performed under the supervision of this Court.

**As and for a**
**SEVENTH CAUSE OF ACTION**
**In the Alternative, Quantum Meruit as against Defendant XOP**

168.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 167.

169. CCS and XOP were in the process of negotiating an OEM agreement for the licensing of the cUCS system by third parties.

170. The portion of the licensing fees that would be directed to XOP was anticipated to amount to no more than 20%.

171. XOP engaged with CCS for nearly a year, teasing more and more information from Plaintiff's principal McDonough, and then wrongfully using that information to obtain contracts with third parties on its own.

172. XOP's and CCS's behaviors demonstrate that the parties had an agreement in principle, if not in fact. CCS offered XOP its vast knowledge and skills in exchange for XOP's product development and partnership in a joint venture with sales to third parties.

173. CCS fulfilled its requirements by providing XOP with extensive information so that XOP could develop the product CCS foresaw.

174. XOP failed to deliver the product and, worse, engaged in a sophisticated scheme intended to receive the immense economic benefit of CCS's knowledge and information without paying for it. XOP in fact developed CCS's product to CCS's exact specifications, marketed it as specified in detail by CCS to the exact customers specified by CCS, and is now earning profit that legally and morally belongs to CCS. XOP must repay to CCS XOP's ill-gotten gains.

175. CCS is entitled to the value of its knowledge and information fraudulently obtained by XOP and Gupta and used in the creation of XOP's product.

**As and for a**
**EIGHTH CAUSE OF ACTION**
**Unfair Competition as against Defendant XOP**

176. CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 175.

177.    XOP and Gupta, in bad faith, misappropriated the commercial advantages held by CCS as a result of its confidential and proprietary knowledge.

178.    As a result of stealing CCS's insider information, XOP signed lucrative contracts with Corporation One, IPC, and possibly others.

179.    The character and circumstances of the business and the nature of the theft of confidential business information and trade secrets place XOP squarely in the position of having unfairly competed against CCS.

180.    Accordingly, CCS has been damaged in an amount to be determined at trial, but in any event, no less than $75,000 plus interest/attorneys' fees and costs as appropriate as well as additional equitable relief as set forth herein.

**As and for a**
**NINTH CAUSE OF ACTION**
**Fraudulent Misrepresentation as against Defendants XOP, Gupta and Harding**

181.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 180.

182.    CCS, at the time that it entered into negotiations with Gupta and XOP, recognized a valuable and fleeting opportunity to bring the revolution in digital voice communication technology to the financial trading industry.

183.    Due to its highly complex nature, this opportunity could only have been fulfilled by an individual with McDonough's extensive and highly specialized background in voice communications technology in the financial trading industry. Only CCS's principal McDonough had the necessary knowledge and skill, and XOP, Gupta and Harding lacked the necessary knowledge and skill.

184.    Plaintiff's principle, McDonough, went on an intense sprint to seize that moment in time he had been working toward his entire life, creating a series of highly in-depth specifications to apply the most advanced digital voice communication technologies to the specific needs and current technologies in use by the financial trading industry.

185.    CCS simply needed a vendor to manufacture a voice communications bridge to implement its specifications. There were many engineering companies capable of doing so, but CCS put its trust in XOP and Gupta because of Defendant Harding's representations that XOP and Gupta were willing and able to perform the service in a commercially reasonable fashion.

186.    Of course, Plaintiff, at the time, had no knowledge that Defendant Harding, CCS's trusted director/employee/shareholder, was flagrantly breaching his fiduciary duties to CCS by actively seeking out opportunities to profit personally with little or no regard for the detrimental effects of his actions on CCS.

187.    CCS had no knowledge of or relationship with Defendants XOP or Gupta prior to Defendant Harding introducing and vouching for them.

188.    As detailed above, Defendants XOP and Gupta solicited an extraordinary amount of highly confidential information from Plaintiff through an ongoing series of representations to Plaintiff that they were becoming progressively more and more interested in manufacturing Plaintiff's product and that they needed ever more in-depth, granular information about the product, the market, and the needs of the specific companies McDonough had worked for on the basis that Defendants XOP and Gupta were satisfied with what they had learned thus far and that the parties were getting ever closer to finalizing an OEM agreement on the terms originally discussed between the parties.

189.    Whether Harding, Gupta, and XOP were colluding to steal the cUCS from CCS from the very outset or whether they hatched a scheme at some later date is not yet clear. But what is abundantly clear is that at some point during the negotiations between Plaintiff and Defendants XOP and Gupta, an unambiguous decision was made to manufacture CCS's product under another name in a conspiracy to deny CCS the fruits of founder McDonough's ingenious ideas, and lifetime of experience and exceptionally hard work. In plain English, they decided to steal his legacy from under his nose.

190.    Once the decision was made by Defendants to manufacture a competing product using CCS's confidential information, all further communications between CCS and the Defendants were made in the worst of bad faith. They were knowingly, deliberately, and inherently false because the communications between the parties ceased being about a partnership and became entirely focused on extracting from CCS all of the proprietary and highly confidential information necessary for XOP to manufacture the current version of their USN product, the competitive advantage of which is, upon information and belief, currently derived entirely or almost entirely from CCS's knowledge and innovation.

191.    At all times during the parties' communications, Defendants deceptively represented that they were negotiating the terms of an OEM agreement with CCS. This was a necessary deception because if CCS realized that Defendants were manufacturing a competing product to capitalize on McDonough's ideas and put CCS out of business, CCS obviously would not have continued to share confidential information and, in fact, would have brought a lawsuit sooner to protect its interests.

192.    The only reason that CCS shared its highly proprietary specifications with Defendants and continued to produce further specifications at Defendants' request was to arrange for the manufacture of CCS's voice communications bridge product.

193.    XOP's USN is currently prospering in the financial trading industry due to its uniquely valuable features, functions, and benefits which are derived from the intellectual property that Defendants stole from CCS during the time they were negotiating over an OEM agreement.

194.    Accordingly, CCS has been damaged in an amount to be determined at trial, but in any event, no less than $75,000 plus interest/attorneys' fees and costs as appropriate, as well as additional equitable relief as set forth above.

**As and for a**
**TENTH CAUSE OF ACTION**
**Misappropriation of Trade Secrets as against Defendants XOP, Gupta and Harding**

195.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 194.

196.    At the time that he founded CCS, McDonough was a 15-year global veteran of the trader voice telecommunications sector. He has the unique experience of having worked with teams that have designed, built, supported, or sold almost every major trader voice solution that exist in the world.

197.    As a result of McDonough's incomparable experience, he often knows the customer's infrastructure better than their existing staff. Because of this, McDonough was able to see the technological problems that were extant in financial services voice trading ecosystems.

