**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CONVERGED COMPLIANCE SOLUTIONS, INC.,

                      Plaintiff,

     v.

XOP NETWORKS, INC., XOP NETWORKS LATVIA, SIA, SUDHIR GUPTA and DAVID HARDING,

                      Defendants.

CIVIL ACTION NO.: 1:21-CV-05482

Hon. Paul G. Gardephe

**<u>ORAL ARGUMENT REQUESTED</u>**

**<u>REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
JOINT MOTION TO DISMISS THE FIRST AMENDED VERIFIED COMPLAINT</u>**

GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, New York 10017
(212) 801-9200

*Counsel for Defendants XOP
Networks, Inc. and Sudhir Gupta*

KLINGMAN LAW, LLC
280 Trumbull  Street, 21st Floor
Hartford, Connecticut 06103
(860) 256-6120

*Counsel for Defendant
David Harding*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................. 2

I.  CCS'S OPPOSITION IS PREMISED ON A DEFUNCT LEGAL STANDARD ............ 2

II.  CCS'S VAGUE AND FACTUALLY UNSUPPORTED BREACH OF
CONTRACT CLAIM DOES NOT SATISFY THE PLAUSIBILITY
STANDARD ..................................................................................................... 3

III.  CCS'S TRADE-SECRET MISAPPROPRIATION CLAIMS ARE EQUALLY
IMPLAUSIBLE AND ALSO UNTIMELY ..................................................... 7

IV.  THE COURT SHOULD REJECT CCS'S ATTEMPT TO SHOEHORN ITS
BREACH OF CONTRACT ALLEGATIONS INTO INDEPENDENT TORT
CLAIMS ......................................................................................................... 10

    A.  The Second Cause Of Action For Conversion Against The XOP Parties
    Fails ..................................................................................................... 11

    B.  The Third Cause Of Action For Unjust Enrichment Against The XOP
    Parties And Seventh Cause Of Action For Quantum Meruit Against XOP
    Fail ...................................................................................................... 12

    C.  The Eighth Cause Of Action For Unfair Competition Against XOP Fails ........... 13

    D.  The Ninth Cause Of Action For Fraudulent Misrepresentation Against All
    Defendants Fails ................................................................................. 13

    E.  The Twelfth Cause Of Action For Tortious Interference Against All
    Defendants Fails ................................................................................. 14

    F.  The Thirteenth Cause Of Action For Conspiracy Against Defendants Fails ........ 15

    G.  The Fourteenth Cause of Action For Breach Of Fiduciary Duty Against
    Harding Fails ...................................................................................... 15

V.  THIS "GARDEN VARIETY" BREACH OF CONTRACT ACTION DOES NOT
SUPPORT A RICO CLAIM ............................................................................ 16

VI.  CCS'S SEPARATE CLAIMS FOR REMEDIES ARE NONCOGNIZABLE ............... 18

    A.  The Fourth Cause Of Action For Declaratory Judgment Against The XOP
    Parties Fails ........................................................................................ 19

    B.  The Fifth Cause Of Action For Injunctive Relief Against Defendants Fails ........ 19

C.     The Sixth Cause of Action For An Accounting Against XOP Fails.................... 20

D.     The Eighteenth Cause Of Action For Attorney's Fees Against The XOP Parties And Nineteenth Cause Of Action For Punitive Damages Against Defendants Fail ................................................................................................ 20

CONCLUSION.......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Accenture Glob. Servs. GMBH v. Guidewire Software, Inc.*,
    581 F. Supp. 2d 654 (D. Del. 2008)........................................................5

*AD Rendon Communs., Inc. v. Lumina Ams. Inc.*,
    No. 04-CV-8832, 2007 U.S. Dist. LEXIS 75625 (S.D.N.Y. Oct. 9, 2007)............................11

*Ancile Inv. Co. v. Archer Daniels Midland Co.*,
    784 F. Supp. 2d 296 (S.D.N.Y. 2011).....................................................11

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*,
    356 F. Supp. 3d 379 (S.D.N.Y. 2019).................................................2, 8

*Aretakis v. Caesars Entm't*,
    No. 16-CV-8751, 2018 U.S. Dist. LEXIS 29552 (S.D.N.Y. Feb. 23, 2018)............................8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................3, 7

*Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC*,
    159 F. Supp. 3d 324 (E.D.N.Y. 2016) ...............................................20

*Bensch v. Estate of Umar*,
    No. 20-CV-2268, 2021 U.S. App. LEXIS 18671 (2d Cir. June 23, 2021)......................2, 3, 4

*Bingham v. Zolt*,
    683 F. Supp. 965 (S.D.N.Y. 1988).....................................................18

*Brooklyn Navy Yard Dev. Corp. v. Harbor Diesel Fuel Servs.*,
    No. 10-CV-5715, 2014 U.S. Dist. LEXIS 123573 (E.D.N.Y. Aug. 1, 2014).........................19

*Cambridge Capital LLC v. Ruby Has LLC*,
    No. 20-CV-11118, 2021 U.S. Dist. LEXIS 188635 (S.D.N.Y. Sep. 30, 2021).......................12

*Cascone v. Ortho Pharm. Corp.*,
    94 F.R.D. 333 (S.D.N.Y. 1982) .......................................................18

*Chill v. GE*,
    101 F.3d 263 (2d Cir. 1996)...........................................................14

*Elsevier Inc. v. Doctor Evidence, LLC*,
    No. 17-CV-5540, 2018 U.S. Dist. LEXIS 10730 (S.D.N.Y. Jan. 23, 2018) ..........................8

*Exceed Holdings LLC v. Chi. Bd. Options Exch. Inc.*,
No. 17-CV-8078, 2018 U.S. Dist. LEXIS 169417 (S.D.N.Y. Sep. 30, 2018)......................4, 5

*Gate Techs., LLC v. Delphix Capital Mkts., LLC*,
2013 U.S. Dist. LEXIS 95368 (S.D.N.Y. July 9, 2013) ...........................................................20

*Goodrich Capital, LLC v. Vector Capital Corp.*,
No. 11-CV-9247, 2012 U.S. Dist. LEXIS 92242 (S.D.N.Y. June 25, 2012) ..........................13

*Green v. Covidien LP*,
No. 18-CV-2939, 2021 U.S. Dist. LEXIS 61250 (S.D.N.Y. Mar. 30, 2021)
(Gardephe, J.)..............................................................................................................................2

