UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

CONVERGED COMPLIANCE SOLUTIONS, INC.,

                Plaintiff,

 -against-

XOP NETWORKS, INC, XOP NETWORKS LATVIA, SIA, SUDHIR GUPTA and DAVID HARDING,

 Defendants.

-----------------------------------------------------------------------X

CIVIL ACTION NO.:
1:21-cv-05482

Hon. Paul G. Gardephe

**ORAL ARGUMENT REQUESTED**


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE FIRST AMENDED VERIFIED COMPLAINT**


THE BAILYN LAW FIRM, P.C.
6301 Mill Lane
Brooklyn, NY 11234
(646) 326-9971

*Counsel for Plaintiff*
*Converged Compliance Solutions, Inc.*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................... 2

ARGUMENT .................................................................................................................... 8

    I.      CCS's Breach of Contract Claim Is Properly Pleaded ...................................... 9

    II.     CCS's Tort Claims Are Properly Pleaded ...................................................... 15

    III.   CCS's Misappropriation of Trade Secrets and Violation of the Defend Trade Secrets Act Claims Are Properly Pleaded ....................................................... 24

    IV.   CCS's Civil RICO Claims Are Properly Pleaded .......................................... 28

    V.    CCS'S Claims for Remedies Are Valid ........................................................ 36

CONCLUSION ............................................................................................................... 39

## TABLE OF AUTHORITIES
**Federal Cases**

*ACR Sys. v. Woori Bank,*
    232 F. Supp. 3d 471 (S.D.N.Y. 2017) ................................................................. 23

*Accenture Glob. Servs. GMBH v. Guidewire Software, Inc.,*
    581 F. Supp. 2d 654 (D. Del. 2008) .................................................................. 27

*Ace Arts, LLC v. Sony/ATV Music Pub., LLC,*
    56 F.Supp.3d 436 (S.D.N.Y. 2014) ................................................................... 22

*Am. Fed. Grp., Ltd. v. Rothenberg,*
    136 F.3d 897 (2d Cir. 1998) .................................................................... 21, 39

*Arcadia Biosciences, Inc. v. Vilmorin & Cie,*
    356 F. Supp. 3d 379 (S.D.N.Y. 2019) ................................................................ 28

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................... 8

*Associated Mortgage Bankers, Inc. v. Calcon Mutual Mortgage, LLC et al.,*
    159 F.Supp.3d 324 (E.D.N.Y. 2016) ................................................................. 38

*BNP Paribas Mortgage Corp. v. Bank of America, N.A.,*
    949 F.Supp.2d 486 (S.D.N.Y. 2013) ................................................................. 15

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,*
    No. 03 Civ. 1537 (MBM), 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003) ...................... 15

*Banks v. Wolk,*
    918 F.2d 418 (3rd Cir. 1990) ..................................................................... 33

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................... 8

*Broker Genius, Inc. v. Zalta,*
    280 F.Supp.3d 495 (S.D.N.Y. 2017) ................................................................. 26

*Brooklyn Navy Yard Development Corp. v. Harbor Diesel Fuel Services, Inc.,*
    No. CV 10-5715 (ENV)(VVP), 2014 WL 4364628 (E.D.N.Y. Aug. 1, 2014) .................... 37

*Caballero v. Anselmo,*
　　759 F.Supp. 144 (S.D.N.Y. 1991) ................................................................. 20

*Campeggi v. Arche Inc.,*
　　No. 15 Civ. 1097 (PGG), 2016 WL 4939539 (S.D.N.Y. Sep. 13, 2016) ........................... 20

*Cascone v. Ortho Pharmaceutical Corp.,*
　　94 F.R.D. 333 (S.D.N.Y 1982) ................................................................. 37

*Chambers v. Time Warner, Inc.,*
　　282 F.3d 147 (2d Cir. 2002) ................................................................... 5

*Chill v. General Elec. Co.,*
　　101 F.3d 263 (2d Cir. 1996) ................................................................. 17

*Congregacion de la Mision Provincia de Venezuela v. Curi,*
　　978 F.Supp. 435 (E.D.N.Y. 1997) ............................................................. 35

*Corporate Synergies Group, LLC v. Andrews Eyeglasses No. 18-13381,*
　　2019 WL 3780098 (D.N.J. Aug. 12, 2019) ..................................................... 26

*David v. Sinclair Refining Co.,*
　　25 F.R.D. 190 (S.D.N.Y. 1960) ............................................................... 37

*Degulis v. LXR Biotechnology, Inc.,*
　　928 F.Supp. 1301 (S.D.N.Y. 1996) ........................................................... 17

*EED Holdings v. Palmer Johnson Acquisition Corp.,*
　　387 F.Supp.2d 265 (S.D.N.Y. 2004) ..................................................... 8, 16 - 18

*Elsevier Inc. v. Doctor Evidence, LLC,*
　　No. 19-CV-5540 (KBF), 2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ......................... 24, 28

*First Capital Asset Management, Inc. v. Satinwood, Inc.,*
　　385 F.3d 159 (2d Cir. 2004) ................................................................. 30

*Free Country Ltd. v. Drennen,*
　　235 F. Supp. 3d 559 (S.D.N.Y. 2016) ......................................................... 28

*G.D. Searle & Co. v. Medicore Communications, Inc.,*
　　843 F.Supp. 895 (S.D.N.Y. 1994) ............................................................. 16

*Goodrich Capital, LLC v. Vector Capital Corp.,*
    No. 11 Civ. 9547 JSR, 2012 WL 4123401 (S.D.N.Y. June 26, 2012) ................................. 18

*Giuliano v. Everything Yogurt, Inc.,*
    819 F.Supp. 240 (E.D.N.Y. 1993) ................................................................................. 31, 33

*H.J. Inc. v. Northwestern Bell Telephone Co.,*
    492 U.S. 229 (1989) ................................................................................................ 30, 31, 33

*Harris v. Coleman,*
    863 F.Supp.2d 336 (S.D.N.Y. 2012) ....................................................................................... 19

*IIT v. Cornfeld,*
    619 F.2d 909 (2d Cir. 1980) ...................................................................................................... 17

*Iacovacci v. Brevet Holdings, LLC,*
    437 F.Supp.3d 367 (S.D.N.Y. 2020) ..................................................................................... 26

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,*
    62 F.3d 69 (2d Cir. 1995) ............................................................................................................ 5

*Island Intellectual Property, LLC v. StoneCastle Asset Management LLC,*
    463 F.Supp.3d 490 (S.D.N.Y. 2020) ..................................................................................... 26

*Jewel Source, Inc. v. Primus Jewels, LLC,*
    11 Civ. 3941 (JSR), 2011 U.S. Dist. LEXIS 115830 (Oct. 3, 2011) ..................................... 38

*Kubin v. Miller,*
    801 F.Supp. 1101 (S.D.N.Y. 1992) ....................................................................................... 19

*Lan Sang v. Ming Hai,*
    951 F.Supp.2d 504 (S.D.N.Y. 2013) ..................................................................................... 21

*Moses v. Martin,*
    360 F. Supp. 2d 533 (S.D.N.Y. 2004) ................................................................................... 19

*Pioneer Commercial Funding Corp. v. United Airlines, Inc.,*
    122 B.R. 871 (S.D.N.Y. 1991) ............................................................................................... 19

*Primavera Familienstifung v. Askin,*
    130 F.Supp.2d 450 (S.D.N.Y 2001) ...................................................................................... 16

*Raine v. Lorimar Productions, Inc.,*
    71 B.R. 450 (S.D.N.Y. 1987) ...................................................................................... 9

*SD Prot., Inc. v. Del Rio,*
    498 F. Supp. 2d 576 (E.D.N.Y. 2007) ....................................................................... 25

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) ...................................................................................................... 9

*Schmid, Inc. v. Zucker's Gifts, Inc.,*
    766 F.Supp. 118 (S.D.N.Y. 1991) ............................................................................ 35

*Sehgal v. Aggarwal,*
    20-CV-4577 (JS)(ARL), 2021 WL 3617479 (E.D.N.Y. Aug. 16, 2021) ............. 30, 32

*Softel Inc. v. Dragon Med. & Scientific Commc'ns, Inc.,*
    118 F.3d 955 (2d Cir. 1997) ...................................................................................... 24

*Sperber Adams Assoc. v. JEM Management Assoc. Corp.,*
    No. 90 Civ. 7405 (JSM), 1992 WL 138344 (S.D.N.Y. June 4, 1992) ..................... 17

*Spool v. World Child Int'l Adoption Agency,*
    520 F.3d 178 (2d Cir. 2008) ...................................................................................... 30

*St. John's University, New York v. Bolton,*
    757 F.Supp.2d 144 (E.D.N.Y. 2010) ........................................................................ 20

*Technical Tape Corp. v. Minnesota Min. & Mfg. Co.,*
    200 F.2d 876 ((2d Cir. 1952) ................................................................................... 40

*Telecom Int'l Am., Ltd. v. AT & T Corp.,*
    280 F.3d 175 (2d Cir. 2001) ...................................................................................... 18

*Tesla Wall Sys., LLC v. Related Cos., L.P.,*
    No. 19-CV-5966 (JSR), 2017 WL 6507110 (S.D.N.Y. Dec. 15, 2017) ................... 26

*Town & Country Linen Corp. and Town & Country Holdings, Inc. v. Ingenious Designs LLC, et al.,*
    436 F.Supp.3d 653 (S.D.N.Y. 2020) ........................................................................ 21

*Uni-Systems, LLC, v. United States Tennis Association, Inc., et al.,*
    350 F.Supp.3d 143 (E.D.N.Y. 2018) ........................................................................ 25

*Waverly Properties LLC v. KMG Waverly LLC,*
    824 F.Supp.2d 547 (S.D.N.Y. 2011) ...................................................15

*Williams v. Affinion Grp., LLC,*
    889 F.3d 116 (2d Cir. 2018) ...........................................................34

*Williams v. Time Warner Inc.,*
    No. 09 Civ. 2962 (RJS), 2010 WL 846970 (S.D.N.Y. Mar. 3, 2010) ....................9

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.,*
    530 F.Supp.2d 486 (S.D.N.Y. 2007) ..................................................32