198.    At the time that McDonough formed CCS, new digital voice communications technologies were emerging that could overcome most or all of the shortcomings of the equipment then in use on trading floors around the world. These new digital voice technologies were far less

costly and far more powerful and efficient than the equipment trading floors were currently using, but not appropriately specialized to meet the needs of the world's largest financial institutions as it relates to financial trading.

199.    McDonough recognized that there was a once-in-a-lifetime opportunity to revolutionize the financial trading industry and generate staggering additional revenues for financial institutions and extraordinary growth and profits for his own company, which planned to install and maintain the new digital voice communications technology equipment for trading floors.

200.    What made this such a unique opportunity for McDonough and created the impetus for him to start CCS was its highly specialized nature. Bridging the divide between the outside world of digital voice technologies and the small, highly proprietary, and closed world of global financial trading between the world's largest financial institutions would require an extraordinary level of knowledge and skill possessed by only a handful of people in the world.

201.    It is against this backdrop that McDonough founded CCS. For months, he labored on a full-time basis over the requirements for a product that could bridge the gap between the highly specialized voice communication needs of financial trading institutions and the generalized digital voice communications technologies that were emerging at the time.

202.    McDonough conducted his development efforts under immense pressure. He rushed to seize the opportunity before it became a crisis that the global financial trading community would be forced to solve by adopting sub-optimal solutions that would be difficult or impossible to replace later.

203.    McDonough spent months writing and rewriting plans and specifications. He conducted in-depth analyses of the potential market for financial voice communications

technologies, the capabilities and features of the existing systems in use by financial institutions versus those offered by newer digital technologies, and he drafted examples of uses those financial institutions could make of the existing TDM/analog voice communication technologies versus how those same uses could be improved using newer digital voice communications technologies. Finally, he applied all of this information to the environments of specific companies whose trading floor technologies he was intimately familiar with from his decades of past experience.

204.    McDonough spent hundreds of hours creating the aforementioned confidential information. Documents containing that confidential information include CCS Supervisories TR v1.3, Line Sharing Overview v1.0, PW State.doc, and CCS cUCS Business Case v1.0. If one values each of those hours based on the projected sales of the product he developed, the value of that time and the underlying materials he produced would easily be in the multi-millions of dollars.

205.    Finally, McDonough reached the point where he was ready to go to market. The next step was hiring an engineering company to build the product that he had developed. Defendant Harding introduced CCS's principal McDonough to XOP and Gupta. XOP had experience developing existing voice communications hardware incorporating standard TDM/analog technology, and McDonough believed it would therefore be capable of upgrading standard TDM/analog hardware with new VoIP functionality based on McDonough's specifications.

206.    Because XOP would need to make a significant investment into the project, it was agreed that XOP would receive a 20% royalty on revenues generated by CCS from the new product. Under the guise of needing to determine whether there was truly a market and a need for this new technology in the financial trading community that would justify the necessary investment, XOP and Gupta deceived, coerced, pressured, and persuaded CCS into producing and delivering to them far more comprehensive and highly proprietary marketing and customer

information than would otherwise be needed to customize a trader voice communications bridge with a combination of hardware and software to support digital voice and VoIP processing technologies.

207.    Due to the extremely small number of major banks with trading floors and the highly secretive nature of the industry, the information provided to XOP and Gupta by McDonough was completely unknown and unknowable to anyone except for a handful of people who worked with major financial institutions on their trading floor technologies.

208.    McDonough knew how valuable the information was and he acted accordingly. He shared it only with his most trusted inner circle. McDonough did not share a meaningful portion of CCS's highly proprietary trade secrets and confidential information with anyone else for any reason whatsoever.

209.    McDonough marked most or all of the information that he shared outside of the company with language indicating its confidential nature. He frequently objected to even providing Gupta and XOP with much of this information because they had no justifiable reason to even have it, but they refused to continue negotiations without it. McDonough believed that they were acting in good faith even if they also appeared unusually unknowledgeable, and so he reluctantly shared it with them.

210.    To be clear, the digital voice trading technology needed to revolutionize the financial trading industry already existed and the hardware bridges needed to implement it already existed. Where the extraordinary opportunity lay was in building a software bridge, compatible with modern hardware and software, that took advantage of digital voice technology's evolution to meet the highly specific and sophisticated needs of major financial institutions with trading floors. Specifically, the solution developed by McDonough would allow traders to accomplish the

same things they were already accomplishing but quicker and far less expensively, and it introduced additional and far more powerful voice communication options, while mitigating risk for our global financial institutions, in a way that only recently became possible due to the advent of digital voice communications technologies.

211.   Institutional financial trading is a multi-billion-dollar industry with very high profit margins. The value created by CCS's innovations would easily justify the costs associated with licensing CCS's technology. Part of the enormous knowledge barrier which limited this opportunity to McDonough and a handful of other people with the necessary knowledge and experience was an awareness of the pricing structure for the technology.  McDonough's highly proprietary market analysis, which he shared with XOP, Gupta and Harding, indicated that the new technology could realistically generate $20 million in sales within the first 5 years once the product was generally available for sale.

212.   However, due to the Coronavirus pandemic, the need for this conferencing solution was at an all time high, and realistically CCS's technology could have generated $20 million in sales over the last 12 months. Traditional BCP/DR plans and regulations never accounted for a global pandemic. The stock market continued to trade, causing financial trading firms to rapidly adopt new technologies to extend private wires to all types of communication devices and allowing them to keep their position in the global markets while maintaining best practices required by the World Health Organization and local health organizations.

213.   There may have been other companies existing outside of or at the margins of the financial trading community that could potentially have developed similar digitally enhanced voice communication bridge products, but without an awareness of the timing and value of the opportunity and the ease with which the technology would likely be adopted, they would have no

particular reason to pursue it. So, it is no exaggeration to say that McDonough's insider insight was worth tens of millions of dollars.

214.    Most or much of the aforementioned trade secrets were, upon information and belief, directly converted by XOP and Gupta during the period that they were negotiating with CCS and thereafter. Upon information and belief, Gupta and XOP directly and deliberately breached the aforementioned contractual confidentiality obligations under the NDAs when they illegally incorporated CCS's trade secrets into XOP's products by manufacturing CAS TDM and VoIP systems, including the USN for trader voice. USN for trader voice bridging is, upon information and belief, the result of the application of CCS's modifications and use cases for financial systems/trader voice networks applied to XOP's platform.

215.    As described earlier in this complaint, there can be no doubt that XOP and Gupta misappropriated the aforementioned highly valuable and confidential information developed by and rightfully belonging to CCS. XOP and Gupta developed and marketed CCS's product under the XOP brand without sharing any of the revenues with CCS. It is objectively impossible that XOP could have or would have developed a product similar to what CCS specified. Prior to entering into the NDAs and receiving access to CCS's confidential information, XOP had little or no background or experience meeting the needs of the institutional financing voice trading industry. In addition, if XOP was already in the process of developing a similar product when Defendant Harding introduced XOP and Gupta to CCS, XOP and Gupta would not have been interested in developing CCS's product and most certainly would not have signed the NDAs as doing so would have been completely and utterly contrary to XOP's economic interests. Finally, a very substantial portion of the confidential information which is the subject of this litigation was produced by CCS specifically as a result of XOP and Gupta's requests, demands, and strong-arm

tactics. If XOP, Gupta and Harding already understood the market, the largest potential customers, and the technological requirements of the global institutional voice trading community, it would have been counterproductive to wait around for months as McDonough produced all of this information from his own head.