*Horowitz v. Nat'l Gas & Elec., LLC*,
No. 17-CV-7742, 2018 U.S. Dist. LEXIS 163285 (S.D.N.Y. Sep. 24, 2018).........................14

*Impax Media, Inc. v. Ne. Advert., Corp.*,
No. 17-CV-8272, 2018 U.S. Dist. LEXIS 139972 (S.D.N.Y. Aug. 17, 2018).........................13

*Joester Loria Grp. v. Licensing Co.*,
No. 10-CV-6742, 2011 U.S. Dist. LEXIS 46597 (S.D.N.Y. Apr. 29, 2011)............................6

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011)........................................................................................................6

*Medafor, Inc. v. Starch Med., Inc.*,
No. 09-CV-0441, 2009 U.S. Dist. LEXIS 61345 (D. Minn. July 16, 2009) .............................4

*Moses v. Martin*,
360 F. Supp. 2d 533 (S.D.N.Y. 2004)......................................................................................12

*Patrizzi v. Bourne in Time, Inc.*,
No. 11-CV-2386, 2012 U.S. Dist. LEXIS 146861 (S.D.N.Y. Oct. 11, 2012).........................17

*Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*,
449 F. App'x 57 (2d Cir. 2011) ................................................................................................11

*Rosenson v. Mordowitz*,
No. 11-CV-6145, 2012 U.S. Dist. LEXIS 120077 (S.D.N.Y. Aug. 23, 2012).........................16

*Sehgal v. Aggarwal*,
No. 20-CV-4577, 2021 U.S. Dist. LEXIS 154043 (E.D.N.Y. Aug. 16, 2021).........................16

*Sorias v. Nat'l Cellular USA, Inc.*,
124 F. Supp. 3d 244 (E.D.N.Y. 2015) ........................................................................................8

*Speedfit LLC v. Chapco Inc.*,
No. 15-CV-1323, 2016 U.S. Dist. LEXIS 87649 (E.D.N.Y. June 29, 2016) ..........................11

*Stadt v. Fox News Network LLC,*
   719 F. Supp. 2d 312 (S.D.N.Y. 2010)........................................................................20

*Town & Country Linen Corp. v. Ingenious Designs LLC,*
   436 F. Supp. 3d 653 (S.D.N.Y. 2020)........................................................................12

*Uddoh v. United Healthcare,*
   254 F. Supp. 3d 424 (E.D.N.Y. 2017) .......................................................................11

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.,*
   530 F. Supp. 2d 486 (S.D.N.Y. 2007), *aff'd* 328 F. App'x 695 (2d Cir. 2009).......................18

*Zirvi v. Flatley,*
   433 F. Supp. 3d 448 (S.D.N.Y. 2020).......................................................................10

**State Cases**

*Kaufman v. Cohen,*
   307 A.D.2d 113 (1st Dep't 2003) ............................................................................16

Defendants[1] respectfully submit this reply memorandum in further support of their joint motion to dismiss the AC in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

At baseline, CCS fails to meet its pleading obligations.  Nothing cited or argued in CCS's opposition compels a different conclusion.  Stripped of all hyperbole and excess, all that remains of the AC's nineteen duplicative and substantively defective causes of action is a speculative claim for breach of contract.  That claim asks the Court to assume that the only way XOP (an established voice communications product developer) could have enhanced its pre-existing USN product for "Trader Voice" was to use vaguely-defined "Confidential Information" allegedly shared by CCS almost six years ago.  Even at the pleading stage, such rank speculation need not be credited—a reality the opposition implicitly acknowledges in urging this Court to apply the long-abrogated "no set of facts" pleading standard to it claims.

Unable to demonstrate plausibility, CCS instead aims for confusion.  It broadens rather than clarifies the scope of Confidential Information on which its contract and misappropriation claims are based; changes the theories of its duplicative tort and frivolous RICO claims in response to Defendants' arguments; makes factual assertions untethered to the AC; makes legal pronouncements without supporting authority; and misstates applicable case law.

Attempting to take advantage of the "doubt" it has created, CCS pleads that USN today is the "same product" CCS designed in 2016.  Yet nowhere in its opposition does CCS dispute that most of the 72 technical features the AC describes as comprising the system CCS "envisioned and created" are in fact copied nearly word-for-word from XOP's 2010-copyrighted marketing

---

[1]  Undefined terms herein have the meaning(s) ascribed to them in Defendants' moving memorandum (the "Mem.") in support of their Joint Motion to Dismiss the First Amended Verified Complaint (the "Motion").  CCS's opposition is referred to herein as the "Opp."

materials about USN.  And while it devotes pages of its opposition to descriptions of categories of information it purportedly shared with XOP, most if not all of those categories consist of information that plainly could have been acquired from XOP's customers or otherwise constitutes general industry knowledge.  CCS pleads no facts which rationally suggest otherwise.

Recognizing the "endless parade" of defects rendering its pleading deficient, CCS urges that discovery will prove its claims have merit (it will not).  The only thing CCS will gain in discovery is access to trade secret information about **_XOP's_** USN product, against which CCS apparently has been unable to compete in the market.  Absent pleading a factual basis supporting such intrusion (which CCS wholly has failed to do),[2] such discovery should not be ordered. Accordingly, the AC should be dismissed in its entirety.

## **ARGUMENT**

## I. **CCS'S OPPOSITION IS PREMISED ON A DEFUNCT LEGAL STANDARD**

The opposition is expressly structured around "an outdated and incorrect statement of the pleading standard."  *Green v. Covidien LP*, No. 18-CV-2939, 2021 U.S. Dist. LEXIS 61250, at *16 n.3 (S.D.N.Y. Mar. 30, 2021) (Gardephe, J.).  More specifically, CCS contends that the Motion must be denied "'unless it appears **_beyond doubt_** that [it] can prove **_no set of facts_** in support of [its] claim[s] which would entitle [it] to relief.'"  Opp. at 8-9 (emphasis added).  That "philosophy of pleading was abandoned, and … expressly disavowed, in *Twombly*."  *Bensch v. Estate of Umar*, No. 20-CV-2268, 2021 U.S. App. LEXIS 18671, at *16-17 (2d Cir. June 23, 2021).  There, "the Supreme Court substituted [the] 'plausibility' standard that requires civil complaints to plead … sufficient 'factual content that allows the court to draw the reasonable inference' that the plaintiff

---

[2] *See Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 398 (S.D.N.Y. 2019) (plaintiff's arguments "'that Defendants are … misusing and misappropriating [confidential] information for Defendant's business activities'" and that "'[r]eview of Defendants' internal … records … will be necessary'" amounted to a "classic fishing expedition").

is entitled to prevail on his claim." *Id.* CCS's invocation of a defunct pleading standard premised on doubt rather than factual plausibility is an acknowledgment that its claims are speculative.