*Zabit v. Brandometry,*
    No. 20 Civ. 555 (JPC), 2021 WL 1987007 (S.D.N.Y. May 18, 2021)...................27

*Zurich American Life Insurance Co. v. Nagel,*
    No. 95-7128 (JSR),2021 WL 1877364 (2d Cir. Aug. 3 1995) ..............5, 22, 24, 39

**State Cases**

*Abacus Fed. Sav. Bank v. Lim,*
    75 A.D.3d 472, 2010 Slip Op. 06143 (1st Dept. 2010) .........................23

*Alexander & Alexander of N.Y. v. Fritzen,*
    68 N.Y.2d 968 (1986) .....................................................23

*Blanco v. Polanco,*
    116 A.D.3d 892, 896, 2014 Slip Op. 02735 (2nd Dept. 2014) ...............23

*Deerfield Communications Corp. v. Chesebrough-Ponds,*
    68 N.Y.2d 954 (1986) .....................................................16

*First Bank of Americas v. Motor Car Funding,*
    257 A.D.2d 287 1999 Slip Op. 04529 (1st Dept. 1999) ....................16

*Perez v. Lopez,*
    97 A.D.3d 558, 2012 Slip Op. 05404 (2nd Dept. 2012) ....................23

**Federal Statutes**

18 U.S.C.A. § 1836(b) ..............................................24, 26
18 U.S.C.A. § 1962(a) ...................................................36
18 U.S.C.A. § 1962(d) ...................................................36

**Rules**

Fed. R. Civ. P. 9(b) .................................................................................................. 17, 35
Fed. R. Civ. P. 12(b)(6) ................................................................................................... 26
Fed. R. Civ. P. 57, Advisory Committee Notes ............................................................ 37

**Other Authorities**

Code Civ.Proc. (Deering, 1937) § 1062a), Michigan (3 Comp.Laws (1929) § 13904) ................... 37
Kentucky (Codes (Carroll, 1932) Civ.Pract. § 639a-3 ..................................................... 37

## PRELIMINARY STATEMENT

Plaintiff Converged Compliance Solutions, Inc. ("CCS") filed this case because its CEO, Terence McDonough ("McDonough"), is a leading expert in Trader Voice technology in the finance industry who saw the opportunity of a lifetime as telephone conferencing technology went digital. McDonough developed a game-changing digital conferencing product. But it was not long before defendants XOP Networks, Inc. ("XOP"), Sudhir Gupta ("Gupta"), and David Harding ("Harding") (XOP, Gupta and Harding collectively, the "Defendants") got wind of the opportunity McDonough had identified and seized it from him. Defendants' actions, which amount to a major intellectual property piracy operation, must not be allowed by this Court to stand.

Defendants have invested extraordinary effort into challenging most or all of CCS's claims based on an endless parade of technicalities that are mostly inconsequential at this very early stage of the case. Defendants waste substantial judicial resources as well as resources of CCS because they fear this case being heard on the merits. Defendants hope to quash this matter before XOP's customers find out how boldly illegal and grossly unethical their actions have been and continue to be. Defendants are attempting to leverage the endless resources which they have gained as a result of exploiting CCS's intellectual property to metaphorically bury CCS, a very small business, in paperwork. Meanwhile, adding insult to injury, CCS has lost profits in the form of lost sales, convoyed sales, and price erosion. Defendants' argument, that they magically developed the same product that CCS had designed without any use of CCS's confidential information or trade secrets, is absurd. There should be no way around discovery under such non-speculative conditions.

In this Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Verified Complaint (the "MOL in Opposition" and "AC" respectively), CCS identifies exactly which facts have been convoluted, conflated, and misrepresented by Defendants in order to fit their facts in line with well-established case law, and in doing so, demonstrates that it is

1

in fact Defendants' version of the facts that is implausible. In this MOL in Opposition, CCS demonstrates why this case must move forward.

## BACKGROUND

**Defendants mischaracterize CCS's history.** CCS was incorporated by McDonough in 2015 and vetted XOP in 2016 as a potential firm to develop a product for CCS leveraging the USN as merely the core engine since it did not support Trader Voice private wires or native integration with Trader Voice turret systems and the integration with ancillary systems used on the trading floor for voice communications. Defendants' allegation in its Memorandum of Law in Support of Defendants' Motion to Dismiss (the "MOL in Support") that in 2016 CCS had no product to sell or under development is speculative, and frankly, wrong. (Def.s' Mem. of Law at 1.) CCS had valuable trade secrets and confidential information that were inherent to a product of great value.[1]

**Defendants misrepresent XOP's past capabilities.** Defendant XOP attempts to contrast itself with CCS, stating that in 2016 it had a 13-year history of sales of communications products. However, XOP's past sales to government agencies and companies were not for products or services designed for Trader Voice. For example, government agencies do not have the same requirements as interdealer brokers or traders, and the back-office users that support them. Government agencies have very minimal connectivity and speed needs. Financial trading companies, trading turret manufacturers, and providers of Trader Voice connectivity (collectively "Trader Voice Consumer(s)") were industries XOP was trying to penetrate, and Harding led the effort by introducing Gupta and XOP to McDonough to harness McDonough's lifetime of experience in Trader Voice and financial markets. In 2016, CCS was vetting XOP's technology. Harding merely

---

[1] As an example, CCS's cUCS product was ready for sale in 2017, despite XOP's delays, and today CCS partners with a heavily regulated global $26B telecom to provide a solution in the Trader Voice market. CCS spent months educating the telcom's technical and sales teams, who provide critical communications daily, on how concepts are implemented in the Trader Voice trade.

knew someone (i.e. Gupta) who could supposedly develop what CCS needed. (First Am. Compl. ¶ 61.)

**More specifically, Defendants misrepresent the capabilities of the USN** by focusing on the USN and not on the USN for Trader Voice. Nowhere does CCS allege that XOP was not in existence or not selling its USN product prior to CCS engaging with XOP. And CCS does not dispute that technology has migrated from TDM to VoIP. However, the USN product Defendants possessed in 2016 was an audio, web, and video conferencing platform for public switched telephone network ("PSTN") connectivity and a private branch exchange ("PBX"), a private telephone network for small offices or enterprises. The capabilities of the USN in 2016 had absolutely nothing to do with the requirements CCS defined for Trader Voice Consumers. XOP's USN in 2016 was merely an enterprise conference bridge that supported video that was fit for government agencies and enterprise voice conferencing for dial in/out conferencing with video, blast dial, and voicemail filters. CCS had a specific set of use cases and evaluated some of the existing features of the USN that could be augmented with CCS's intellectual property, confidential information, and trade secrets to make the USN fit for the purposes for Trader Voice Consumers, including IPC. Contrary to Defendants' representations, the USN was quite simply not fit for the purposes of the Trader Voice vertical at the time of the parties' engagement. Yet Defendants appear to imply that the USN product that existed in, say, 2010, is the same product that exists in 2021. It is wholly incredible and implausible that Defendants would have sat on what amounts to a technological revolution for a decade if the USN was the same product today that it was years ago.

**Defendants manipulate CCS's statement regarding the market.** IPC was not CCS's dominant competitor, but rather, the dominant provider of Trader Voice communication systems and network connectivity for Trader Voice private wires. Corporation One was the linchpin for XOP to work with CCS, and CCS commenced this lawsuit in June 2021, after learning that Corporation One

awarded XOP the business that CCS targeted to win. (*See* First Am. Compl. ¶¶ 20,42,49,53–54,64,79,81–82, 123, 128–129, 181, 279, 280, 302, 308–309, 311, 356, 359.)

**Defendants misquote CCS.** They state that "CCS alleges that it first became aware of XOP's alleged use of its confidential information on June 12, 2018, when XOP issued a press release.  AC ¶¶ 73–74." (Def.s' Mem. of Law at 21.) In fact, as the AC states, the press release was issued on June 12, 2018, according to the document itself; CCS became *aware* of the press release some time after that date. (First Am. Compl. ¶¶ 73–74.)

**Defendants attempt to minimize CCS's description of its trade secrets in the AC.** In fact, CCS provided a specific list of confidential CCS documents that contain confidential information and trade secrets. To suggest otherwise is disingenuous, at best. The confidential information described in the AC, which includes trade secrets, are included in several paragraphs: (i) "a document sent on February 27, 2016, entitled 'CCS Supervisories TR v1.3'" (First Am. Compl. ¶ 45); (ii) an "email [describing] what equipment was in-scope to be replaced by the CCS product being developed, with rough order-of-magnitude pricing" (First Am. Compl. ¶ 45); (iii) "connectivity and use case slides" in a document entitled "Line Sharing Overview v1.0" (First Am. Compl. ¶¶ 47–48); (iv) "On May 3, 2016, CCS provided XOP with additional technical specifications for the product development." (First Am. Compl. ¶ 57); (v) "On May 6, 2016, CCS sent a confidential document entitled 'PW State.doc' to XOP" (First Am. Compl. ¶ 58); (vii) "On May 9, 2016, at XOP's request, CCS sent a confidential and proprietary document entitled 'CCS cUCS Business Case v1.0' to Gupta. There were additional iterations of this document sent to XOP/Gupta, and the document included market problems and solutions overview, volumetrics, market opportunity specifications, and a competition overview including Sycamore/Coriant, all of which were intended to assist Gupta in creating an internal marketing research document for XOP." (First Am. Compl. ¶ 59); and (viii) "CCS created a marketing document based on its solution using XOP's USN. This

confidential and proprietary document is titled 'CCS–Converged Unified Conference Solution.pdf.'" (First Am. Compl. ¶ 85) (the foregoing documents collectively, the "Confidential Documents").[2]

**Defendants' MOL in Support does not address Trader Voice technology.** Ms. Surprenant's Declaration, which accompanies the MOL in Support, and is foundational to Defendants' argument, demonstrates Defendants' lack of clarity in regard to Trader Voice. More specifically:

The Trader Voice industry relies on "always on or available" connections known as private wires and voice devices, known as dealer boards or turrets. The CCS information allowed for a previously unavailable ability for an audio conference solution to: (i) use methods/signaling used by dealer boards to initiate and process communication; (ii) interpret the various turret manufacturer-specific signaling protocols to overcome roadblocks to inter- and intra-provider communication; (iii) manipulate a conference to act like a private wire; and (iv) have a plain standard audio conference to understand the types of configurations used by traders (such as manual and automatic ring downs).