216.    Regardless of any of the above, Defendants XOP and Gupta signed the NDAs and the NDAs by their explicit language protect all of the confidential information that Plaintiff shared with Defendants Harding, Gupta and XOP from use by Defendants for any purpose other than the negotiation of a manufacturing agreement, which is why the information was shared to begin with.

217.    As detailed previously, the NDAs prohibit each party from using the Confidential Information of the other party for any purpose other than to identify and evaluate business opportunities that the parties might be able to jointly pursue.

218.    Specifically, the NDAs specify that the Disclosing Party shall retain all "right, title and interest to its Confidential Information…" and prohibit the Receiving Party from altering, modifying, breaking down, disassembling, or reverse engineering any portion of the Confidential Information. The NDAs require the Receiving Party to destroy all Confidential Information provided by the Disclosing Party within 10 days of a written demand, and make clear that by terminating the Receiving Party's right to access the Disclosing Party's Confidential Information, the Disclosing Party does not forfeit any rights and the Receiving Party does not retain any rights.

219.    In reliance on the specific language contained in the NDAs signed by XOP and Gupta, and in reliance on XOP and Gupta's continuous representations that they were seriously evaluating the technology and the market for voice communication technology optimized for the financial trading industry in order to enter into an OEM arrangement with CCS, CCS provided most or all of its trade secrets to XOP.

220.    Due to the misappropriation of CCS's confidential information by Defendants XOP, Gupta and Harding, and the incorporation of such information into the development and marketing of a competing product, Defendants XOP, Gupta and Harding have damaged CCS in an amount to be determined at trial, but in any event, at least $11.2 million plus interest/attorneys' fees and costs as appropriate as well as additional equitable relief as set forth above.

**As and for an**
**ELEVENTH CAUSE OF ACTION**
**Misappropriation of Trade Secrets as against Defendants XOP, Gupta and Harding pursuant to 18 U.S.C. § 1836 et seq. – the Defend Trade Secrets Act**

221.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 220.

222.    The DTSA protects trade secrets, which are defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information" that "the owner thereof has taken reasonable measures to keep such information secret," and that has an economic value because it is not "generally known." 18 U.S.C. § 1839(3).

223.    Additionally, CCS "need not plead the trade secret claim with specificity in the complaint" *Elsevier Inc.*, 2018 WL 557906, at *6 (citing *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14-cv-9687, 2016 WL 4616969, at *11 (S.D.N.Y. Feb. 11, 2016)).

224.    At the time that he founded CCS, McDonough was a 15-year global veteran of the trader voice telecommunications sector. He has the unique experience of having worked with teams that have designed, built, supported, or sold almost every major trader voice solution that exist in the world.

225. As a result of McDonough's incomparable experience, he often knows the customer's infrastructure better than their existing staff. Because of this, McDonough was able to see the technological problems that were extant in financial services voice trading ecosystems.

226. At the time that McDonough formed CCS, new digital voice communications technologies were emerging that could overcome most or all of the shortcomings of the equipment then in use on trading floors around the world. These new digital voice technologies were far less costly and far more powerful and efficient than the equipment trading floors were currently using, but not appropriately specialized to meet the needs of the world's largest financial institutions as it relates to financial trading.

227. McDonough recognized that there was a once-in-a-lifetime opportunity to revolutionize the financial trading industry and generate staggering additional revenues for financial institutions and extraordinary growth and profits for his own company, which planned to install and maintain the new digital voice communications technology equipment for trading floors.

228. What made this such a unique opportunity for McDonough and created the impetus for him to start CCS was its highly specialized nature. Bridging the divide between the outside world of digital voice technologies and the small, highly proprietary, and closed world of global financial trading between the world's largest financial institutions would require an extraordinary level of knowledge and skill possessed by only a handful of people in the world.

229. It is against this backdrop that McDonough founded CCS. For months, he labored on a full-time basis over the requirements for a product that could bridge the gap between the highly specialized voice communication needs of financial trading institutions and the generalized digital voice communications technologies that were emerging at the time.

230.    McDonough conducted his development efforts under immense pressure. He rushed to seize the opportunity before it became a crisis that the global financial trading community would be forced to solve by adopting sub-optimal solutions that would be difficult or impossible to replace later.

231.    McDonough spent months writing and rewriting plans and specifications. He conducted in-depth analyses of the potential market for financial voice communications technologies, the capabilities and features of the existing systems in use by financial institutions versus those offered by newer digital technologies, and he drafted examples of uses those financial institutions could make of the existing TDM/analog voice communication technologies versus how those same uses could be improved using newer digital voice communications technologies. Finally, he applied all of this information to the environments of specific companies whose trading floor technologies he was intimately familiar with from his decades of past experience.

232.    McDonough spent hundreds of hours creating the aforementioned confidential information. Documents containing that confidential information and trade secrets include CCS Supervisories TR v1.3, Line Sharing Overview v1.0, PW State.doc, and CCS cUCS Business Case v1.0. If one values each of those hours based on the projected sales of the product he developed, the value of that time and the underlying materials he produced would easily be in the multi-millions of dollars.

233.    To protect his company's confidential information and trade secrets, McDonough took the following steps: (i) access to the information was limited to no more than three company employees at any time; (ii) any non-CCS employees granted access to the information was subject to an NDA; (iii) the information was stored primarily in McDonough's mind, as well as on protected computer servers with limited access.

234.    Finally, McDonough reached the point where he was ready to go to market. The next step was hiring an engineering company to build the product that he had developed. Defendant Harding introduced CCS's principal McDonough to XOP and Gupta. XOP had experience developing existing voice communications hardware incorporating standard TDM/analog technology, and McDonough believed it would therefore be capable of upgrading standard TDM/analog hardware with new VoIP functionality based on McDonough's specifications.

235.    XOP and Gupta deceived, coerced, pressured, and persuaded CCS into producing and delivering to them far more comprehensive and highly proprietary marketing and customer information than would otherwise be needed to customize a trader voice communications bridge with a combination of hardware and software to support digital voice and VoIP processing technologies.

236.    McDonough knew how valuable the information was and he acted accordingly. He shared it only with his most trusted inner circle. McDonough did not share a meaningful portion of CCS's highly proprietary trade secrets and confidential information with anyone else for any reason whatsoever.