## II. CCS'S VAGUE AND FACTUALLY UNSUPPORTED BREACH OF CONTRACT CLAIM DOES NOT SATISFY THE PLAUSIBILITY STANDARD

CCS's misapprehension of the applicable pleading standard is nowhere more evident than in its defense of its first cause of action against the XOP Parties for breach of the NDAs. As previously explained, the claim pleads that the XOP Parties used "Confidential Information" shared by CCS in 2016 to improve and/or market USN years later. *See* Mem. at 11. However, the AC only identifies the "Confidential Information" in question by listing broad categories "devoid of 'further factual enhancement,'" which is not sufficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, the only facts pled to suggest that the XOP Parties are using CCS's broadly-described Confidential Information are that, after those parties' negotiations terminated in 2016, XOP (i) continued its efforts to sell USN to the financial trading industry, and (ii) ultimately was able to work with companies in that industry to incorporate USN into their existing systems. These allegations suggest no more than a "sheer possibility" of a breach, which is too slender a reed on which to base a claim (let alone a nineteen-cause-of-action complaint). *See id.*

In opposition, CCS muddles matters further in its misdirected attempt to establish "doubt" rather than plausibility. It begins by arguing that the definition of "Confidential Information" in the NDAs is "extremely broad" (Opp. at 10)—as if that observation relieves it of its obligation to (i) identify with sufficient specificity the particular information *within* that universe which it believes has been used in breach of the NDAs, and (ii) allege facts plausibly supporting that belief. *See* Mem. at 11-13 & n.13 (citing authorities). If anything, the breadth of the contractual definition makes it *more* important for CCS to concretely describe the information on which its contract claim is based, so that the XOP Parties and Court have notice of the claim's scope and can assess

whether it is "reasonable." *See Bensch*, 2021 U.S. App. LEXIS 18671, at *16-17; *see also Exceed Holdings LLC v. Chi. Bd. Options Exch. Inc.*, No. 17-CV-8078, 2018 U.S. Dist. LEXIS 169417, at *14-15 (S.D.N.Y. Sep. 30, 2018) (dismissing claim for breach of NDA where the allegations "d[id] not identify what proprietary information was used by VEST and precisely *how* the VEST products were similar to Exceed's" and were therefore "insufficient to 'nudge [its] claims across the line from conceivable to plausible'" (emphasis in original)).

Instead of identifying the Confidential Information it believes has been used with clarity, or any features which made cUCS unique from USN, the opposition offers a lengthy list of generic categories of business information[3] and equally generalized descriptions of technical information purportedly contained in documents with names like "Line Sharing Overview v1.1."[4] While these overly technical descriptions consume significant space on the page, their detail upon closer examination proves entirely superficial.[5] They are each individually "so broad as to be meaningless" and "insufficient to inform [the XOP Parties] of the basic fact of what exactly [they are] supposed to have stolen." *See Medafor, Inc. v. Starch Med., Inc.*, No. 09-CV-0441, 2009 U.S. Dist. LEXIS 61345, at *3-4 (D. Minn. July 16, 2009).

Further, even assuming that its communications contained information falling into these

---

[3] *See* Opp. at 10-11 (unhelpfully describing the Confidential Information at issue as including "market problems and solutions overview[s]," "market opportunity specifications," "case slides [] specif[ying] the requirements of a system to be developed," "business models," "business process requirements," "information highly specific to an existing system and its requirements," "technical specifications for the product development," and (more general still) "compilations of information that derive independent economic value from not being generally known").

[4] *See* Opp. at 11-13 (referring to "SIP information to CAS mapping to support private wires," "SIP/VoIP, Private Wire Conference for ARD, MRD, Hoot and Holler, and WebRTC," "a continuous-use process for the Trader Voice Consumers," "trade specific concepts of Call Forking and Line Sharing and implementation plans," and "BT Dealer Boards").

[5] The longer CCS's generic list of Confidential Information becomes, the more apparent it is that CCS is ***unable*** to identify any ***particular*** Confidential Information it has any reasonable basis to believe has been used.

exceedingly broad categories, CCS must also allege a ***factual basis*** for its speculation that ***those*** communications were used to enhance USN. *Cf. McGrath v. Bayer Healthcare Pharm.*, Inc., 393 F. Supp. 3d 161, 169 (E.D.N.Y. 2019) ("[I]t helps precious little to mount [] minutiae on top of technical jargon if that information ultimately does not plead a plausible [claim]").

CCS asserts that the current version of USN is the "same product" as cUCS, which would have required "magic[]" to develop "without any use of CCS's confidential information" (Opp. at 1), but that is just a conclusion which need not be credited.  CCS does not, in opposition, compare even a ***single category*** of the Confidential Information referenced above to the current features or marketing of USN.  As previously noted, the only way the AC is able to portray USN as identical to cUCS is by copying dozens of features from the pre-2016 marketing materials for USN and misrepresenting them as features of cUCS.  *See* Mem. at 6-7; Surprenant Decl. Ex. E.  The AC also relies on a 2018 press release that describes USN in exactly the way it was described in pre-2016 marketing materials.  Mem. at 9.  In other words, the AC merely compares USN ***to itself***.

What CCS is left with is the speculative assumption that simply because USN is now purportedly being used for "Trader Voice," XOP must have used CCS's communications.  That is not enough, because "while [such] allegations [may be] 'consistent' with a scenario in which [defendant] violated the NDA, they do not 'plausibly suggest[]' that is what in fact occurred."  *See Exceed Holdings*, 2018 U.S. Dist. LEXIS 169417, at *14-15 (breach of NDA claim dismissed where plaintiff "ha[d] no direct allegations" of disclosure but "instead relie[d] on the assumption that VEST could not have launched its products without receiving [its] proprietary information").[6]

---

[6] *See also Accenture Glob. Servs. GMBH v. Guidewire Software, Inc.*, 581 F. Supp. 2d 654, 663 (D. Del. 2008) (dismissing claim where plaintiff merely "assume[d], based upon what it feels was 'a surprisingly quick development trajectory,' that [defendant] ha[d] 'somehow' … used [its] trade secrets").  CCS describes *Accenture* as "not at all analogous," but offers no reasoning.  Opp. at 27.