The capability and products described in the Declaration's Exhibits A and B (i) do not mention dealer boards or private wires; (ii) make no mention of potential use in the financial sector; and (iii) do not refer to Telecommunications as a customer sector including Trader Voice Consumers.

---

[2] Importantly, on a motion to dismiss, the Court must generally consider only the allegations of the complaint, but "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements *or documents incorporated in it by reference.*" *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (internal quotation marks omitted, emphasis added). The Court may also consider a document that is "'integral' to the complaint" because "the complaint 'relies heavily upon its terms and effect.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext*, 62 F.3d at 72) as cited in *Zurich American Life Insurance Co. v. Nagel*, No. 95-7128 (JSR),2021 WL 1877364, at *1 (2d Cir. Aug. 3 1995). For the benefit of the Court, CCS describes the Confidential Documents in further detail *infra*, and CCS is prepared to, if necessary, seek leave to file the documents under seal.

In plain terms, prior to 2007 cellular telephones could make voice calls but in no case can they be understood as the same as the iPhone that exists today. XOP possessed a voice conference bridge in 2014, with no capability to speak voice the way Trader Voice Consumers required.

Attached as Exhibit A to the Declaration is a copy of a screen capture of the "About Us" page of XOP's website as it appeared on December 3, 2014. *Contrary to Defendants' suggestions, at no point does CCS state that the USN did not exist in 2016. Yet Exhibit A does not mention anything regarding Trader Voice.* Exhibit A describes a customer base of Cellular Operators, Independent Telephone Companies, Competitive Local Exchange Carriers and Service Bureaus, meaning, the exhibit shows that XOP had an audio conference bridge for standard voice conferencing and a history of selling it to markets outside of Trader Voice Consumers. Yet after speaking with and requesting endless technical information from CCS, today they are a critical provider to IPC (*See* First Am. Compl. ¶¶ 73, 119, 150, 298.) IPC is a significant player in CCS's sector and a company for which McDonough once worked. XOP has also won a deal as a Trader Voice provider to Corporation One, a target CCS directly discussed with XOP.

Attached as Exhibit B to the Declaration is a copy of a screen capture of the "Universal Service Node" page of XOP's website as it appeared on July 7, 2014. *Contrary to Defendants' suggestions, at no point does CCS state that the USN did not exist in 2016. Yet Exhibit B does not mention anything regarding Trader Voice.* The exhibit merely shows that XOP's audio conference bridge supported TDM/VoIP conferencing for plain old vanilla dial tone telephony systems including PSTN and enterprise telephony systems such as Avaya and Cisco. The TDM/VoIP conferencing features they mention natively supported Trader Voice systems without the use of the USN. Legacy voice trading turret systems also have their own internal conferencing capabilities. The information contained on this page has nothing to do with Trader Voice Consumers. The USN is

6

for enterprise telephony, and Trader Voice is treated like a black hole when it comes to voice communications. The USN did not support these features.

Attached as Exhibit C to the Declaration is a copy of the 2010-copyrighted Product Information Folder for XOP's Universal Service Node. *Again, Exhibit C demonstrates the same things as Exhibit B.* Furthermore, in Exhibit C, the CAS TDM Protocols are for dial tone telephony for PSTN and PBX. These are not specific to TDM/VoIP E1/T1/Analog private wires for Trader Voice. TDM Protocols are as follows:

- Analog: FXO/FXS Loop Start

- T1: CAS E&M (Wink Start, Immediate Start), MF, DTMF

- T1: ISDN NI-2, 4ESS, 5ESS, DMS250, INS1500, Q.Sig

- E1: CAS Many country-specific MFC-R2 variants

- E1: Euro ISDN, NET5, DPNSS, DASS32, QSIG

Attached as Exhibit D to the Declaration is a copy of a screen capture demonstrating that the Product Information Folder attached as Exhibit C was available on XOP's website as of at least March 29, 2012. *The above responses apply here as well* and need not be repeated.

Attached as Exhibit E to the Declaration is a demonstrative exhibit comparing excerpts of paragraphs 28--35 of the AC with excerpts of the Product Information Folder attached as Exhibit C. However, paragraphs 28--35 of the AC including Hoot were functions of the USN at the time of engagement that CCS intended to leverage while incorporating all of the trade secrets and confidential information that CCS provided to XOP for the development of the cUCS. The cUCS was and is a defined set of requirements for Trader Voice and Trader Voice Consumers. (*See* First Am. Compl. ¶ 36.) The requirements were defined in multiple documents, technical PowerPoints,

and emails. Since the cUCS incorporated the USN, there was an *intentionally overlapping* design between the cUCS and the USN, which Defendants' counsel attempts to use as a distraction.

As described above, Defendants have glossed over and misrepresented numerous aspects of the AC. As discussed further below, their argument also fails to meet the legal standard for a motion to dismiss and should be denied.

## ARGUMENT

**Standard for a Motion to Dismiss.** To survive a motion to dismiss, the complaint need only contain sufficient factual matter to state a claim to relief that is plausible on its face, and a "claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Whether a complaint is "plausible," as that term is used in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), turns not on whether the alleged conduct is unlikely, but on whether the complaint contains sufficient nonconclusory factual allegations to support a reasonable inference that the conduct occurred. *See Ashcroft v. Iqbal*, at 663.

On a motion to dismiss, the Court need only determine whether the facts pled meet the bare minimum threshold to survive the motion.[3] For purposes of a Rule 12 motion, all well-pleaded allegations are accepted as true, and all inferences are drawn in favor of the pleader. *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F.Supp.2d 265, 271 (S.D.N.Y. 2004).[4] More specifically, a motion to dismiss pursuant to Rule 12 must be denied "unless it appears beyond doubt that the

---

[3] Defendants' assertion on page 20 of their MOL in Support that the AC must identify "which of cUCS's purported features (a) derive from CCS's trade secrets, (b) derive from XOP's pre-existing knowledge or USN product, or (c) are common of communications technology and/or otherwise not CCS's secret and proprietary information" is, in fact, not what the law requires and is a transparent attempt by Defendants to mislead the Court into misconstruing the AC.
[4] To preserve the flow of argument, parentheticals identifying internally quoted or cited authorities have been omitted from the citations from this point forward.

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). This sets a very high bar for dismissal, one which Defendants have failed to meet.

The question before the Court is whether there is any chance CCS can prove its case. *See Raine v. Lorimar Productions, Inc.*, 71 B.R. 450, 453 (S.D.N.Y. 1987) (stating that "doubt as to a party's ability to prove his case, no matter how unlikely it seems he will be able to prove it, is no reason for dismissing [the party's] pleadings for failure to state a claim upon which relief can be granted."). The inevitable answer as to whether CCS might prove its case, is yes, it is possible. Therefore, CCS has adequately pled its case in the AC. Accordingly, as demonstrated below, Defendants' motion to dismiss the AC must be denied.

I.    CCS's Breach of Contract Claim Is Properly Pleaded

Under New York law, "to prevail on a breach of contract claim ... a plaintiff must prove [i] a contract; [ii] performance of the contract by one party; [iii] breach by the other party; and [iv] damages." *Williams v. Time Warner Inc.*, No. 09 Civ. 2962 (RJS), 2010 WL 846970, at *6 (S.D.N.Y. Mar. 3, 2010). Defendants' objection to CCS's breach of contract claim is premised on an alleged failure to plausibly identify confidential information. (Def.s' Mem. of Law at 11–16.) Defendants do not dispute the existence or validity of the NDAs. We find it helpful to begin with the definition of confidential information as agreed to by the parties in the NDAs so that the allegations of breach can be properly examined.

Pursuant to the NDAs, "Confidential Information" includes any discussions or communications, whether in writing or otherwise, and irrespective of the method or medium of transmission which relate to, concern or contain information with respect to the Company's or Exchanging Party's business plans, business relationships, customer list(s), prospective or potential business prospects, negotiations, discussions or agreements with third parties, finances or financial

performance, proprietary technologies and/or intellectual property, whether owned or licensed, including patents, patent applications, computer software programs, source and/or object code, know how, inventions, systems, and methods, any technical or business information of a third party, technical information and intellectual property, business plans, financial models, strategic relationships, business prospects, customer lists, third party agreements and other information which is deemed to be of a confidential and proprietary nature. (First Am. Compl., Exs. B and C ¶¶ 1–2, and introductory paragraphs.)[5] In summary, what can be construed as confidential information between the parties is extremely broad.

CCS's confidential information was sufficiently described in the AC. *See* "Confidential Documents", *supra*. More specifically, the documents provided to Defendants by CCS contained confidential information and trade secrets. They are described in the AC as: (i) containing "market problems and solutions overview, volumetrics, market opportunity specifications, and a competition overview including Sycamore/Coriant," (First Am. Compl. ¶ 59); (ii) being "compilations of information that derive independent economic value from not being generally known or available to the public or other persons who could obtain value from their disclosure or use" (First Am. Compl. ¶ 87); (iii) having steps taken to ensure the confidentiality of the trade secrets (First Am. Compl. ¶ 89); (iv) describing what equipment was in-scope to be replaced by the CCS product being developed, with rough order-of-magnitude pricing (First Am. Compl. ¶ 45); (v) including connectivity and use case slides that specified the requirements of a system to be developed and business models and business process requirements in the context of business process reengineering initiatives (First Am. Compl. ¶ 47); (vi) containing general information and information highly specific to an existing

---

[5] Rather than delve into the NDAs, Defendants reference the AC's paragraph 107 in an attempt to suggest a more limited definition of Confidential Information. (Def.s' Mem. of Law at 12.) Defendants also reference the NDAs on page 8 of their MOL in Support but fail to reveal the full extent of what is defined as Confidential Information in the NDAs.

system and its requirements, including, but not limited to, use cases and the types, nature, and extent of the equipment then in use, as well as use cases and how CCS's new bridge product would meet those needs (First Am. Compl. ¶ 48); (vii) describing the type of equipment that needed replacing (First Am. Compl. ¶ 49); (viii) including technical specifications for the product development (First Am. Compl. ¶ 57); (ix) providing SIP information to CAS mapping to support private wires (First Am. Compl. ¶ 58); (x) including a market problems and solutions overview, volumetrics, market opportunity specifications, and a competition overview including Sycamore/Coriant (First Am. Compl. ¶ 59); (xi) and including a marketing document based on the cUCS solution which included migration towards packet-based technologies SIP/VoIP, Private Wire Conference for ARD, MRD, Hoot and Holler, and WebRTC. (First Am. Compl. ¶ 85).