237.    McDonough marked most or all of the information that he shared outside of the company with language indicating its confidential nature. He frequently objected to even providing Gupta and XOP with much of this information because they had no justifiable reason to even have it, but they refused to continue negotiations without it. McDonough believed that they were acting in good faith even if they also appeared unusually unknowledgeable, and so he reluctantly shared it with them.

238.    To be clear, the digital voice trading technology needed to revolutionize the financial trading industry already existed and the hardware bridges needed to implement it already

existed. Where the extraordinary opportunity lay was in building a software bridge, compatible with modern hardware and software, that took advantage of digital voice technology's evolution to meet the highly specific and sophisticated needs of major financial institutions with trading floors. Specifically, the solution developed by McDonough would allow traders to accomplish the same things they were already accomplishing but quicker and far less expensively, and it introduced additional and far more powerful voice communication options, while mitigating risk for our global financial institutions, in a way that only recently became possible due to the advent of digital voice communications technologies.

239.    Institutional financial trading is a multi-billion-dollar industry with very high profit margins. The value created by CCS's innovations would easily justify the costs associated with licensing CCS's technology. Part of the enormous knowledge barrier which limited this opportunity to McDonough and a handful of other people with the necessary knowledge and experience was an awareness of the pricing structure for the technology.  McDonough's highly proprietary market analysis, which he shared with XOP, Gupta and Harding, indicated that the new technology could realistically generate $20 million in sales within the first 5 years once the product was generally available for sale.

240.    However, due to the Coronavirus pandemic, the need for this conferencing solution was at an all-time high, and realistically CCS's technology could have generated $20 million in sales over the last 12 months. Traditional BCP/DR plans and regulations never accounted for a global pandemic. The stock market continued to trade, causing financial trading firms to rapidly adopt new technologies to extend private wires to all types of communication devices and allowing them to keep their position in the global markets while maintaining best practices required by the World Health Organization and local health organizations.

241.    There may have been other companies existing outside of or at the margins of the financial trading community that could potentially have developed similar digitally enhanced voice communication bridge products, but without an awareness of the timing and value of the opportunity and the ease with which the technology would likely be adopted, they would have no particular reason to pursue it. So, it is no exaggeration to say that McDonough's insider insight was worth tens of millions of dollars.

242.    Most or much of the aforementioned trade secrets were, upon information and belief, directly converted by XOP and Gupta during the period that they were negotiating with CCS and thereafter. Upon information and belief, Gupta and XOP directly and deliberately breached the aforementioned contractual confidentiality obligations under the NDAs when they illegally incorporated CCS's trade secrets into XOP's products by manufacturing CAS TDM and VoIP systems, including the USN for trader voice. USN for trader voice bridging is, upon information and belief, the result of the application of CCS's modifications and use cases for financial systems/trader voice networks applied to XOP's platform.

243.    As described earlier in this complaint, there can be no doubt that XOP and Gupta misappropriated the aforementioned highly valuable and confidential information developed by and rightfully belonging to CCS. XOP and Gupta developed and marketed CCS's product under the XOP brand without sharing any of the revenues with CCS. It is objectively impossible that XOP could have or would have developed a product similar to what CCS specified. Prior to entering into the NDAs and receiving access to CCS's confidential information, XOP had little or no background or experience meeting the needs of the institutional financing voice trading industry.  In addition, if XOP was already in the process of developing a similar product when Defendant Harding introduced XOP and Gupta to CCS, XOP and Gupta would not have been

interested in developing CCS's product and most certainly would not have signed the NDAs as doing so would have been completely and utterly contrary to XOP's economic interests. Finally, a very substantial portion of the confidential information which is the subject of this litigation was produced by CCS specifically as a result of XOP and Gupta's requests, demands, and strong-arm tactics. If XOP, Gupta and Harding already understood the market, the largest potential customers, and the technological requirements of the global institutional voice trading community, it would have been counterproductive to wait around for months as McDonough produced all of this information from his own head.

244.    In reliance on the specific language contained in the NDAs signed by XOP and Gupta, and in reliance on XOP and Gupta's continuous representations that they were seriously evaluating the technology and the market for voice communication technology optimized for the financial trading industry in order to enter into an OEM arrangement with CCS, CCS provided most or all of its trade secrets to XOP.

245.    Due to the misappropriation of CCS's confidential information by Defendants XOP, Gupta and Harding, and the incorporation of such information into the development and marketing of a competing product, Defendants XOP, Gupta and Harding have damaged CCS in an amount to be determined at trial, but in any event, at least $11.2 million plus interest/attorneys' fees and costs as appropriate as well as additional equitable relief as set forth above.

**As and for a**
**TWELFTH CAUSE OF ACTION**
**Tortious Interference with Prospective Contractual Relations as against**
**Defendants XOP, Gupta and Harding**

246.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 245.

247.     Plaintiff's founder and president, Terence McDonough, is a 20-year veteran of the trader voice telecommunications sector where his career led him to work across North America, South America, Europe, Asia Pacific, and the United Kingdom. He has worked with diverse global teams that have designed, built, supported, or sold almost every major trader voice solution in the world.

248.     As a result of his incomparable experience, McDonough has extensive general knowledge of market challenges and often knows the customer's infrastructure better than their existing staff. The reason for this is that all financial institutions' trading floors use similar voice technologies or a mix of the available technologies that allow our global markets to communicate and trade with voice.

249.     McDonough recognized that most or all global institutional financial traders were using antiquated voice communications technology. McDonough further recognized that there was a real problem because the hardware these traders were relying on would soon no longer be supported. Maintaining their voice communications systems would become progressively more difficult. Finally, McDonough recognized that there was not a solution available in the marketplace that could meet the highly specialized voice needs of global institutional financial trading floors.

250.     McDonough formed CCS, a small communications technology company that delivers unique, customizable, and flexible voice conferencing, bridging, routing, and delivery solutions, and specializes in financial institutions voice collaboration.

251.     McDonough had a reasonable expectation of economic advantage. McDonough was uniquely positioned to develop a voice communications product tailored to global institutional financial traders that would replace the antiquated voice bridging products that traders were currently using.

252.    CCS developed in-depth specifications, market research and other proprietary materials capable of revolutionizing trading floors around the world by enabling them to take advantage of VoIP and other digital communication technologies to achieve critical additional capabilities at substantially lower prices than they were currently paying.  Specifically, CCS designed a VoIP unified communications bridge for the trader voice ecosystem to replace the widespread legacy TDM/analog bridges that were quickly becoming outdated.

253.    After months of labor, formulating specifications in painstaking detail for CCS's new voice communications bridge product, McDonough was ready to have his product developed and manufactured. Defendant Harding, who at the time was Chief Operating Officer and Director of CCS, introduced McDonough to Defendants Gupta and XOP.