This is particularly true where, as here, there are "alternative explanations … so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).   Take CCS's unpled assertions that it gave XOP documents describing, *e.g.*, the "history of the niche Trader Voice sector," "trade-specific codes," "Trade Voice Consumers architecture," and "Corporation One's Trader Voice environment, equipment, design, current issues and expected future needs."  Opp. at 11-13.  All of these categories of information plainly are known by third parties.  Although McDonough may believe that his experience (which the AC describes in highly vague terms) gives him a better understanding of financial traders' systems and needs than ***IPC and Corporation One themselves*** (*see* AC ¶¶ 49, 377; Opp. at 23), nothing prevented those companies from working with XOP to develop a version of USN ***they*** felt was suitable for their purposes. *See Joester Loria Grp. v. Licensing Co.*, No. 10-CV-6742, 2011 U.S. Dist. LEXIS 46597, at *7 (S.D.N.Y. Apr. 29, 2011) (allegations "consistent with an alternative, lawful explanation of events" do not satisfy *Twombly*).

Indeed, the AC acknowledges that after XOP's discussions with CCS fell through, XOP worked with IPC, the "dominant" provider of voice communications products to financial trading companies (AC ¶¶ 286, 326), to "incorporat[e] [USN] … into its core offerings for financial institutions."  *Id.* ¶ 298.  There is no rational basis to infer that whatever information XOP needed to adapt USN for this purpose came from ***CCS*** as opposed to IPC, or anyone else in the financial trading industry with whom XOP may have consulted.  In opposition, CCS weakly asserts that "[t]he absence of XOP's knowledge in the [relevant] areas would have … given them no credibility to sell a solution to IPC."  Opp. at 13.  Nonsense.  XOP apparently had enough "credibility" for

6

*CCS* to want XOP to develop *its* product.[7]  *See* AC ¶ 41.  Moreover, CCS itself acknowledges that XOP's relationship with IPC predated its own 2016 negotiations.  *See id.* ¶ 62.

Next, apparently concerned that even the outdated "no set of facts" pleading standard may not save its claims, CCS contends that the NDAs somehow shift its pleading burden to the XOP Parties.  The paragraph it cites[8] does not purport to modify the Supreme Court's pleading standard (and CCS cites no authority that doing so is even possible).

Finally, CCS contends that "the only way ... to determine whether Defendants did in fact steal [its] confidential information ... is to move the case forward to discovery."  Opp. at 15. However, the "doors of discovery" are closed to a plaintiff who asserts "nothing more than conclusions."  *Iqbal*, 556 U.S. at 679-680; *see also* fn. 2.  Here, the assertion that the XOP Parties must have used CCS's Confidential Information to sell USN is so speculative and unsupported by any modicum of detail or facts supportive of wrongdoing that it is undeserving of discovery.  The claim is implausible under *Iqbal/Twombly* and should be dismissed.

## III. CCS'S TRADE-SECRET MISAPPROPRIATION CLAIMS ARE EQUALLY IMPLAUSIBLE AND ALSO UNTIMELY

CCS acknowledges that to plead an independent misappropriation claim under New York common law, it must plead the breach of a duty independent of the NDAs.  *See* Opp. at 28.  Its tactic for doing so, apparently, is to undermine its breach of contract claim by characterizing the NDAs as requiring merely "that confidential information be kept in confidence."  *Id.*  Thus, it argues, the allegation that Defendants "[u]s[ed] CCS's confidential information and trade secrets

---

[7] As noted in the moving memorandum, XOP has more than a decade's worth of experience developing and selling voice communications products to clients across a variety of industries— which is no doubt why CCS wanted to work with XOP in 2016.  *See* Mem. at 3-5.

[8] Paragraph 10(b) of the NDAs, on which CCS relies, provides: [n]otwithstanding anything to the contrary contained herein, the foregoing obligations with respect to the nondisclosure of Confidential Information shall not apply to a party if it can show: … b. such information was received from a third party without any obligation or duty to hold the same in confidence."

to secure a competitive advantage" goes "beyond the requirements of the contract" and states a "separate tort meriting a separate remedy." *See id.*  The NDAs flatly refute this contention, as their stated purpose was to prohibit the use of Confidential Information for any purpose other than "evaluating business opportunities of ***mutual*** interest and potential business cooperation transactions."  AC Ex. B § 2 and p. 7 (emphasis added).  The use of Confidential Information "to secure a competitive advantage" (although not adequately pled here) falls within that scope.[9]

For reasons similar to those discussed in Point II, *supra*, both the common-law and DTSA misappropriation claims are also speculative and implausible, in view of CCS's failure to plead (i) its purported trade secrets with any semblance of detail, or (ii) any facts plausibly suggesting that those particular trade secrets have been improperly used.  CCS notably fails to dispute or address a number of Defendants' arguments in this regard.  It ***continues*** in opposition to describe the "trade secrets" at issue interchangeably with "Confidential Information," even though the common law is clear that those categories are not equivalent.  *See* Mem. at 17 (citing *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-CV-5540, 2018 U.S. Dist. LEXIS 10730, at *14, 17 (S.D.N.Y. Jan. 23, 2018)).  It also does not dispute that its trade secrets appear to relate solely to a "new product idea," a category not protected by trade secret law.  *Id.* at 20 (citing, *inter alia*, *Sorias v. Nat'l Cellular USA, Inc.*, 124 F. Supp. 3d 244, 259 (E.D.N.Y. 2015)).

Rather, CCS's opposition begins with the argument that it need not "explicitly disclose in detail … the trade secrets that were the subject of the theft"—a point Defendants have never disputed.  Opp. at 25; Mem. at 18.  There is a huge difference, however, between (i) "explicitly

---

[9] The Court should also reject CCS's contention that duplication turns on whether the Court sustains its breach of contract claim.  *See* Opp. at 28.  Courts routinely dismiss tort claims that are duplicative of nonviable breach of contract claims.  *See, e.g., Arcadia Biosciences*, 356 F. Supp. 3d 379, 401 (S.D.N.Y. 2019); *Aretakis v. Caesars Entm't*, No. 16-CV-8751, 2018 U.S. Dist. LEXIS 29552, at *29 (S.D.N.Y. Feb. 23, 2018).

disclos[ing]" trade secrets, and (ii) describing them as "includ[ing], without limitation, [] non-public formulas, methods, business strategies, techniques, processes, contacts, and all such similar information necessary for CCS to conduct its Trader Voice business in a competitive marketplace," as CCS does. AC ¶ 232. The latter is ***precisely*** the type of meaningless, categorical allegation that has been soundly rejected by Courts. *See* Mem. at 18-19 & n.16 (collecting authorities).