In other words, in the Confidential Documents, CCS specifically described to XOP and Gupta its confidential information and trade secrets. (*See* First Am. Compl., Exs. B and C ¶¶ 1–2.) CCS has been explicit in describing its confidential information in the AC, aiming only to avoid disclosing the exact content of the Confidential Documents themselves. Furthermore, Defendants know exactly what information is in the Confidential Documents. For Defendants to pretend that they have not been adequately put on notice of what confidential information and trade secrets were exchanged is absurd. That said, for the benefit of the Court, CCS will further elucidate:

Line Sharing Overview v1.1 contains four (4) separate discrete components of information combined into a continuous use process for Trader Voice Consumers, with specific designs for Corporation One: (i) how BT dealer boards work and communicate; (ii) knowledge of Trader Voice Consumers architecture, their service in general, and specifically at Corporation One; (iii) Corporation One's Trader Voice environment, equipment, design, current issues and expected future needs; and (iv) McDonough's unique, new vision and technical diagrams of how all the parts should all work together. The process illustrated in this document is the golden key to a

communication model, understood only by Trader Voice professionals such as McDonough, that did not exist in the market and is applicable to all Trader Voice Consumers.

CCS cUCS Business Case v1.1 contains five (5) separate discrete components of information combined into a continuous-use process for the Trader Voice Consumers: (i) a history of the niche Trader Voice sector and how the specific impact of well-known global events formed McDonough's perspective as a Trader Voice engineer; (ii) identified issues in the Trader Voice market known only to insiders and engineers; (iii) a target market with financial assumptions not generally known outside Trader Voice, including specific to Corporation One, which XOP eventually won; (iv) an overview of how competitors operate and accomplish their service, only known by someone who worked in the bowels of their engineering departments and spent countless hours in data centers getting Trader Voice systems and the ancillary systems that connect to the Trader Voice systems to work properly; and (v) a roadmap of how to deliver and support in a manner consistent with accepted Trader Voice delivery standards. The roadmap and unknown Trader Voice information detailed by McDonough in this document provided and delivered a blueprint to the market strategy needed to deliver CCS's solution giving XOP first mover advantage to market a product to IPC that McDonough knew would be crucial because of his lifetime of experience in the trade.

CCS Supervisories TR v1.3 contains four (4) separate discrete components of information combined into a continuous use process for the banking sector: (i) trade specific concepts of Call Forking and Line Sharing and implementation plans; (ii) a conceptual inter- and intra-site overview specific to the trade in Financials; (iii) integration into existing Trader Voice systems; and (iv) trade-specific security considerations derived from dealing with Trader Voice Consumers. As a conferencing bridge provider to mostly government entities, XOP would not be familiar with trade floor specific concepts of Call Forking and Line Sharing and their various implementations in Trader

Voice. They would have never had to integrate with a Dealer Board much less Dealer Boards from various providers on various networks.

PW State.doc is a white paper that contains over eight (8) separate discrete components of information combined into a continuous use process for the operation of private wires from CAS to SIP for use in the banking sector, including: (i) trade-specific concepts of international signaling protocols and how they are implemented in the trade; and (ii) trade-specific codes, timing, design, and events required to decipher communications. Private Wires and their configuration are foreign concepts to anyone outside of the trade. The detailed information on specific private wire codes, timing, and events and how they are implemented for Trader Voice Consumers is only known to Trader Voice engineers. Without this information and the knowledge of how they should interact with a conferencing bridge, coding a solution would be impossible. This document needed to be augmented with McDonough's knowledge of edge cases (codes, signals, etc., that may exist but will not always exist) and was requested by Gupta when XOP was having issues implementing the code.

**The Impossibility and Implausibility of Other Explanations.** Defendants argue that "any information about the existing systems or needs of such [financial trading] companies could have been provided by IPC or the companies themselves at some point in the five years since XOP and CCS's discussions terminated." (Def.s' Mem. of Law at 15.) The absence of XOP's knowledge in the aforementioned areas would have made it impossible for XOP to develop a solution for Trader Voice and given them no credibility to sell a solution to IPC. McDonough's role prior to CCS was at IPC, and as he has attested in the affidavit attached hereto as Exhibit A, IPC could not have transferred the information to XOP because it did not possess the totality of the information, or anything close to it. IPC was not developing a similar product and had to have relied on XOP to tailor the USN for the future of their Trader Voice network based on CCS's confidential information and trade secrets. (*See* First Am. Compl., ¶¶ 73, 119, 150, 298.) If XOP had a product ready for

13

Trader Voice, IPC would have selected them prior to 2018. McDonough's unique vision of how to use a conferencing bridge with CCS' intellectual property dictating how to deliver these specific concepts was critical to the process.

However, even if it were possible for the confidential information and trade secrets to come from elsewhere, the burden is not on CCS to prove that XOP breached the NDAs. The NDAs clearly place the burden on XOP: "the foregoing obligations with respect to the nondisclosure of Confidential Information *shall not apply to a party if it can show*: ... b. such information was received from a third party without any obligation or duty to hold the same in confidence;" (First. Am. Compl., Exs. A and B ¶ 10, emphasis added.) In other words, XOP must demonstrate to this Court--and it has failed to do so--that in fact the confidential information it received from CCS was duplicated in receipt from a third party. Ultimately, the law admits as plausible CCS's assertion that Defendants stole its intellectual property, and the contract requires that Defendants prove their innocence, which they have failed to do.

Defendants pretend that this relationship was an arm's length negotiation over an OEM agreement. The truth is that this was, upon information and belief, a "good cop--bad cop" scheme between Harding and Gupta to deceive McDonough into producing and delivering extensive intellectual property. XOP played "bad cop," refusing to continue the negotiations unless McDonough produced more and more highly confidential information and trade secrets. Harding, an employee and director of CCS, played "good cop," pressuring McDonough into releasing the information, ostensibly for CCS's benefit. He assured McDonough over and over that he knew Gupta, Gupta was negotiating in good faith, and everything would work out. Producing all of the confidential information which Gupta needed to help him understand the customers' needs, the market size and the technology of Trader Voice Consumers took McDonough hundreds of hours. To suggest that Gupta magically forgot all of this and then went straight to IPC with nothing in his

head, and then IPC proposed to do exactly what CCS was planning to do the same way that CCS was planning to do it, without compromising CCS's intellectual property, is not remotely plausible.

As a threshold matter, CCS's breach of contract claim meets and surpasses the *Iqbal/Twombly* standard to survive a motion to dismiss. Furthermore, the only way for the trier of facts to determine whether Defendants did in fact steal CCS's confidential information—which, it appears, they did—is to move the case forward to discovery. Dismissing its breach of contract claim at this early stage would disenfranchise CCS and undermine any possibility of redress for the extensive harm caused to it by Defendants.

## II.    CCS's Tort Claims Are Properly Pleaded

CCS is entitled to make a breach of contract claim and additional tort claims because Defendants may be liable in tort as well as in contract. "[A] defendant may be liable in tort ... when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537 (MBM), 2003 WL 23018888, at *16 (S.D.N.Y. Dec. 22, 2003), aff'd, 110 F. App'x 191 (2d Cir. 2004). For example, under New York law, "[w]here a party has fraudulently induced the plaintiff to enter into a contract, it may be liable in tort, or where a party engages in conduct outside the contract but intended to defeat the contract, its extraneous conduct may support an independent tort claim." *BNP Paribas Mortgage Corp. v. Bank of America, N.A.*, 949 F.Supp.2d 486, 505 (S.D.N.Y. 2013).

In order to distinguish a tort claim from a breach of contract claim under New York law, a plaintiff must: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation or other tortious conduct collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation or other tortious conduct and unrecoverable as contract damages. *Waverly Properties LLC v. KMG Waverly LLC*, 824 F.Supp.2d 547 (S.D.N.Y. 2011). In the sections below, CCS will demonstrate, for each of its

claims, either a legal duty independent of the NDAs, tortious conduct collateral and extraneous to the NDAs, or special damages.

**Fraudulent Misrepresentation.** Under New York law, "[i]n order to convert a contract claim into a tort claim for fraudulent inducement, the allegedly defrauded party must set forth specific facts from which a reasonable trier of facts could directly or indirectly infer that promisor intended not to honor his obligations at the time the promise was made. *G.D. Searle & Co. v. Medicore Communications, Inc.*, 843 F.Supp. 895, 910 (S.D.N.Y. 1994). It is well established that a misrepresentation of present fact which is the inducement for a contract is collateral to said contract, and can support a separate fraud claim. See, e.g., *Deerfield Communications Corp. v. Chesebrough-Ponds*, 68 N.Y.2d 954, 956 (1986); see also *Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 491, *reconsidered on other grounds*, 137 F.Supp.2d 438 (S.D.N.Y. 2001) (stating that "a false representation that induces one to enter into a contract supports a fraud claim"); and *First Bank of Americas v. Motor Car Funding*, 257 A.D.2d 287, 292 Slip Op. 04259 (1st Dept. 1999) ("[A] misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty."). *EED Holdings*, 387 F.Supp.2d at 279.

It is necessary to understand the course of events amongst the parties in order to distinguish the breach of contract claim from the tort claims. Defendants appear to suggest that they already had the technical knowledge that CCS provided. If that were true, XOP and Gupta would have had no need to sign an NDA with CCS—in which case these defendants misrepresented what they knew in order to get CCS to enter into the NDAs. That is a basis for the tort claims. By entering into the NDAs, XOP and Gupta received, *inter alia*, the contents of the Confidential Documents.