254.    At the time that the companies were introduced, XOP had an enterprise audio conferencing bridge, a traditional video conferencing system, a web conference application, a traditional group dial conference, a voicemail system, and a blast notify application that it offered to customers. But none of these products were adapted for use by financial markets. Notably, XOP did not, at this time, offer TDM CAS E1-T1/VoIP private wire conferencing or WebRTC private wire conferencing, and did not offer trader voice Hoot and Holler conferencing, enhanced group dial conferencing, or enhanced voicemail for trader voice systems and their private wires and Hoot.

255.    There is no room for doubt that Defendants Harding, XOP, and Gupta had knowledge of CCS's expectation of economic advantage when McDonough entered into negotiations with Defendants XOP and Gupta.

256.    In accordance with the NDAs signed by XOP and Gupta, the companies' shared goal was to build a digital communications bridge together that would leverage XOP's products and CCS's skills and knowledge, and eventually create other products for financial markets. More

specifically, the purpose of the engagement between CCS and XOP was to have XOP develop a voice communications product for CCS. CCS owned the intellectual property underlying the product and intended to use XOP's hardware and software for enterprise audio conferencing, but have it tailored for voice trading. XOP and CCS agreed in principle that XOP would receive 20% of each license fee, essentially getting a royalty from each sale.

257. On February 9, 2016, when signing the NDA, Gupta asked CCS to provide XOP with a business plan laying out the potential opportunity in financial markets. The business plan was to include technical requirements as well as detailed examples of potential uses by trading floors, and projected market sizes and values of the various product features. CCS believed at the time that Gupta wanted this information so XOP could appropriately value its share of the licensing fees.

258. McDonough provided multiple documents with the information requested by Gupta, including a confidential and proprietary document sent on February 27, 2016, entitled "CCS Supervisories TR v1.3". In addition, McDonough also described in a detailed email what equipment was in-scope to be replaced by the CCS product being developed, with rough order-of-magnitude pricing for the opportunity.

259. After signing the NDA and receiving the information he requested, XOP, Gupta, and CCS continued negotiations and discussions related to the development of product specifications and marketing materials for the product XOP was supposed to develop for CCS. Notably, Gupta reached out by telephone and email numerous times between February and May of 2016 to request ever more detailed and highly proprietary customer, technical, and market research information from CCS, all of which was subject to the NDAs.

260.    On March 3, 2016, CCS provided XOP with a confidential and proprietary document entitled "Line Sharing Overview v1.0". The document contained both general information and information highly specific to an incumbent's systems and requirements, including, but not limited to, use cases and the types, nature, and extent of the equipment then in use. The document depicted various use cases and how CCS's new bridge product, which XOP was being hired to develop, would meet those needs. Only McDonough was able to provide this specific information, and only because of his tenure in the industry. Accordingly, the Line Sharing Overview document was clearly labeled "Confidential and Proprietary".

261.    After receiving CCS's production of information, Gupta sought to confirm with McDonough the type of equipment that needed replacing. Again, only McDonough was able to provide this information because of his tenure in the industry. Not only did XOP, Gupta and Harding not possess the specialized knowledge that CCS's principal McDonough did, XOP and Gupta did not even possess a basic level of familiarity with the industry: any person or company that has experience in the financial markets trader voice vertical would have known, at the very least, the turret equipment installed in a major player since it was a historical competitive knockout between trader voice incumbents. Yet, because XOP and its team members were not financial markets trader voice experts, they lacked this knowledge.

262.    On or about March 4, 2016, Gupta asked CCS if it had access to hardware so he could do some development and testing work with and on it.  CCS confirmed that it had an ITS trader voice test system XOP could use. Gupta was not well versed in ITS systems or voice trading systems in general, and again asked for additional information.

263.    Because Gupta stubbornly refused to continue the negotiations unless and until he received all of the information he demanded, CCS provided all information requested by Gupta

each and every time he made a request. CCS had no knowledge at this time that XOP and Gupta were acting in bad faith and, upon information and belief, intended to steal CCS's intellectual property assets.

264. CCS tried to move the development process along: on March 22, 2016, CCS asked Gupta for next steps to kick-off the development effort and asked for XOP to provide it with an original equipment manufacturer (OEM) agreement to review.

265. Gupta's response was to ask CCS if it had thought of specific customers along with sales and marketing strategies to close those deals, allegedly for a proof of concept (POC). CCS explained that their targets included Corporation One, another major investment banking firm (hereinafter, "Corporation Two"), and smaller companies that had existing vendor relationships with Corporation One. Defendants Gupta and XOP also later requested and received highly specific and proprietary technical information relating to features that would be of interest to another financial services company (hereinafter, "Corporation Three").

266. In fact, Gupta and XOP were mining CCS for information from the beginning of the engagement: Gupta asked for detailed technical information, demanded connectivity and use case slides, needed comprehensive explanations of the use cases described by CCS—both for the product in general and for Corporation One specifically—and even needed access to CCS's physical equipment for development/testing, as well as coaching in how the equipment worked.

267. During this time, XOP provided little in return: on April 21, 2016, Gupta sent CCS a brief overview presentation of their product customized to suit the financial services market. Gupta sent this information to CCS so that McDonough's team could use it to create marketing materials.

268.    On April 26, 2016, after a request from XOP, CCS issued a purchase order for $25,000 with supporting technical use case slides to XOP for development of the CCS MVP. CCS also asked XOP for its technical documentation on the hardware product and again, for the OEM agreement. Gupta confirmed receipt of the purchase order but failed to provide CCS with any technical documentation on the development effort.

269.    On May 3, 2016, CCS provided XOP with additional technical specifications for the product development. Perhaps predictably, Gupta requested additional information. CCS again provided the requested information.

270.    On May 9, 2016, at XOP's request, CCS sent a document entitled "CCS cUCS Business Case v1.0" to Gupta. The document included volumetrics, market opportunity specifications, and a competition overview including Sycamore/Coriant, all of which were intended to assist Gupta in creating an internal marketing research document for XOP. The document was labeled "Confidential" and "In Strictest Confidence", and included the following warning against disclosure:

> This document and the information contained in it is confidential and proprietary information of the Company [Converged Compliance Solutions, Inc.]. No person other than a recipient authorized by the Company may possess or use the same for any purpose except as approved by the Company in advance. The reproduction, dissemination or disclosure of this document or the information contained in it is expressly prohibited without the prior written authorization of the Company.

p. 3.

271.    Again, the purpose of all of this negotiation and development of product specifications and marketing materials was to help XOP develop a product for CCS, not the other way around.

272.    On May 13, 2016, for the first time, and after months of work by CCS, XOP expressed concern that CCS using their platform to build their product would jeopardize business

XOP was allegedly conducting or proposing to conduct with IPC Systems, Inc. ("IPC"). IPC was the dominant player in the market for CCS's product, and McDonough had also worked at IPC prior to forming CCS. Astonishingly, XOP asked CCS to speak with IPC and get permission to develop a Sycamore SPS-1000 replacement on XOP's behalf. CCS refused and said that it was not its place to speak with IPC, a company it, at the time, had no relationship or business with.