Rather than provide "specific allegations as to the information owned," as required by case law (*see id.* at 18), CCS argues that it has sufficiently put Defendants on notice because they purportedly "are extremely familiar with the contents of the Confidential Documents" and "know exactly what confidential information and trade secrets" are at issue. Opp. at 26-27. The law does not require Defendants to guess what information CCS is contending fits the legal definition of trade secret, based on what they may (or may not) remember or retain of communications from almost six years ago. It is CCS's burden to put Defendants on notice of what ***it*** considers the trade secrets at issue. If accepted, the vague AC would give CCS undue latitude to change its theory *ad hoc* later in the case, as it already attempts to do repeatedly in opposition even in instances where it is clear what it pled (*see, e.g.*, discussion of the conversion and RICO claims, *infra*).

The AC also fails to plead any facts plausibly suggesting that any of CCS's broadly described "trade secrets" have been used by Defendants. At its core, the claim is that because cUCS was purportedly "for Trader Voice," and USN is now being used "for Trader Voice," Defendants must have used CCS's trade secrets.[10] But XOP was free to use its own knowledge of voice communications technology, as well as information from IPC, Corporation One, and others, to enhance its system for their purposes. There are no facts pled to suggest that XOP used CCS's

---

[10] It is difficult to avoid the impression that CCS believes ***any*** future product developed by the XOP Parties "for Trader Voice" would infringe its intellectual property.

trade secrets other than the assertion that those secrets purportedly were exchanged six years ago.

Finally, both claims are untimely under the applicable three-year limitations period. *See* Mem. at 21. CCS argues that the claims cannot have accrued until its trade secrets were used to enhance USN, and that date "is not known." Opp. at 27. The proper question is whether the AC permits an inference that such misappropriation occurred within the three-year window preceding this action. Since CCS's contention is that its Confidential Information was how XOP got an audience with IPC (Opp. at 13), any misappropriation must have occurred prior to June 12, 2018, when the IPC-XOP deal was announced. *See* AC ¶ 73. Indeed, the press release itself says XOP had been supporting IPC's system "for months." *Id.* ¶ 86. Although CCS now claims that it did not become ***aware*** of the press release immediately (*see* Opp. at 4), its discovery of the misappropriation is irrelevant to the accrual of the common-law claim, and the DTSA claim runs from the date it "'should have known'" of the use. Mem. at 21 (quoting *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 459 (S.D.N.Y. 2020)). McDonough claims to have extensive insider access to and knowledge of the Trader Voice industry. If that allegation is accepted, it should be inferred that he learned of the claimed misappropriation more than three years before this action was commenced on June 23, 2021. Both trade-secret misappropriation claims should be dismissed.

## IV. THE COURT SHOULD REJECT CCS'S ATTEMPT TO SHOEHORN ITS BREACH OF CONTRACT ALLEGATIONS INTO INDEPENDENT TORT CLAIMS

As discussed in the moving memorandum, CCS has asserted nine tort claims against XOP, Gupta, and/or Harding, eight of which are premised entirely on the allegation that the XOP Parties used CCS's Confidential Information in breach of the NDAs. The NDAs—which ***CCS*** "required Defendants XOP and Gupta to sign" (AC ¶ 374)—were entered specifically to limit what those parties might do with Confidential Information and extensively cover that subject. CCS's attempt, now, to expand or circumvent that bargain through tort law is without legal basis. *See* Mem. at

21-22 (citing *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d

Cir. 2011)).  In any event, the tort claims also fail for independent reasons as discussed below, and

because CCS fails to plead that Defendants have used its Confidential Information.

### A.     The Second Cause Of Action For Conversion Against The XOP Parties Fails

Contrary to CCS's suggestion, the sole theory of conversion pled in the AC is that the XOP

Parties "have converted a significant but unknown ***amount of Plaintiff's money***" from the sale of

USN.  AC ¶ 124 (emphasis added).  This claim is fatally defective for numerous reasons, including

because CCS cannot allege that it owned or possessed any USN sale proceeds before they were

paid to XOP.  *See* Mem. at 22-23 & n.19 (collecting numerous authorities).

No doubt recognizing these flaws, the Opposition falsely characterizes the second cause of

action as pleading conversion of "intangible property" (*i.e.*, Confidential Information).  *See* Opp.

at 19-20.  That theory appears nowhere in the AC, and the law prohibits CCS from "interpos[ing]

… a new legal theory in opposing a motion to dismiss."  *See Uddoh v. United Healthcare*, 254 F.

Supp. 3d 424, 429 (E.D.N.Y. 2017).  Any claim for conversion of Confidential Information is also

a nonstarter because it would be utterly duplicative of the breach of contract, notwithstanding the

frivolous request for punitive damages.[11]  Finally, the unpled conversion claim fails because even

though New York law recognizes that "a document into which intangible rights have merged" can

be converted, *Ancile Inv. Co. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 312 (S.D.N.Y.

2011), the plaintiff must still plead that the defendant exercised dominion over the property "'to

---

[11] *See Speedfit LLC v. Chapco Inc.*, No. 15-CV-1323, 2016 U.S. Dist. LEXIS 87649, at *29-30 (E.D.N.Y. June 29, 2016) (dismissing conversion claim based on the allegation that the defendants "coopted [] design specifications … [and] exercised an unauthorized dominion over the intellectual property of [p]laintiffs" as duplicative of contract claim, even though the plaintiff alleged that defendants incorporated the intellectual property into products they sold); *AD Rendon Communs., Inc. v. Lumina Ams. Inc.*, No. 04-CV-8832, 2007 U.S. Dist. LEXIS 75625, at *23-24 (S.D.N.Y. Oct. 9, 2007) (request for punitive damages did not save duplicative conversion claim).

the alteration of its condition or to the exclusion of the plaintiff's rights.'" *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004). CCS does not explain how the XOP Parties have deprived CCS of its own use of any Confidential Information. The claim must be dismissed.