Here, the fraud claim seeks to recover the damages CCS has sustained as a result of being induced to enter into the NDAs with Defendants by the Defendants' misrepresentations of fact

concerning the present conditions of XOP's hardware, knowledge, and capabilities. XOP and Gupta's statements as to the conditions, which were made to induce the signing of the NDAs, are collateral to the actual terms of the contract. Furthermore, the damages that CCS seeks to recover in its fraud claim are distinct from the "benefit of the bargain" damages sought in the contract claim. While there is no specification of these damages in the complaint, no such specification is required. *See EED Holdings* at 279 (2004).

Additionally, a plaintiff "cannot be expected to plead a defendant's actual state of mind[,]" and thus need not allege the defendant's requisite intent with any great specificity. *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996). Under Rule 9(b), ("'plaintiffs have the burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter'") *Id.*; *see also EED Holdings* at 280 (stating that "Rule 9(b) requires that a plaintiff plead the intent element of fraud only in general terms").

Furthermore, a plaintiff can establish a strong inference of fraudulent intent "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Chill* at 267. Here, the complaint contains specific allegations that XOP presented itself as an experienced partner capable of performing to CCS's needs. (First Am. Compl. ¶ 41.) Such allegations satisfy the scienter pleading requirement. See *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1312 (S.D.N.Y. 1996) (holding that the scienter pleading requirement was satisfied simply by alleging that the defendants were directors of companies that disseminated misleading financial information); and *Sperber Adams Assoc. v. JEM Management Assoc. Corp.*, No. 90 Civ. 7405 (JSM), 1992 WL 138344, at *4 (S.D.N.Y. June 4, 1992) (holding that scienter was adequately pled where private placement memoranda and investment summaries were alleged to contain material omissions and defendants were alleged to have prepared such documents) (citing *IIT v. Cornfeld*, 619 F.2d 909, 923–24 (2d Cir. 1980) (holding that scienter was sufficiently plead where the complaint included

both general allegations of knowledge of a fraud and specific allegations of misrepresentations)) as cited in *EED Holdings* at 280.

**Unfair Competition.** "The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001).

CCS properly alleged that: (i) it identified a major market need; (ii) it developed highly detailed plans and specifications for a product that would fulfill that need; (iii) Harding connected CCS with Gupta and XOP, allegedly for a business purpose; and (iv) as evidenced by the outcome, the purpose was deceitful. (*See* First Am. Compl. ¶¶ 297--300.) CCS's unfair competition claim is not duplicative of its contractual claim because of Defendants' fraudulent misrepresentations which induced CCS to enter into the NDAs.

In *Goodrich Capital*, "plaintiffs allege that [defendant] abused the confidential relationship the parties had under the NDA by misappropriating the fruit's [*sic*] of plaintiffs' labor, including, among other things, their proprietary business strategies," and the Court found that this was sufficient. *Goodrich Capital, LLC v. Vector Capital Corp.*, No. 11 Civ. 9547 JSR, 2012 WL 4123401, at *5 (S.D.N.Y. June 26, 2012). Likewise, in this matter, CCS alleges that the Defendants misappropriated the fruits of CCS's labors, both through the fraudulent actions of XOP and Gupta, through the abuse of a confidential relationship premised on the NDAs, and through the abuse of a fiduciary relationship in relation to Harding's actions, which is sufficient to maintain this cause of action.

**Conversion**. To sustain a conversion claim, a plaintiff must allege that "'(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control

over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'" *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004). XOP is rightfully subject to a conversion claim, and Defendants' cited case law acknowledges such: "plaintiff's *superior right of ownership* is sufficient to establish conversion as an action distinct from any breach of contract claim." *Id.* (emphasis added), CCS's breach of contract claim is based on XOP's unauthorized use of its confidential information, which CCS has plausibly pled (*see* section I *supra*). The sale of a product incorporating that confidential information is a tort of conversion meriting a separate remedy.

"Additionally, New York has extended the tort of conversion to some intangible property rights that are 'merged in, or identified with, some document.'" *Harris v. Coleman*, 863 F.Supp.2d 336, 244 (S.D.N.Y. 2012). "Under New York law, a claim for conversion of intangible interests embodied in a tangible document need not allege conversion of the document itself. In both *Kubin v. Miller*, 801 F.Supp. 1101, 1118 (S.D.N.Y. 1992) and *Pioneer Commercial Funding Corp. v. United Airlines, Inc.*, 122 B.R. 871, 884 (S.D.N.Y. 1991), the Court sustained a claim for conversion where plaintiff alleged that the property converted was the intangible property interest that was identified in a document, not the document itself.

CCS has shown that its intellectual property is specifically identifiable. (First Am. Compl. ¶¶ 45, 47–48, 57–59, 85, 232–233.) CCS has shown that it had ownership, possession, and control over the intellectual property before its conversion. (First Am. Compl. ¶¶ 234.) And CCS has shown that XOP had to have taken that intellectual property and put it to use without CCS's authorization because XOP did not possess the capabilities to enter the Trader Voice space on its own. (First Am. Compl. ¶¶ 117–119.) That is all CCS needs to plead for the conversion claim to stand. CCS's argument that it is entitled to 80% of the proceeds from the sale of the USN for Trader Voice is

merely a reasonable estimate of what it is entitled to based on prior discussions between CCS and XOP, however as CCS states in its prayer for relief, the amount to which CCS is entitled must be determined at trial.

Furthermore, the conversion claim is not duplicative of any other claim because punitive damages may be available upon a successful claim for conversion. S*ee Caballero v. Anselmo,* 759 F.Supp. 144, 153–54 (S.D.N.Y. 1991) (punitive damages were available for conversion where the plaintiff proves Defendant's malice or reckless disregard of the plaintiff's rights). "The act is malicious when the thing done is with the knowledge of plaintiff's rights, and with the intent to interfere therewith. In a legal sense it means a wrongful act, done intentionally, without just cause or excuse." *St. John's University, New York v. Bolton,* 757 F.Supp.2d 144, 178 (E.D.N.Y. 2010). Here, Defendants acted intentionally without just cause or excuse.

**Quantum Meruit and Unjust Enrichment.** Again, CCS has the right to plead multiple causes of action. "'Under New York law, quantum meruit and unjust enrichment claims may be analyzed in tandem as a single quasi-contract claim.'" *Campeggi v. Arche Inc.,* No. 15 Civ. 1097 (PGG), 2016 WL 4939539, at *11 (S.D.N.Y. Sep. 13, 2016). The elements of a quantum meruit claim are: "'(1) the performance of services [by the plaintiff] in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Id.*

CCS plausibly pleads that all of McDonough's work that went into producing the confidential information is the definition of a service provided to XOP and Gupta. Material was designed, created, and produced specifically for them, and, at their request, edited and improved for them.[6]

---

[6] A reasonable estimate of the time involved in the production of several key documents totals 524 hours. At a consultant rate of $200/hour, the value of the work produced by CCS is at minimum $104,800.00.

On at least 12 occasions, Defendants asked and needed CCS to provide further information or explanation. (See First Am. Compl. ¶¶ 44–50, 53–54, 57–59.) Furthermore, XOP re-packaged and sold the fruits of that labor, thereby receiving benefits from it. (First Am. Compl. ¶¶ 297–300.) Accordingly, the quantum meruit and unjust enrichment claims must stand because they are external to the NDAs. *See*, e.g., *Town & Country Linen Corp. and Town & Country Holdings, Inc. v. Ingenious Designs LLC, et al.*, 436 F.Supp.3d 653 (S.D.N.Y. 2020).

Contrary to what Defendants argue, CCS absolutely had an expectation of compensation for the services it was providing to XOP. It quite reasonably expected to monetize the intellectual property it developed and transferred to XOP, which XOP ultimately benefited from.

On page 25 of the MOL in Support, Defendants wrongly frame the exchange of information pursuant to the NDAs as a one-way street: "CCS's creation and/or provision of materials to XOP was not a 'service' performed for XOP's benefit—it was done to convince XOP to execute an OEM agreement under which **XOP** would provide design, engineering, and development services **for CCS's benefit**. *See* AC ¶¶ 40–41 & Ex. B at 1, 7." That may have been the case initially but when Defendants misappropriated the confidential information, CCS's creation of the documents became a service. Furthermore, CCS specifically amended its documents at Gupta's request. (*See* First Am. Compl. ¶ 50.) As such, the quantum meruit and unjust enrichment claims should stand.

**Breach of Fiduciary Duties**. Under New York law, a claim for a breach of fiduciary duty requires "(1) that the defendant owed [plaintiff] a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach." *Lan Sang v. Ming Hai*, 951 F.Supp.2d 504 (S.D.N.Y. 2013).

Harding, as CCS's employee, owed CCS a fiduciary duty of care. "Under New York law, employees owe fiduciary duties to their employers, independent of any contractual duties, and some such duties survive termination. *See*, e.g., *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 906 (2d

21

Cir. 1998) ("[E]ven former employees may not misappropriate and utilize confidential information, such as customer lists and other confidential information not generally known to the public, but available only to employees in their endeavors for the company.").", *Zurich American Life Ins. Co. v. Nagel*, No. 95-7128 (JSR),2021 WL 1877364 (2d Cir. Aug. 3 1995). (*See also* First Am. Compl. ¶ 318.) Harding breached that duty of care in several ways. (*See* First Am. Compl. ¶317.) And as a direct result of Harding's conspiring with XOP and Gupta, CCS has incurred enormous harm. *See id.*

**Timing.** Harding argues, on the basis of his own speculation and assumption, that CCS's claim against Harding for breach of fiduciary duty is time-barred. It is not clear at this point when Harding's unauthorized charges became apparent to CCS, much less the nature, scope, and timing of all of Harding's breaches of his fiduciary duties. Additionally, if sounding in fraud, the statute of limitations is six years, not three years. Alternatively, as Defendants acknowledge, the discovery rule may also toll the statute of limitations if it is a fraud-based breach of fiduciary duty claim. (Def.s' Mem. of Law at 30.) The claim for breach of fiduciary duties is quite simply unlikely to be time-barred and a judgment for dismissal of the cause of action cannot be made at this stage of litigation.