273.   Shortly thereafter, XOP started pulling back from the negotiations.

274.   On May 20, 2016, XOP put some basic slides together to confirm that what it envisioned aligned with CCS's desired end result. As with XOP's prior work, CCS had to correct these slides.

275.   CCS explained that it could not sell the product without the OEM agreement in place, and again asked Gupta to expedite its drafting.

276.   Gupta knew an OEM agreement was necessary: on May 24, 2016, Harding confirmed to McDonough that Gupta agreed in a phone call with Harding to brand the system they were developing as a CCS product.

277.   Gupta informed CCS that XOP was having some problems with programming errors being generated, so CCS temporarily reduced the requirements of what it demanded in the product.

278.   Between June and August 2016, the parties continued to negotiate the OEM agreement, but XOP did not negotiate in good faith and would not stand by the basic representations which it had been making during the time that had induced CCS to do all of the work and provide all of the information which CCS had provided from the outset of the relationship.

279.   After sending a marked-up version of the OEM agreement on August 3, 2016, Defendants Gupta and XOP ceased all communications with CCS, and on September 29, 2016, CCS cancelled the purchase order due to total failure by XOP to communicate.

280.   Upon information and belief, prior to engaging with CCS, XOP had no particular competitive advantage or specialized knowledge of the needs of the institutional trading industry.

281.   And yet today, XOP is a manufacturer of TDM and VoIP systems, including the Universal Service Node (USN), a converged communications platform enhanced for the financial services trader voice industry that is, upon information and belief, substantially derived from Plaintiff's intellectual property and the cause of the instant litigation. USN for trader voice bridging is the result of the application of CCS's principal McDonough's vast and highly complex specifications and use cases for financial systems/trader voice networks applied to XOP's dated, simplistic platform.

282.   Defendants are now fearless. They are openly and notoriously bragging about the extraordinary windfall that they are reaping as a result of having defrauded Plaintiff's principal McDonough by means of bullying and deception out of the sweetest fruits of his life's labor. Defendants are enjoying rising and profitable careers each day as McDonough wakes up sick, agonizing over CCS's very survival. Defendants are attempting to seize the first-mover advantage and use it as a dagger plunged deep into the heart and soul of McDonough. A greater economic injustice is hard to imagine.

283.   Defendants' regular publication of press releases showcasing the technology that they stole by fraud from Plaintiff CCS and the deals they are closing with Plaintiff's intended customers using Plaintiff's highly confidential marketing plans and specifications make clear the

extent to which Defendants have wrongfully and without justification interfered with CCS's reasonable expectation for economic advantage or benefit from its intellectual property.

284.    On or about June 12, 2018, XOP issued a press release entitled "IPC Selects XOP Networks for Evolution of its Trader Voice Network", stating that IPC was incorporating the XOP voice bridge product into its core offerings for financial institutions. Upon information and belief, the XOP product to which IPC's press release refers (the USN product) fully incorporated Plaintiff's trade secrets and intellectual property produced to it during the negotiations in 2016 pursuant to the NDAs.

285.    That press release described XOP's products as "allow[ing] customers to seamlessly transition their value-added services from legacy circuit switched networks to VoIP based packet switched networks." This type of product is exactly what CCS asked XOP to create following the exchange of the NDAs.

286.    On or about March 26, 2019, XOP issued a press release entitled "Looking for Sycamore's SPS-1000 Replacement – XOP Networks has the Answer". Gupta had never heard of there being a need to locate a replacement system for Sycamore/Coriant's manufacturing discontinued Signal Processing System (SPS) SPS-1000 prior to speaking with CCS. CCS had explained to Gupta that a software replacement was necessary as the SPS-1000 is widely deployed in the financial services trader voice, trader voice providers networks, voice trading system manufacturers, commodity brokerage, capital markets firms, and utility and transportation industries. Once Gupta, and therefore XOP, had this information, XOP issued its press release, which states that XOP has a product available which appears to and does, upon information and belief, fully incorporate CCS's intellectual property and trade secrets.

287.    Upon information and belief, XOP in fact had no such product at the time, but the product it advertised and eventually developed was based on confidential information provided to it and Gupta by CCS.

288.    On or around June 27, 2016, Corporation One invited CCS to participate in a request for proposal regarding CCS's cUCS product. The request for proposal was to replace the legacy communication bridges supporting Corporation One's Hoot and Holler network.

289.    In April of 2018, a major corporation confirmed to McDonough that Harding, Gupta, and XOP had managed to get XOP's USN into the corporation's development lab for testing and were pushing sales hard in 2017 for the product functionality and use cases CCS had engaged XOP to develop for them.

290.    The intellectual property that forms the basis of the USN for trader voice resulted from McDonough's years of highly specialized experience in communications bridges and trader voice technology specifically for financial markets. XOP simply did not have the experience, knowledge, or skills to develop the technology on its own.

291.    In all of the documents CCS provided to XOP/Gupta, the common theme is transitioning trader voice from TDM to SIP supporting ARD, MRD, and Hoot private wires. CCS described the equipment that IPC and all private wire carriers currently had in their legacy trader voice network including Sycamore SPS-1000, DNX, and other switching devices that need to be replaced by the USN. In CCS's cUCS Business Case for Sudhir/XOP, a closing paragraph is: "CCS' seasoned leadership team will revolutionize the unified communications industry for financial markets. By leveraging, with exclusivity, the significant investments made by a team at XOP Networks, CCS will work to create 'The' platform that the future of trader voice will be built on."

292.    In addition, CCS created a marketing document based on the solution with XOP's USN. The document is titled "CCS – Converged Unified Conference Solution.pdf." The Product Summary is exceedingly similar to what IPC selected XOP for, including the migration toward packet-based technologies SIP/VoIP. It also covers Private Wire Conference for ARD, Hoot and Holler, and WebRTC. All of these use cases are, upon information and belief, planning to be or are used by IPC.

293.    The IPC Press Release quotes Gupta as follows: "'XOP Networks' platforms have been running thousands of audio conferencing ports non-stop for months without any issues in support of our trader voice services such as Hoots and Automatic or Manual Ring Downs (ARD / MRD) which are crucial to voice trading activity. IPC's trader voice network is used daily by tens of thousands of traders worldwide. We feel privileged to have been selected for providing our SIP/VoIP based conference bridges as part of IPC's network migration towards packet-based technologies,'" said Sudhir Gupta, CEO of XOP Networks."

294.    A deal with Corporation One was expected to bring in approximately $3.4 million. A deal with IPC, based on its press release stating that it would run thousands of ports for months, would have brought in approximately $11.3 million. Therefore, the total value of the deals that CCS rightfully anticipated was in excess of $14 million, with XOP's share being only 20% of the conference port fees.