**B.     The Third Cause Of Action For Unjust Enrichment Against The XOP Parties And Seventh Cause Of Action For Quantum Meruit Against XOP Fail**

The parties agree that the unjust enrichment and quantum meruit claims may be considered together under the rubric of the latter. Mem. at 25-26; Opp. at 20. In response to the argument that CCS has not adequately pled that it performed a "service" with a reasonable "expectation of compensation," CCS argues that "when Defendants misappropriated the confidential information, [its] creation of the documents ***became*** a service" for which it ***now*** feels it should be compensated. Opp. at 21 (emphasis added). CCS does not dispute that it had no expectation of compensation "initially," when it performed the dubious "service" of answering XOP's questions. *See* Opp. at 21. It did so merely "with the hope and the expectation that, ***if [an OEM agreement] was consummated***, … it would realize a benefit." *See Cambridge Capital LLC v. Ruby Has LLC*, No. 20-CV-11118, 2021 U.S. Dist. LEXIS 188635, at *80 (S.D.N.Y. Sep. 30, 2021) (emphasis added), discussed in the Moving Mem. at 24-25). That is insufficient.

Both claims are also duplicative of the alleged breach of contract. *See* Mem. at 25 (citing authorities ignored by CCS). The only rationale CCS offers for why the claims purportedly allege duties "external to the NDAs" is that "XOP re-packaged and sold the fruits of [CCS's] labor."[12] Opp. at 21. However, the primary, obvious purpose of the NDAs was to bar such conduct. *See* AC Ex. B §§ 2-3. The claims should be dismissed.

---

[12] The sole case CCS cites on the duplication point is inapt because in that case there was a "factual dispute as to the existence of valid contracts governing some of the subject matter of the unjust enrichment and quantum meruit claims." *Town & Country Linen Corp. v. Ingenious Designs LLC*, 436 F. Supp. 3d 653, 670 (S.D.N.Y. 2020). No such dispute exists here.

### C.     The Eighth Cause Of Action For Unfair Competition Against XOP Fails

As explained in the moving memorandum, CCS's unfair competition claim is duplicative of both its breach of contract claim and its claim for common-law misappropriation of trade secrets. *See* Mem. at 25-26 (citing authorities).  CCS ignores this argument, focusing instead on irrelevant issues.[13]  The claim should therefore be dismissed.  *See Impax Media, Inc. v. Ne. Advert., Corp.*, No. 17-CV-8272, 2018 U.S. Dist. LEXIS 139972, at *28 (S.D.N.Y. Aug. 17, 2018) (dismissing unfair competition claim as duplicative where plaintiff "did not address this contention").

### D.     The Ninth Cause Of Action For Fraudulent Misrepresentation Against All Defendants Fails

As previously explained, CCS's fraud claim suffers from at least two critical flaws.  First, it violates Rule 9(b) by failing to identify any specific statement or the "who, when, where" details required by governing law, and improperly conflates Defendants together.  *See* Mem. at 26 (citing authorities ignored by CCS).  Second, insofar as can be discerned from the AC, the fraud alleged appears to relate to the sincerity of the XOP Parties' contractual promise to use the Confidential Information solely for the purpose of evaluating whether to develop cUCS for CCS.  This renders the claim impermissibly duplicative of the claim for breach of the NDAs.  *See id.* at 26-27.

CCS's ignores Defendants' Rule 9(b) arguments.  Nowhere in the opposition's lengthy treatment of the fraud claim is there a ***single citation*** to a misrepresentation in the AC.[14]  CCS mentions Rule 9(b) only once, in the context of arguing that it is not required to plead ***scienter*** with "great specificity."  *See* Opp. at 17.  As made clear by CCS's own citations, although scienter

---

[13] The "primary argument" in *Goodrich Capital, LLC v. Vector Capital Corp.*, No. 11-CV-9247, 2012 U.S. Dist. LEXIS 92242, at *25 (S.D.N.Y. June 25, 2012) was that "plaintiffs have not alleged consumer confusion"—an element not discussed in this Motion.

[14] CCS cites AC ¶ 41 to argue that "the complaint contains specific allegations that XOP presented itself as an experienced partner capable of performing to CCS's needs." Opp. at 17.  However, (i) Paragraph 41 does not in fact feature any such allegation, (ii) the statement itself does not satisfy Rule 9(b), and (iii) there are no facts pled which suggest that the purported statement was false.

may be averred generally, "'the circumstances constituting fraud [must] … be stated with *particularity*.'" *See Chill v. GE*, 101 F.3d 263, 267 (2d Cir. 1996) (emphasis in original).[15]

Although the Court need not reach the issue, CCS also fails to demonstrate that its fraud claim is not duplicative of its breach of contract claim.  Most of the cases cited by CCS on this issue no longer accurately reflect the law.  *See* Opp. at 16 (citing cases from the 1980s and '90s). Recent cases make clear that "where a fraud claim arises out of the same facts as [a] breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, … plaintiff's sole remedy is for breach of contract.'" *Horowitz v. Nat'l Gas & Elec., LLC*, No. 17-CV-7742, 2018 U.S. Dist. LEXIS 163285, at *5 (S.D.N.Y. Sep. 24, 2018).  Although a plaintiff can evade this limitation by pleading a fraud "extraneous and collateral to" the contract, such as an insincere "promise to do something other than what is expressly required by the contract" (*id.*), no such allegations appear in the AC.[16]  For all of these reasons, the fraud claim should be dismissed.

### E.  The Twelfth Cause Of Action For Tortious Interference Against All Defendants Fails

In the moving memorandum, Defendants established that the claim for tortious interference with prospective contractual relations should be dismissed because it (i) is duplicative of the breach of contract claim, (ii) fails to plead that CCS had a "reasonable probability" of entering a business

---

[15] *Chill* also holds that courts "'must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations.'… Plaintiffs still have the 'burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter.'" 101 F.3d at 267.

[16] The best the Opposition offers is a strange assertion that *if* Defendants "already had the technical knowledge that CCS provided," they "misrepresented what they knew in order to get CCS to enter into the NDAs." Opp. at 16.  That assertion (i) is not pled, (ii) is not asserted with particularity, (iii) contradicts CCS's core allegation that the XOP knew nothing about needs or systems of financial trading companies in 2016, and (iv) makes no sense, insofar as why would an entity attempt to steal information it already knew?

relationship with any third party, and (iii) does not plead tortious conduct directed at those third parties, as required by governing law.  Mem. at 27-28.