<u>**Tortious Interference**</u>. In order to state a claim for tortious interference with prospective economic relations, a plaintiff must allege that: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F.Supp.3d 436, 452 (S.D.N.Y. 2014).

Again, CCS has properly pled tortious interference with prospective contractual relations. Contrary to Defendants' assertions, CCS has properly pled facts plausibly demonstrating that it "had a reasonable probability of a business relationship" with IPC and Corporation One. (First Am.

Compl. ¶¶ 308–311.) Defendants knew of the relationship, and improperly used CCS's confidential information and trade secrets, causing injury to the relationship. (First Am. Compl. ¶¶ 310–311.) While CCS did not have a finished product in 2016, it did in 2017. CCS also had the only person in the world at this time, who had integrated a design for the Trader Voice industry: McDonough.

Defendants tortiously interfered with CCS's prospective business relations with IPC and Corporation One by marketing to them the USN for Trader Voice, which incorporates CCS's confidential information and trade secrets. By doing so, XOP perpetrated a fraud upon IPC and Corporation One. This tortious conduct substantiates CCS's claim.

**Conspiracy.** "[A] plaintiff may plead the existence of a conspiracy in order to connect the actions of the individual defendants with an actionable, underlying tort, and establish that those actions were part of a common scheme (*see Alexander & Alexander of N.Y. v. Fritzen*, 68 N.Y.2d 968, 969 (1986); *Blanco v. Polanco*, 116 A.D.3d 892, 896, 2014 Slip Op. 02735 (2nd Dept. 2014). Under New York law, "[i]n order to properly plead a cause of action to recover damages for civil conspiracy, the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement" (*Perez v. Lopez*, 97 A.D.3d 558, 560, 2012 Slip Op. 05404 (2nd Dept. 2012)). *See also Abacus Fed. Sav. Bank v. Lim*, 75 A.D.3d 472, 474, 2010 Slip Op. 06143 (1st Dept. 2010), and Exhibit B hereto.

As Defendants' state, New York recognizes that a claim of civil conspiracy is viable to "'connect the actions of separate defendants with an otherwise actionable tort.'" *ACR Sys. v. Woori Bank*, 232 F. Supp. 3d 471, 478 (S.D.N.Y. 2017). The torts of conversion, fraudulent misrepresentation, and misappropriation of trade secrets are viable and tie together the independent actions of the Defendants. Because the underlying torts are distinct from the breach of contract claim for the reasons described in the sections dealing with each tort in this MOL in Opposition, the conspiracy cause of action is also not duplicative of CCS's breach of contract claim.

III.   **CCS's Misappropriation of Trade Secrets and Violation of the Defend Trade Secrets Act Claims Are Properly Pleaded**

For a party to succeed on a claim for the misappropriation of trade secrets under New York law, it must demonstrate: "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means." *Elsevier Inc. v. Doctor Evidence, LLC*, No. 19-CV-5540 (KBF), 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23, 2018). Similarly,

> [t]o prevail on a claim for violation of the [Defend Trade Secrets Act], [a party] must show that it "own[s] a trade secret," 18 U.S.C. § 1836(b)(1); and either that there has been "actual or threatened misappropriation," in which case injunctive relief is authorized, *id.* § 1836(b)(3)(A), or that there has been "unjust enrichment" or "actual loss caused by the misappropriation of the trade secret," in which case damages are authorized, *id.* § 1836(b)(3)(B). The statute provides that
>
> > "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
> >
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.] *Id.* § 1839(3).

*Zurich* at *5.

"[A] trade secret is any pattern, formula, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Elsevier*, at *3. It is "not simply information as to a single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business." *Softel Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955,

968 (2d Cir. 1997). Trade secrets can "exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable trade secret." *Elsevier*, at *3.

Although there is no one-size-fits-all definition to a trade secret, New York courts generally consider the following factors to determine its contours:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; *4 (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*Elsevier*, at *3–4.

As described in section I *supra*, and in accordance with these definitions, CCS possessed trade secrets, which it provided to XOP.

**Explicit Disclosure of Trade Secrets is Not Required**. Unsurprisingly, nothing in the law requires CCS to explicitly disclose in detail in its AC the trade secrets that were the subject of the theft. See *SD Prot., Inc. v. Del Rio*, 498 F. Supp. 2d 576, 586 (E.D.N.Y. 2007) (stating that a trade-secret plaintiff "has no obligation to reveal those secrets in the [c]omplaint simply to prove that they exist."). All CCS need present is factual allegations that confidential information rising to the level of a trade secret exists, and that it is being used by a party who had previous, but has not present, entitlement to its use. *See Uni-Systems, LLC, v. United States Tennis Association, Inc., et al.*, 350 F.Supp.3d 143, 171 (E.D.N.Y. 2018). And CCS has indeed made such allegations. (*See* section I *supra*, First Am. Compl. ¶¶ 70–74.) As alleged in the AC, CCS specifically designed a product *for Trader Voice*, and XOP's press release specifically calls for the integration of the USN into the

25

*Trader Voice* industry--an industry which neither Gupta nor XOP knew anything about prior to encountering CCS. ¶¶ 73--75.

"There is no heightened pleading standard for claims brought under the Defend Trade Secrets Act (DTSA)." 18 U.S.C.A. § 1836(b). CCS's disclosure in the AC need only be adequate to put Defendants on notice of the trade secrets at issue. *Island Intellectual Property, LLC v. StoneCastle Asset Management LLC*, 463 F.Supp.3d 490 (S.D.N.Y. 2020). Here, Defendants are extremely familiar with the contents of the Confidential Documents; any purported failure to explicitly identify the trade secrets is merely a fraud by Defendants perpetrated on their own counsel in order to mislead the Court. *See* Background section *supra*. Furthermore, as *Island* points out, courts in this district have accepted relatively general descriptions of alleged secrets at the motion to dismiss stage. *See*, e.g., *Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 19-CV-5966 (JSR), 2017 WL 6507110, at *9 (S.D.N.Y. Dec. 15, 2017) (holding that "technical data, internal pricing information, work product, research, engineering designs" was sufficiently specific in light of the specific course of conduct alleged).

Defendants argue that CCS's trade secret claims fail because CCS does not identify the asserted trade secrets with enough specificity. *See* F.R.C.P. 12(b)(6). The cases that Defendant relies on in making this argument, however, are distinguishable. In *Elsevier*, at *5, the Court dismissed the trade secrets claim because the plaintiff only listed "nine extraordinarily general categories" to demonstrate the existence of trade secrets. *See Corporate Synergies Group, LLC v. Andrews Eyeglasses* No. 18-13381, 2019 WL 3780098, at *4 (D.N.J. Aug. 12, 2019).

Here, the claims "are not the type of "vague and indefinite" claims, (*see Broker Genius, Inc. v. Zalta*, 280 F.Supp.3d 495, 515 (S.D.N.Y. 2017)), that are insufficient to "inform the defendants of what they are alleged to have misappropriated," *Iacovacci v. Brevet Holdings*, LLC, 437 F.Supp.3d 367, 380 (S.D.N.Y. 2020). "Courts in this District often allow trade secret claims that are

broad so long as they provide sufficient detail that the *defendant* can identify the trade secret(s) at issue." *Zabit v. Brandometry*, No. 20 Civ. 555 (JPC), 2021 WL 1987007, at *8 (S.D.N.Y. May 18, 2021), emphasis added. Here, Defendants know exactly what confidential information and trade secrets are contained within the Confidential Documents.

Defendants' primary case on misappropriation of trade secrets/violation of the DTSA is *Accenture Glob. Servs. GMBH v. Guidewire Software, Inc.*, 581 F. Supp. 2d 654 (D. Del. 2008). In *Accenture*, the Court dismissed a claim based on purported theft of trade secrets where the plaintiff merely "assume[d], based upon what it feels was 'a surprisingly quick development trajectory,' that [defendant] ha[d] 'somehow' ... used [its] trade secrets"). *Id.* At 663. However, the facts in *Accenture* are not at all analogous to the facts here: CCS has clearly identified: (i) how Defendants obtained access to its confidential and trade secret information (First Am. Compl. ¶¶ 37–41.); (ii) how it secured its confidential and trade secret information (First Am. Compl. ¶234.); (iii) how its confidential information and trade secrets were used (First Am. Compl. ¶¶ 239–242.); and the value of its trade secrets. (First Am. Compl. ¶ 42.)

**Statute of Limitations–Timing of Misappropriation.** Defendants conflate the legitimate sharing of confidential information and trade secrets pursuant to the NDAs and in pursuit of a further business purpose with the misappropriation of confidential information and trade secrets. The two are entirely separate events, or a separate series of events. For clarity, when CCS transferred confidential information and trade secrets to XOP in 2016, the transfer was pursuant to legitimate contracts; it is not known to CCS when exactly Defendants *misappropriated* the confidential information and trade secrets. It only became clear to CCS that misappropriation had in fact occurred after CCS discovered XOP's press releases, which were initially released in 2018 and 2019. (First Am. Compl. ¶¶ 73–75.) The only way for this Court to determine when misappropriation occurred, when it was discovered, and whether claims pursuant to the DTSA and New York's

common law cause of action for misappropriation of trade secrets should stand, is to proceed with the case, and in particular, with the process of discovery.

**Misappropriation and DTSA Claims are Not Duplicative.** Defendants argue that CCS's misappropriation of trade secrets claim is duplicative of its breach of contract claim. (Def.s' Mem. of Law at point III.) As with all of CCS's tort causes of action, if the breach of contract claim is dismissed, Defendants' argument that the tort causes of action are duplicative fails. Furthermore, even if the breach of contract claim is not dismissed, the misappropriation of trade secrets claim and DTSA claim are not duplicative. The NDAs require that confidential information be kept in confidence. Using CCS's confidential information and trade secrets to secure a competitive advantage is a separate tort meriting a separate remedy. CCS has followed the rule that "[w]here the plaintiff and defendant are both parties to a contract, the plaintiff must allege a breach of a duty independent of the duties under the contract." *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 402 (S.D.N.Y. 2019). Defendants have, in bad faith, taken affirmative steps beyond the requirements of the contract to harm CCS. *See* section IV *infra*. Using information "in breach of an agreement or confidential relationship" may constitute misappropriation, *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 567 (S.D.N.Y. 2016).