295.    In the absence of the wrongful acts of Defendants, it is reasonably probable that CCS would have entered into direct or indirect contractual relationships with most or all of the companies that XOP entered into contractual relationships with, as described in XOP's press releases. This includes specifically Corporation One, given McDonough's knowledge of and expertise on the trader voice systems then in use.

296.    McDonough was an expert in the aforementioned companies' needs. The specifications he provided to XOP laid out in detail how to build a product that would be tailor-made to satisfy those companies' needs. This was the entire business opportunity CCS was created to capitalize on.

297.    XOP, Gupta and Harding wrongfully and intentionally prevented the relationship from developing by fraudulently obtaining CCS's intellectual property and thereafter using it to pursue a business relationship with Corporation One, IPC, and possibly others.

298.    CCS has been damaged by XOP, Gupta and Harding's tortious interference with CCS's prospective contractual relations with the aforementioned companies and potentially others unknown to CCS at this time in an amount to be determined at trial, but in any event, at least $75,000 plus interest/attorneys' fees and costs as appropriate as well as additional equitable relief as set forth above.

**As and for a**
**THIRTEENTH CAUSE OF ACTION**
**Conspiracy as against Defendants XOP, Gupta and Harding, for fraudulent misrepresentation, conversion and misappropriation of CCS's intellectual property**

299.    CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 298.

300.    As described above, McDonough is an expert by knowledge and experience in voice communications technology as applied to the global institutional financing trading market. McDonough saw an opportunity to apply his deep and highly specialized expertise in the needs of major global financial trading institutions to the emerging revolution in digital voice communication technology by designing his own converged communications bridge product. In furtherance of his plan, he formed the company which is your Plaintiff in the instant case.

301.   McDonough subsequently met Defendant Harding, who deceived him into believing that they both shared a good faith goal to transform the voice communication technology powering the global institutional financial trading market. McDonough placed his complete trust in Harding, offering Harding a Chief Operating Officer position with Plaintiff CCS.

302.   Only after it was too late did McDonough conclude that Harding was a smooth-talking con artist with no loyalty to anybody but himself as demonstrated by an ongoing series of undisclosed breaches of his fiduciary duties and contractual obligations to CCS.

303.   By information and belief, the bad acts committed by Harding while serving as director/COO/CPO of CCS included but most definitely were not limited to covertly selling products directly competitive with CCS, misusing CCS's limited company funds, and, worst of all, conspiring with Defendants XOP and Gupta to destroy CCS by transferring its most highly confidential intellectual property to XOP and Gupta at a time when Defendant Harding knew or should have known that XOP and Gupta were incorporating that information into their own competing product which would be first to market, reducing CCS to a helpless bystander.

304.   Harding independently assumed the fiduciary duties that accompany those positions. Harding was provided with complete and total access to McDonough's plans and ideas to revolutionize the global institutional financial trading communications market.

305.   Defendant Harding introduced McDonough to Defendants XOP and Gupta, allegedly so XOP and Gupta could manufacture McDonough's product.  McDonough would not have provided his most prized and highly confidential information unless the NDAs were signed, and, in fact, Gupta and XOP did sign the NDAs.

306.   Whether Defendants Harding, Gupta, and XOP conspired and agreed to fraudulently misrepresent their intentions, and to misappropriate and convert Plaintiff's

intellectual property for their own benefit from the very outset or whether they formed the conspiracy at some later date is not yet clear. But what is abundantly clear is that at some point during the negotiations with XOP to manufacture Plaintiff's product, Defendants Harding, XOP, and Gupta did, upon information and belief, agree and conspire to manufacture CCS's product under another name and deny CCS the fruits of founder McDonough's ingenious ideas and lifetime of experience and exceptionally hard work.

307.    Once Defendants XOP, Gupta, and Harding had conspired and agreed to manufacture a competing product using CCS's confidential information, all further communications between CCS and the Defendants/conspirators were made purely in furtherance of the conspiracy and in the worst of bad faith.

308.    The communications between the parties became knowingly, deliberately, and inherently false because the communications were in fact unrelated to any goal of forming a partnership to manufacture CCS's product and entirely focused on extracting from CCS proprietary and highly confidential marketing and customer data to aid Defendants/conspirators in developing and marketing the current version of their USN product, the competitive advantage of which is, upon information and belief, currently derived entirely or almost entirely from CCS's knowledge and innovations.

309.    During the alleged negotiations between Plaintiff and Defendants/conspirators XOP and Gupta, there came a time when McDonough's suspicions were aroused and McDonough became very uncomfortable providing further information to Defendants/conspirators. The reason for this was the ever-dwindling connection between the detailed sales and marketing data that XOP and Gupta were then requesting and the purpose of the negotiations, which was to create an OEM agreement in which XOP would manufacture CCS's voice communications bridge product.

310.    To the best of Plaintiff's knowledge, Defendant/conspirator Harding engaged in multiple overt acts in furtherance of the conspiracy via his role as "neutral mediator" between Plaintiff and Defendants/conspirators XOP and Gupta. He accomplished this first by introducing the parties to each other and later by constantly reassuring McDonough that XOP and Gupta were acting in good faith when he knew or should have known that they were acting pursuant to the conspiracy the Defendants had formed and not at all in good faith.

311.    Harding's participation was essential to the conspiracy. But for Harding deceiving McDonough into creating and/or providing to Defendants XOP and Gupta highly confidential marketing and customer data that McDonough otherwise would not have provided to them, Harding enabled Defendants/conspirators XOP and Gupta to fulfill their roles in the scheme to essentially rob Plaintiff blind.

312.    Specifically, on or about May 13, 2016, XOP started pulling back from the negotiations. Ironically, XOP expressed concern that CCS using its platform to build its product would jeopardize business XOP was allegedly conducting or proposing to conduct with IPC Systems, Inc.  Again, IPC is the dominant player in the market for CCS's product and would be an essential partner in CCS's quest to dominate the global institutional financial trading niche of the voice communications technology marketplace.  McDonough was alarmed and upset.

313.    On May 24, 2016, Harding confirmed to McDonough that Gupta agreed in a phone call with Harding to brand the system they were developing as a CCS product.

314.    Seemingly the idea behind the conspiracy was that Defendants would be first to market with McDonough's innovations. The market for those innovations was small and an insurmountable competitive advantage could be established quickly through the trifecta of (a) partnership with IPC, which already had its foot in the door with most or all of the global

institutional financial traders; (b) strategic pricing based on the highly confidential data provided to Defendants XOP and Gupta by McDonough, due largely to Harding's manipulation; and (c) the perfect fit of the product to the severe and immediate needs of the market.

315.   McDonough painstakingly designed the product to meet the needs of this particular market, so given easy access to the hardware/software through IPC and competitive pricing by XOP and Gupta, the rapid success of Plaintiff's product which XOP illegally manufactured and sold was all but assured.