CCS does not dispute that the claim is duplicative, which alone requires that the claim be dismissed.  Further, the AC flatly pleads that in 2016, CCS "had no relationship or business with" IPC.  AC ¶ 286.  CCS's only response to Defendants' argument that it has not pled a "reasonable probability of a business relationship" with IPC or Corporation One is the unpled assertion that "[w]hile CCS did not have a finished product in 2016, it did in 2017."  Opp. at 23.  No such product is named or described.  *See* Mem. at 3-4.  Nor does CCS explain how, if McDonough was "the only person in the world [in 2017] who had integrated a design for the Trader Voice industry," Defendants can have interfered with any of its business prospects.  In the words of CCS, "if [CCS] had a product ready for Trader Voice [in 2017], IPC would have selected them prior to 2018."  Opp. at 13-14.  Finally, in response to Defendants' argument that it has failed to plead conduct directed at third parties, CCS summarily asserts that "XOP perpetrated a fraud upon IPC and Corporation One."  Opp. at 23.  No citation to the AC is offered, because no such "fraud" appears therein (and no further detail is provided in opposition either).  The claim should be dismissed.

### F.   The Thirteenth Cause Of Action For Conspiracy Against Defendants Fails

Since CCS's fraudulent misrepresentation, conversion, and common-law misappropriation claims are not "actionable tort[s]," the conspiracy claim also fails.  *See* Mem. at 28.

### G.   The Fourteenth Cause of Action For Breach Of Fiduciary Duty Against Harding Fails

CCS's breach of fiduciary duty claim is untimely under the applicable three-year statute of limitations.  *See* Mem. at 29.  In opposition, CCS first attempts to hide behind its own pleading failures, arguing that "[i]t is not clear" from the AC when it first suffered loss.  *See* Opp. at 22.  This issue is less opaque than CCS thinks.  The AC expressly pleads that "Harding's breaches of

15

fiduciary duty began as early as 2015, and continued through his separation from CCS in March, 2017." AC ¶ 97. "Continued through" is not synonymous with "continued beyond," and there is no logical basis in the AC to infer that unauthorized charges or conflicts of interest may have caused losses after Harding's departure. Thus, the limitations period began to run in March 2017, more than three years prior to the commencement of this action.

CCS's remaining arguments are entirely summary and unsupported. The AC does not plead fraud by Harding with the particularity required by Rule 9(b)—let alone misrepresentations "essential" to the claim, as required to bring it within the six-year statute of limitations. *See* Mem. at 30 (Harding's prior argument on these points, which CCS ignores). CCS's assertion that the "discovery rule *may* also toll" the limitations period is equally unavailing. *See* Opp. at 22 (emphasis added). Under that rule, a fraud-based claim must be brought within "2 years from the date the party discovered the fraud or could, with due diligence, have discovered it." *Kaufman v. Cohen*, 307 A.D.2d 113, 122 (1st Dep't 2003). Here, CCS plainly should have discovered any fraud within two years of the June 2018 press release referenced in the AC. AC ¶¶ 73-74.

## V.   THIS "GARDEN VARIETY" BREACH OF CONTRACT ACTION DOES NOT SUPPORT A RICO CLAIM

Even affording the AC the most generous of constructions, no "ongoing fraud on a grand scale" is pled. *See* Opp. at 30. At best, the AC pleads a "scheme[] involving a single, narrow purpose and one or few participants directed towards a single victim." *Sehgal v. Aggarwal*, No. 20-CV-4577, 2021 U.S. Dist. LEXIS 154043, at *11 (E.D.N.Y. Aug. 16, 2021). As previously explained, courts have "uniformly and consistently held" that such schemes are not appropriately addressed by RICO. *Id.*; *Rosenson v. Mordowitz*, No. 11-CV-6145, 2012 U.S. Dist. LEXIS 120077, at *12-13 (S.D.N.Y. Aug. 23, 2012) (observing that judges must "scrutinize" RICO claims

closely to ensure that "'garden variety'" disputes are "'flush[ed] out … at an early stage'").[17]

CCS accuses Defendants of "select[ing] the hardest hit victim" and "focus[ing] on stealing CCS's trade secrets" (Opp. at 31), but there are no other wrongs or victims in the AC on which to focus. Contrary to the opposition's suggestion, the AC does not characterize XOP's **customers** as additional victims of a purported fraud—that is a completely new factual theory invented solely to avoid the authorities discussed above. *See* AC ¶ 340 (pleading "a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding **CCS**" (emphasis added)).

Even if the Court were to humor this new theory (which it should not), it is based on speculation that XOP is making "fraudulent misrepresentations to new and existing Trader Voice Consumers … regarding its knowledge and experience … and Defendants' ability to support and update the products it is providing them with." Opp. at 29. This, CCS claims, "*represents a threat to the integrity of the global financial system* as the global economy relies on the hardware and software … manufactured by Defendants without any oversight by CCS." *Id.* (emphasis in original). As with all of CCS's allegations, this is pure speculation. CCS has no idea what representations XOP makes to its customers, and thus cannot (and does not) articulate any such misrepresentations with the particularity required by Rule 9(b). Nor is there any factual basis for CCS's assertion that XOP is or will be unable to "support and update" its products. *Compare* AC ¶ 307 (citing a 2018 press release which states that XOP had by then been supporting IPC's systems "for months without any issues"). CCS's concern that the economy will collapse if USN is used "without [its] oversight" is dramatically hyperbolic and does not support a RICO claim.

---

[17] *See also Patrizzi v. Bourne in Time, Inc.*, No. 11-CV-2386, 2012 U.S. Dist. LEXIS 146861, at *14-15 (S.D.N.Y. Oct. 11, 2012) (dismissing RICO claim based on defendants' use of the plaintiff's name and trademarks to steal his business and goodwill "because the scheme [plaintiff] alleges is too narrow, and the victims too few, to constitute a continuous pattern," and collecting additional authorities).

Although unnecessary to address in light of the above, CCS's remaining arguments are also meritless. The AC purports to plead an "open-ended pattern" (AC ¶ 342), and CCS doubles-down on that theory in its opposition. *See* Opp. at 30-31. However, the AC does not plausibly plead a threat of continuing criminal conduct. *See* Mem. at 32. Contrary to CCS's assertion (which is unaccompanied by any citation to the AC) CCS does not sufficiently allege that "'the predicate acts or offenses are [Defendants'] … regular way of doing business.'" Opp. at 31. The opposition asserts that "each time that Defendants trafficked in CCS's stolen confidential information and trade secrets, they committed new acts of mail and wire fraud," but the case law is to the contrary.[18] CCS's allegations of "wire fraud" also are not pled with requisite particularity, and Defendants' mere profit from the sale of USN is not "money laundering." Mem. at 33-35 (Defendants' prior arguments ignored by CCS). For all of these reasons, the RICO claims should be dismissed.