Because the details on exactly when Defendants misused the specific information disclosed by CCS is only known to Defendants, factual disputes as to the date of accrual exist, and discovery is necessary. Accordingly, the misappropriation of trade secrets and violation of the DTSA claims should not be dismissed at this early stage.

## IV.    CCS's Civil RICO Claims Are Properly Pleaded

**Defendants' Predicate Acts Are Continuous and RICO Applies.** Defendants argue that CCS no longer has a valid claim for a permanent injunction by quoting the section of CCS's AC that references XOP being mere weeks from breakout: "According to the AC, as of July 13, 2021, XOP

was just "weeks away" from its USN product being "installed on trading floors around the world." AC ¶ 146." (Def.s' Mem. of Law at 37.) By virtue of XOP making this argument, the Court must assume that there is substantial truth to CCS's allegations. Defendants' counsel could not sign off on a motion which they knew or should have known would mislead the Court by asking it to rule based on assertions the truth or falsity of which is completely within their clients' knowledge.

Taking it as true that XOP has reached "breakout," the USN for Trader Voice product is now in use by **Trader Voice Consumers** across the world and Defendants have made highly lucrative long-term contracts for the sale and maintenance of the USN for Trader Voice product. Many millions of dollars' worth of contracts likely have been signed and hundreds of millions of dollars more in contracts will likely be signed.

All of these contracts require that XOP *continuously makes fraudulent misrepresentations* to new and existing **Trader Voice Consumers** with whom it is negotiating regarding its knowledge and experience with regard to the financial trading industry and Defendants' ability to support and update the products it is providing them with. *This represents a threat to the integrity of the global financial system* as the global economy relies on the hardware and software designed by CCS and manufactured by Defendants without any oversight by CCS.

Defendants allege that RICO is "aimed at broad financial schemes," which of course would not include their own scheme, which they allege would be better classified as one "involving a single, narrow purpose and one or few participants directed towards a single victim..." But according to the United States Supreme Court, "Suppose a hoodlum were to sell "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage." Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the

future, and thus supply the requisite threat of continuity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989). The Supreme Court goes on to clarify that, "The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *Id.* at 243.

The reality is Defendants stole most or all of the plans and specifications incorporated specifically into the USN for Trader Voice product for **Trader Voice Consumers** and have never demonstrated the required level of knowledge or proficiency to service the **Trader Voice Consumers**. This is ongoing fraud on a grand scale and is not even remotely close to the "garden variety fraud" involved in *Sehgal v. Aggarwal*, 20-CV-4577 (JS)(ARL), 2021 WL 3617479 (E.D.N.Y. Aug. 16, 2021), a case cited by Defendants in which a deal for the acquisition of four Dairy Queen stores failed to materialize.

**Defendants' Predicate Acts Demonstrate Open-Ended Continuity.** To sustain the RICO claims, CCS must plead facts plausibly establishing that Defendants committed at least two predicate acts that were "related, and [either] amount to or pose a threat of continuing criminal activity." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). Such "continuity" can be satisfied "either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Id.* at 183; *accord First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004) (similar).

Defendants argue that they are in a business which on its face is legitimate and this defeats CCS's racketeering claims. CCS does not have to prove that Defendants operate a completely illegal

business. The case law is clear that an otherwise legitimate business which engages in illegitimate acts on a regular basis satisfies the continuity standards.

"The threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. "Since plaintiffs allege that defendants' normal course of conducting its legitimate business was to defraud franchisees, they have sufficiently pleaded a pattern of racketeering activity under RICO." *Giuliano v. Everything Yogurt, Inc.* 819 F.Supp. 240, 248 (E.D.N.Y. 1993).

Defendants attempt to avoid the consequences of their actions by dramatically downplaying the breadth of their scheme. They take a small slice of their scheme--the initial theft of the core trade secrets required to manufacture and sell CCS's product--they figure out what is the shortest time that slice of the scheme possibly could have taken, and they label that time period as the entirety of the scheme. They then select the hardest hit victim, CCS, and declare CCS to be the only victim. Defendants close the loop by citing irrelevant and inapplicable cases involving schemes with similarly limited scopes which were rightfully dismissed. This is an inaccurate and irresponsible way to downplay and mischaracterize Defendants' multitude of ongoing illegal predicate acts that make them subject to RICO.

Specifically, Defendants attempt to characterize their alleged scheme as focused on stealing CCS's trade secrets. The obvious goal of the scheme in fact was to profit immensely from exploiting CCS' trade secrets to continuously sell new and existing products and services based on CCS's trade secrets to global **Trader Voice Consumers** that rely on Trader Voice technologies. Defendants have made a business out of exploiting CCS's trade secrets to sell products and services to global **Trader Voice Consumers** under the false pretense that they developed the technology, understand the needs of this specialized group of customers and can be relied on to continue to develop and evolve the product over time. They make new false representations and deceive new companies into licensing

their products which exploit CCS's trade secrets on a regular and ongoing basis. Each and every time Defendants mislead financial institutions regarding products which rely on CCS' trade secrets, they commit one or more new predicate acts which extend the continuity time period.

Defendants cite *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F.Supp.2d 486, 511 (**S.D.N.Y.** 2007), aff'd 328 F. App'x 695 (2009), where the Defendant allegedly obtained a legitimate license by inappropriate means and then profited from the royalties on an ongoing basis. Each act of licensing alone did not extend the continuity time period because Defendant obtained a valid license and so repeatedly using it involved no new RICO predicate act. Defendants' other case, *Sehgal v. Aggarwal,* is dissimilar to the facts here and the Court there found that the time between the defendant's predicate acts was a mere three months.

In our case, the largest financial institutions and **Trader Voice Consumers** in the world are being defrauded on a daily basis, each time a false representation is made that XOP created the product and is capable of understanding and supporting the needs of the **Trader Voice Consumers**. In the instant case, CCS never licensed its trade secrets to Defendants. The process may have begun in 2016 but continues to the present day.

Some facts in this case are not in dispute. There is no dispute that Harding and Gupta had a relationship prior to Harding introducing McDonough to Gupta in 2016. There is no dispute that substantial amounts of confidential information were shared by CCS with Defendants in 2016. There is no dispute that XOP began selling and manufacturing a voice bridge product specifically tailored to the needs of **Trader Voice Consumers** on or around June 2018, with characteristics the same as or similar to the product CCS specified, and there is no dispute that XOP and Gupta are at the present time continuing to sell that product to the same customers to which CCS intended to sell its product. There is no dispute that in or around 2018 XOP entered into a relationship with IPC to market a product with features similar to the product CCS specified, depriving CCS of the

opportunity to establish this critical relationship. All of these acts arguably constitute RICO predicate acts and they cover a time period of more than two years.

CCS cannot say how many victims there have been as it does not have access to Defendants' records, but it is at least two (based on XOP's press releases) and is likely far more due to IPC's agreement to incorporate the USN for Trader Voice product into its core offerings. And it is clear that there is a continuing threat of criminal activity as Defendants admit that USN for Trader Voice is a product they are actively selling to **Trader Voice Consumers**.

**Defendants' Predicate Acts Are Related To Each Other**. The Supreme Court has held that the predicate acts are related if they involve "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240.

All of the aforementioned predicate acts committed by Defendants shared a common purpose: to profit by exploiting CCS's trade secrets. "In this case, plaintiffs allege that the same participants, i.e., defendants, defrauded plaintiffs and other EY franchisees for the common purpose of earning illicit franchising fees, and that defendants' fraud involved similar victims in the sense that all of the alleged victims were engaged in obtaining franchises from EYI. See, e.g., *Banks v. Wolk*, 918 F.2d 418, 424-25 (1990) (victims are considered "similar" if they are defrauded while engaging in similar business dealings with defendants)." *Giuliano* at 248.

The many transactions involving the USN for Trader Voice product are united by a common purpose of exploiting CCS's confidential information and trade secrets for Defendants' financial gain and target similar victims– **Trader Voice Consumers**, including CCS. Each of the aforementioned transactions is individually capable of serving as a predicate act because it is part of a common scheme to defraud CCS and profit at CCS's expense. And CCS contends in the strongest possible

fashion that there is a relationship between its communications with Defendants and all transactions involving the USN for Trader Voice product.

Every time Defendants license their USN for Trader Voice product, they engage in one or more of the RICO predicate acts complained of by CCS: (1) violating the DTSA by licensing technology that includes trade secrets stolen from the CCS; (2) committing mail and wire fraud by soliciting purchase orders in exchange for technology which it knows to be stolen and representing falsely that it has the requisite knowledge and skill to develop and support these products; and (3) money laundering by funneling their fraudulently obtained profits through their otherwise "legitimate" business.

**Defendants Have Engaged in Mail and Wire Fraud.** Defendants allege in their motion to dismiss that CCS's assertions regarding wire fraud are meritless. Wire fraud requires a showing of "'(i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires.'" *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018). A plaintiff must provide proof of a material misrepresentation. *Id.*

CCS has pleaded specifically multiple specific acts of mail and wire fraud–more than the minimum of two which are required. (*See* First Am. Compl. ¶¶ 353–352.) There are likely dozens of such acts but until the case progresses it is not possible for CCS to allege them with greater specificity. Setting aside for a moment the acts involved in stealing the confidential information and trade secrets to begin with, each time that Defendants trafficked in CCS's stolen confidential information and trade secrets, they committed new acts of mail and wire fraud. CCS has pleaded, based on Defendants' press releases, that Defendants have sold a product fully incorporating CCS's trade secrets to IPC and to Corporation One with as much specificity as it is capable of pleading based on the press releases. This alone satisfies its predicate acts requirement.

The aforementioned facts are of the exact type that have been found by the courts to constitute mail and wire fraud. In *Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F.Supp. 435, 446 (E.D.N.Y. 1997), the plaintiffs' financial advisor and related individuals were found guilty of RICO violations. The financial advisor was allegedly in the legitimate business of providing financial advisory services but in fact engaged in at least two acts of mail and wire fraud to embezzle money.