316.   The wheels of justice turn slowly and by the time CCS gets its day in court, XOP will have its proprietary hardware on trading floors all over the world. Whatever ultimately happens in court will be a small ding in the massive profit Defendants' actions will ultimately yield, which is why the facts cry out for an injunction.

317.   As detailed earlier in this complaint, CCS has been severely damaged by Defendants' conduct. CCS has been delayed by years in producing the product McDonough designed at a time when even losing days makes a major difference, and CCS has entirely lost the first-mover advantage in a tiny market as evidenced by XOP's press releases detailing its partnership with IPC and its deals with other major customers and organizations within CCS's target market.

318.   CCS has been damaged by XOP, Gupta, and Harding's conspiracy to fraudulently misrepresent their intentions and by the misappropriation and conversion of CCS's intellectual property in an amount unknown at this time and to be determined at trial, but in any event, at least $75,000 plus interest/attorneys' fees and costs as appropriate as well as additional equitable relief as set forth above.

**As and for a**
**FOURTEENTH CAUSE OF ACTION**
**Breach of Fiduciary Duties as against Defendant Harding**

319.     CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 318.

320.     As a shareholder and director of CCS, Harding had certain fiduciary duties to CCS and its other shareholders.

321.     Harding breached those duties by: (i) spending thousands of dollars of company funds on personal purchases; (ii) working as a sales agent for competitors of CCS; (iii) failing to perform his duties, such that CCS was having great difficulties by the time Harding departed, and (iv) colluding with Gupta and XOP to eviscerate the value of CCS by converting much of its intellectual property.

322.     As a result of Harding's misuse of company funds, abuse of his position in the company, and other acts and omissions, CCS's finances were significantly impacted.

323.     Harding directly caused harm to CCS by breaching his fiduciary duties to it.

324.     Accordingly, CCS seeks a judgment from this Court in favor of CCS in an amount to be determined at trial, but in any event, in excess of $75,000.00.

**As and for a**
**FIFTEENTH CAUSE OF ACTION**
**Attorneys' Fees**

325.     CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 324.

326.     Gupta and XOP signed the NDAs with CCS, which are attached hereto as Exhibits B and C.

78

327. Paragraph 11 in each NDA allows for the recovery of attorneys' fees in any "dispute, claim, or legal action between the parties regarding or relating to this Agreement."

328. The breach of the NDAs is a central claim in this case, and as such, attorneys' fees should be recoverable.

329. CCS is also entitled to attorneys' fees pursuant to 18 U.S.C. § 1836 et seq. – the Defend Trade Secrets Act.

330. Accordingly, CCS seeks a judgment from this Court in favor of CCS in the amount of its attorneys' fees.

**As and for a**
**SIXTEENTH CAUSE OF ACTION**
**Punitive Damages as against Defendants XOP, Gupta and Harding**

331. CCS incorporates by reference as if fully set forth herein all the answers and allegations in Paragraphs 1 through 330.

332. Pursuant to 18 U.S.C. § 1836 et seq. – the Defend Trade Secrets Act – CCS is entitled to punitive damages.

333. Accordingly, CCS seeks a judgment from this Court in favor of CCS in the amount of punitive damages to which it is entitled.

**DEMAND FOR JURY TRIAL**

334. Pursuant to FRCP 38, CCS demands a jury trial on all issues triable as of right by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff CCS respectfully requests that the Court enter judgment in its favor and against Defendants XOP, XOP Latvia, XOP India, Harding, and Gupta, holding them liable, jointly and severally, and awarding CCS relief as follows:

(a) judgement in favor of CCS on all claims;

(b) a declaratory judgment by this Court affirming CCS's ownership of all confidential business information including trade secrets misappropriated by Defendants;

(c) injunctive relief to halt any and all further distribution of CCS's confidential business information and trade secrets;

(d) judgment against XOP, Harding, and Gupta in an amount to be determined at trial, but in any event, in excess of $11,200,000;

(e) judgment against Harding in an amount that fairly addresses his breaches of fiduciary duty and unjust enrichment, such amount to be determined at trial, but in any event, believed to be in excess of $75,000.00;

(f) other damages in an amount to be proven at trial, together with pre-and-post judgment interest;

(g) an award of costs and litigation expenses, including reasonable attorneys' fees, incurred in this action;

(h) punitive damages; and

(i) such other and further relief as the Court deems just and proper.

Dated: June 23, 2021                    Respectfully submitted,

                                        THE BAILYN LAW FIRM, P.C.

                                        /s/Bradley R. Bailyn
                                        Bradley R. Bailyn, Esq.
                                        NY Bar No. 4179560
                                        6301 Mill Lane
                                        Brooklyn, NY 11234
                                        Telephone: (646) 326-9971
                                        E-mail: brad@bailynlaw.com

                                        *Attorneys for Plaintiff CCS*

## VERIFICATION

I, Terence McDonough, declare as follows:

1.      I am the Chief Executive Officer of CCS, the Plaintiff in the foregoing case captioned CONVERGED COMPLIANCE SOLUTIONS, INC. v. XOP NETWORKS, INC, XOP NETWORKS LATVIA, SIA, XOP NETWORKS INDIA, PRIVATE LIMITED, ALL AFFILIATES OF THE FOREGOING, SUDHIR GUPTA and DAVID HARDING, in the U.S. District Court for the Southern District of New York. I am a citizen of the United States of America and a resident of the State of New York.

2.      I have authorized the filing of this Complaint. I have reviewed the allegations set out in the foregoing Complaint, and to those allegations of which I have personal knowledge, I know them to be true. As to those allegations of which I do not have personal knowledge, I believe them to be true. If called on to testify I would competently testify as to the matters stated therein.

3.      I verify, under penalty of perjury, that the factual statements in this Complaint concerning myself, my activities, and my intentions, and the Plaintiff, its activities and its intentions, are true and correct.

Executed on: June 21, 2021

Verified by:

_____
Name: Terence McDonough
Title: CEO
Company: Converged Compliance Solutions, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing complaint will be personally served on the following persons as soon as the summons is available:

XOP Networks, Inc. and its affiliates
17218 Preston Road, #2400
Dallas, TX 75252

Sudhir Gupta
5213 Seascape Lane
Plano, TX 75093

David Harding
50 Cortland Lane
Glastonbury, CT 06033

I hereby certify that the foregoing complaint will be served on the following persons in a manner complaint with the 1965 Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters as soon as the summons is available:

XOP Networks Latvia, SIA and its affiliates
Rīga, Kalnciema iela 40, LV-1046
Latvia

XOP Networks India, Private Limited and its affiliates
4/18, Block 4 Roop Nagar Delhi
North Delhi Dl 110007 India

/s/Bradley R. Bailyn

Bradley R. Bailyn, Esq.
NY Bar No. 4179560