## VI.   CCS'S SEPARATE CLAIMS FOR REMEDIES ARE NONCOGNIZABLE

In respect to the AC's assertion of five causes of action for remedies not recognized by New York Law, CCS is compounding its own "attempted distraction." *See* Opp. at 36. Rather than simply withdrawing these claims, the opposition argues that "'issues of procedure'" do not warrant dismissal. *Id.* at 37. However, CCS's cited cases all concern dismissals affecting a party's substantive rights. *See, e.g.*, *Cascone v. Ortho Pharm. Corp.*, 94 F.R.D. 333, 337 (S.D.N.Y. 1982) (question was whether attorney's inadvertence should cause his client to be deprived of her Seventh Amendment "valuable right to a trial by jury"). Dismissing CCS's claims for a declaratory

---

[18] *Compare* Opp. at 34 *with World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 511 (S.D.N.Y. 2007) ("Once an allegedly fraudulent transaction is complete, a plaintiff may not rely on the defendants' retention or use of his assets to establish open-ended continuity.'"), *aff'd* 328 F. App'x 695 (2d Cir. 2009) *and Bingham v. Zolt*, 683 F. Supp. 965, 970 (S.D.N.Y. 1988) ("To say that their continuing control of the music companies constituted ongoing criminal activity would allow plaintiffs to turn every finite scheme … into an enterprise simply by characterizing the defendant's subsequent enjoyment of the proceeds of the scheme as continuous criminal activity.").

judgment, permanent injunction, accounting, attorney's fees, and punitive damages because they are remedies and not causes of action would not prevent CCS from seeking those remedies in appropriate fashion; it would merely bring procedural order to its pleading. The claims do, however, also fail on their merits, as discussed below.

### A.    The Fourth Cause Of Action For Declaratory Judgment Against The XOP Parties Fails

CCS cites California, Kentucky, and Michigan law to argue that its declaratory judgment claim is permissible. Governing *New York* law, however, is clear that the claim is noncognizable. Mem. at 35-36 (collecting authorities).[19] In any event, since CCS has not pled a viable underlying claim or future threat of harm, it is not entitled to the remedy of a declaratory judgment.

### B.    The Fifth Cause Of Action For Injunctive Relief Against Defendants Fails

CCS argues that it "is contractually entitled to seek" an injunction under the NDAs. Opp. at 38. Whether or not this is true, an injunction is a remedy for a substantive claim, not a separate cause of action. Mem. at 36-37. Moreover, CCS does not address Defendants' arguments that the AC fails to plead irreparable injury or that the equities and public interest favor granting such relief (it summarily asserts that these elements are "properly pled"). Opp. at 38. To the contrary, CCS itself pleads that the requested injunction would be an "impossibility" due to the harm it would cause to financial trading companies and others relying on USN. *Id.* Given that no preliminary injunction has been sought, the sole apparent purpose of this claim is to scare XOP's customers and perhaps convince them to contract with CCS instead. *See* AC ¶ 147 (pleading that injunctive relief is warranted because "CCS is far more capable of providing the customers with the same or better quality and support"). This claim should be dismissed.

---

[19] *Brooklyn Navy Yard Dev. Corp. v. Harbor Diesel Fuel Servs.*, No. 10-CV-5715, 2014 U.S. Dist. LEXIS 123573, at *20 (E.D.N.Y. Aug. 1, 2014) is inapposite insofar as it appropriately treats declaratory judgment as a *remedy*, not a cause of action.

### C.      The Sixth Cause of Action For An Accounting Against XOP Fails

CCS does not dispute that an accounting is a remedy, not a cause of action.  Mem. at 38; Opp. at 38-39.  In any event, CCS has no right to an accounting.  The primary case on which it relies, *Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC*, 159 F. Supp. 3d 324, 339 (E.D.N.Y. 2016), did not involve an NDA, did not find a "confidential relationship" adequately pled, and expressly confirms that arm's length business transactions and "relationship[s] aris[ing] from a contract" generally do not give rise to such a relationship.  In contrast, the case law cited by Defendants (which CCS ignores) expressly confirms that "a confidential relationship born out of a standard contractual provision … fail[s] to give rise to [the] required fiduciary relationship." *Gate Techs., LLC v. Delphix Capital Mkts., LLC*, 2013 U.S. Dist. LEXIS 95368, at \*25 (S.D.N.Y. July 9, 2013); *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 323 (S.D.N.Y. 2010) (same).

CCS also contends that the required fiduciary or confidential relationship "existed because of Harding's employment status with CCS."  Opp. at 39.  However, the accounting claim is by its caption and terms asserted solely against XOP.  AC ¶ 169.  CCS cites no authority supporting its suggestion that Harding's employment relationship can satisfy the requirement for an accounting of ***XOP's*** records.

### D.      The Eighteenth Cause Of Action For Attorney's Fees Against The XOP Parties And Nineteenth Cause Of Action For Punitive Damages Against Defendants Fail

CCS's attorney's fees and punitive damages claims are not properly asserted as separate causes of action, and in any event must be dismissed because the breach of contract, DTSA, and/or RICO claims on which they are based are nonviable.  Mem. at 39.

### CONCLUSION

For all the above reasons, the Court should grant this Motion and dismiss the AC in its entirety for failure to state a cause of action.

Dated:      New York, New York             GREENBERG TRAURIG, LLP
            November 12, 2021

                                            */s/ Jennifer A. Surprenant*
                                            Jennifer A. Surprenant
                                            Keith Hammeran

                                            One Vanderbilt Avenue
                                            New York, New York 10017
                                            Tel: (212) 801-9200
                                            Fax: (212) 801-6400
                                            SurprenantJ@gtlaw.com
                                            HammeranK@gtlaw.com

                                            *Counsel for Defendants XOP Networks,*
                                            *Inc. and Sudhir Gupta*


                                            KLINGMAN LAW, PLLC

                                            */s/ Patrick A. Klingman*
                                            Patrick A. Klingman

                                            280 Trumbull Street, 21st Floor
                                            Hartford, Connecticut 06103
                                            Tel: (860) 256-6120
                                            pak@klingmanlaw.com

                                            *Counsel for Defendant David Harding*