In the instant case, it is confidential information and trade secrets that were stolen and diverted rather than money, and then the scheme continued as Defendants monetized the stolen trade secrets by trafficking in products which could only be developed and sold by utilizing those trade secrets.

Similarly, in *Schmid, Inc. v. Zucker's Gifts, Inc.*, 766 F.Supp. 118, 123 (S.D.N.Y. 1991), the Southern District found that where the defendant was engaging in wire fraud on a "regular and continuing basis" by "misrepresenting the true purchaser and ultimate destination" of a certain product, that was sufficient to plead the requisite predicate acts of mail and wire fraud.

In *Schmid*,

[the plaintiff's] pleadings suggest that the defendants have engaged in a pattern of illegal conduct and committed the required predicate acts by sending wire and postal communications on a regular and continuing basis ... For purposes of Rule 9(b) and a motion to dismiss, Schmid in its complaint has identified the requisite elements of a RICO claim and with adequate specificity. For these same reasons, plaintiff's fraud and misrepresentation counts also survive a motion to dismiss.

*Id.*

**Defendants' Predicate Acts Are Easily Established Under the DTSA.** To plead continuity under RICO, CCS only needs to plausibly plead a minimum of two related predicate acts. CCS has

met this burden under theories of mail and wire fraud, but Defendants' actions also constitute violations of the DTSA as described *supra*.

Defendants argue that their alleged theft of CCS's trade secrets occurred prior to the enactment of the DTSA and this has been dealt with *supra*. However, far after the enactment of the DTSA, on at least the occasions marked by XOP's press releases, Defendants, upon information and belief, licensed equipment built using CCS's confidential information and trade secrets to IPC and Corporation One and misled those consumers throughout the sales process. This is well after the passage of the DTSA and squarely establishes two predicate acts and continuity with nothing further required.

**CCS Has Identified a Pattern of RICO Predicate Acts for Each Defendant.** *See* Exhibit B, attached hereto, which lists numerous predicate acts.

**RICO 1962(a) Applies to Defendants XOP and Gupta, and 1962(d) Applies to All Defendants.** Defendants have not specifically challenged CCS's 1962(d) or 1962(a) claims except in a footnote. (*See* Def.s' Mem. of Law at 31.) Defendants quote certain language from Section 1962(a) and cite a case indicating that Section 1962(a) is reserved for situations in which the plaintiffs' injuries result not from the predicate acts of racketeering, but from defendants' investment of racketeering income. Defendants wrongly allege that CCS has not pled this. In fact, CCS has pleaded just that. (*See* First Am. Compl. ¶ 392.) At this time CCS cannot plead with gerater specificity how XOP and Gupta invested and re-invested the proceeds because there is no way to know these details without engaging in discovery.

**V.    CCS's Claims for Remedies Are Valid**

Defendants, as an attempted distraction, argue that CCS's claims for attorneys' fees, punitive damages, declaratory judgment, injunctive relief, and an accounting are non-cognizable as causes of action under New York law. The Court has leave to broadly interpret the AC. "Dismissals not going

to the merits based on mere technical defects and ambiguities in pleadings are viewed with disfavor in federal courts." *David v. Sinclair Refining Co.*, 25 F.R.D. 190, 191 (S.D.N.Y. 1960). "The Supreme Court has held that, "(t)he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Cascone v. Ortho Pharmaceutical Corp.*, 94 F.R.D. 333, 337 (S.D.N.Y 1982).

> In conformity with this expressed intention of our modern jurisprudence to concentrate on the "merits" of litigation, rather than to permit cases to go off on issues of procedure such as mistakes in pleading, our most prestigious law schools have changed the focus of legal education. ... we now preach, and teach lawyers, that they should go to the heart of the matter, abandon their cherished litanies, and seek Justice.

*Cascone*, at 337. CCS's claims for declaratory judgment, injunctive relief, accounting, attorney's fees, and punitive damages may be interpreted by the Court as requests for relief. CCS asks that the Court seek justice here too.

**Attorneys' Fees**. Despite Defendants' argument, CCS properly states a claim for violations of the DTSA and breach of the NDAs. Accordingly, attorneys' fees should stand as a request for relief by CCS.

**Punitive Damages**. Despite Defendants' argument, CCS properly states a claim for violations of the DTSA and RICO, as well as a proper conversion claim. Accordingly, punitive damages should stand as a request for relief by CCS.

**Declaratory Judgment**. The existence of a claim lying in contract does not preclude a declaratory judgment claim. (*See* Code Civ.Proc. (Deering, 1937) § 1062a), Michigan (3 Comp.Laws (1929) § 13904), and Kentucky (Codes (Carroll, 1932) Civ.Pract. § 639a-3, stating that "declaratory relief is alternative or cumulative and not exclusive or extraordinary."). Federal Rules of Civil Procedure Rule 57 Advisory Committee Notes. Furthermore, the prospect of future damage is the essential trigger for the remedy of declaratory judgment. *Brooklyn Navy Yard Development Corp.*

*v. Harbor Diesel Fuel Services, Inc.*, No. CV 10-5715 (ENV)(VVP), 2014 WL 4364628, at *8 (E.D.N.Y. Aug. 1, 2014). Because XOP's USN for Trader Voice product incorporates CCS's intellectual property, prospective harm exists that may not be resolved by the breach of contract claim. As long as any claim is outstanding, CCS's request for a declaratory judgment must stand.

**Injunctive Relief.** As a preliminary matter, CCS's claim for an injunction should not be dismissed as CCS is contractually entitled to seek such relief. (First. Am. Compl., Exs. A and B ¶ 15.) CCS has also properly pled an entitlement to injunctive relief. A plaintiff seeking a permanent injunction must show:

> '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'

*Jewel Source, Inc. v. Primus Jewels, LLC*, 11 Civ. 3941 (JSR), 2011 U.S. Dist. LEXIS 115830, at *10 (Oct. 3, 2011).

CCS has properly pled that: (i) it has suffered an irreparable injury, one that in fact, has the potential to exponentially increase, if "breakout" has not yet been achieved (First Am. Compl. ¶¶ 139–151); (ii) monetary damages would be an inadequate response to the harm suffered by CCS (First Am. Compl. ¶ 139); (iii) the equitable remedy is warranted, considering the balance of hardships between CCS and the Defendants (First Am. Compl. ¶¶ 142); and (iv) the public interest would not be disserved by an injunction (First Am. Compl. ¶ 147). Accordingly, CCS's request for relief in the form of an injunction must stand.

**Accounting.** Under New York law, a "confidential relationship" in the context of an accounting refers to "a relationship 'which induced plaintiff to entrust defendant with property or money.'"" *Associated Mortgage Bankers, Inc. v. Calcon Mutual Mortgage, LLC et al.*, 159

F.Supp.3d 324 (E.D.N.Y. 2016). By this standard, the NDAs between CCS, XOP and Gupta certainly implicate a confidential relationship.

However, here a fiduciary duty also existed because of Harding's employment status with CCS, and because he was, upon information and belief, cooperating with Gupta and XOP to defraud CCS. The limited fiduciary duty created by the circumstances results from the employer-employee agency relationship. Under New York law, employees owe fiduciary duties to their employers, independent of any contractual duties. *See*, e.g., *Am. Fed. Grp.* at 906 ("[E]ven former employees may not misappropriate and utilize confidential information"). *Zurich*, at *4. Harding had no non-disclosure agreement with CCS, so his fiduciary duty not to misappropriate and utilize confidential information is independent of the specific promises XOP and Gupta made in the NDAs. As a result, this claim is not duplicative of the breach of contract claim. The claim for an accounting should be sustained because of Harding's association and collusion with XOP and Gupta. Furthermore, McDonough relied on Harding's representations when negotiating with XOP/Gupta. There was nothing arm's-length about the Defendants' collusion.

Even if CCS's claims for attorneys' fees, punitive damages, declaratory judgment, injunctive relief, and an accounting are noncognizable as causes of action under New York law, in its prayer for relief, CCS explicitly asks for attorneys' fees (subpart g), punitive damages (subpart h), declaratory judgment (subpart b), and injunctive relief (subpart c). While an accounting is not specifically requested in its prayer for relief, CCS does state that the amounts of damages are to be determined at trial (see subparts d, e, and f). The Court should not outright dismiss these remedies to which CCS is or may be entitled.

## CONCLUSION

McDonough is a telecom engineering expert with 20 years of progressively increasing responsibility working on the world's largest and most sophisticated trading floors. There are very

few people with the training and experience to design a technology product that would meet the highly complex and unique needs of the financial institutions and Trader Voice Consumers at which McDonough worked. The notion that XOP could sell the USN for Trader Voice and not have stolen CCS's intellectual property is implausible. By the legal standards, CCS has met its burden on multiple counts.

Ultimately, it is clear to CCS that Defendants wish to avoid discovery at all costs. Except for what is stated in the AC, paragraphs 49–50, the cUCS was not a proprietary version of the USN. The AC provides a factual basis for the allegations that Defendants did not have the knowledge or experience to create the cUCS/USN for Trader Voice.

For all of the reasons stated above, the Court should deny Defendants' Motion to Dismiss and allow this matter to proceed.[7]

Dated: November 5, 2021
New York, NY

Respectfully submitted,

THE BAILYN LAW FIRM, P.C.

/s/Bradley R. Bailyn
Bradley R. Bailyn, Esq.
NY Bar No. 4179560
6301 Mill Lane
Brooklyn, NY 11234
Telephone: (646) 326-9971
E-mail: brad@bailynlaw.com

*Counsel for Plaintiff*
*Converged Compliance Solutions, Inc.*

---

[7] Should this Court determine that further clarification would be beneficial, or that a lack of specificity is momentarily fatal to any particular cause of action, CCS would be happy to seek leave to file a second amended complaint. *See Technical Tape Corp. v. Minnesota Min. & Mfg. Co.*, 200 F.2d 876 ((2d Cir. 1952), allowing amendment.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of November, 2021, I served a true and correct copy of the foregoing Plaintiff's Opposition to Defendants' Motion to Dismiss via email to all counsel of record.

/s/Bradley R. Bailyn
Bradley R. Bailyn, Esq.
NY Bar No. 4179560