**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
CONVERGED COMPLIANCE SOLUTIONS, INC.,    :
                                                                        :
                                    Plaintiff,              :            21-CV-5482 (PGG) (OTW)
                                                                        :
                                    -against-               :            **REPORT & RECOMMENDATION TO**
                                                                        :            **THE HONORABLE PAUL G. GARDEPHE**
XOP NETWORKS, INC., et al.,                              :
                                                                        :
                                    Defendants.            :
                                                                        :
                                                                        :
------------------------------------------------------------x

**ONA T. WANG**, **United States Magistrate Judge**:

I.    **INTRODUCTION**

        Plaintiff Converged Compliance Solutions, Inc. ("CCS"), a communications technology

company, brings many claims against Defendants XOP Networks, Inc. ("XOP"), Sudhir Gupta

("Gupta"), and David Harding ("Harding") (collectively "Defendants"),[1] arising from their prior

business relationship in 2016. In short, CCS alleges that Defendants "manipulated Plaintiff's

principals and then misappropriated Plaintiff's trade secrets and confidential business

information, eventually using it to enter into at least one high-value deal." (First Amended

Complaint ("AC"), ECF 9, ¶ 2). Defendants' motion to dismiss was fully submitted on November

12, 2021, (see ECF 39, 41 and 40), and Judge Gardephe referred this motion to me for report

and recommendation on November 14, 2023. (ECF 46). For the reasons below, I respectfully

---

[1] On September 22, 2024, in response to an Order to Show Cause, Plaintiff requested the Court dismiss XOP Latvia under Rule 4(m). (ECF 51). In addition, on September 24, 2024, I issued a Report and Recommendation that XOP Latvia be dismissed without prejudice. (ECF 53).

recommend that the AC be **DISMISSED** in its entirety, with leave to amend <u>only</u> for Plaintiff's breach of fiduciary duty claim against Harding.

## II.    BACKGROUND[2]

This dispute arises from failed business development discussions between CCS and XOP that took place over several months in 2016. The parties had signed a mutual non-disclosure agreement ("NDA") in early 2016 before embarking on discussions on selling a new system of "trader voice" to financial institutions. CCS's principal and founder, Terence McDonough ("McDonough"), exchanged multiple drafts of marketing materials, business plans, requirements, and specifications with XOP, but ultimately those conversations ceased around August 2016. In June 2018, XOP announced it had been retained by IPC Systems, Inc. ("IPC") to develop a trader voice system similar to proposals that CCS and XOP had discussed years earlier. In March 2019, XOP further announced that it had developed a replacement for the Sycamore Signal Processing System ("SPS") SPS-1000, another third-party product which the parties had previously discussed. On or around September 1, 2020, CCS learned that XOP been awarded a contract with a major investment bank ("Corporation One"), one of CCS's primary customer targets. This suit followed in June of 2021.

### A.    The Parties and Their Initial Collaboration/Discussions

McDonough and Defendant Harding founded CCS in 2015 to solve the communications technology needs of financial institution trading floors. (ECF 9 at ¶¶ 16-20). Specifically, McDonough and Harding sought to create a software replacement for certain legacy equipment

---

[2] For the purpose of deciding a motion to dismiss, the Court accepts the amended complaint's factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

combined with third-party manufactured hardware that would "fit the current technological needs of the trading floor." (*Id.* at ¶ 21). In January 2016, Harding, who was employed at CCS and elsewhere,[3] introduced McDonough to XOP's principal, Defendant Gupta. (*Id.* at ¶ 37). CCS and McDonough developed a multimedia communications suite called "Converged Unified Conference Solution" ("cUCS") which "stands out by going far beyond the industry standard in introducing a new degree of system integration." (*Id.* at ¶ 22). McDonough's "vision" for cUCS "was comprised of a specific, cognizable set of requirements," which the AC describes in detail.[4] (*Id.* at ¶¶ 28-35). With the specific requirements in mind, CCS "sought a partner to help create the software and hardware needed to support the envisioned trader voice conference bridge." (*Id.* at ¶ 36).

---

[3] The AC is rambling and circuitous, and does not name or describe parties when they are first mentioned. Plaintiff does not identify Harding or his alleged role until ¶ 97, where Plaintiff asserts that, among other roles and employment, Harding was at some time before January 2017 the COO of CCS and then demoted to Chief Product Officer. (ECF 9 at ¶¶ 97-103).

[4] The AC outlines the requirements for the various applications that made up the cUCS product, including requirements for: (1) Private Wire Conference application (e.g., Call Forking; shares private wires between voice trading systems, UC systems, and PBX endpoints; Barge conferencing between disparate voice systems; usage reporting and call detail reporting logs); (2) Hoot and Holler conference application (e.g., conferencing across TDM and VoIP networks; integrates legacy squawk boxes and voice trading systems, next generation IP phones, and soft phones; regulatory-compliant voice recording with the ability to make separate audio recordings); (3) WebRTC conference application (e.g., private wire call forking and common lamping across cUCS WebRTC client and legacy trading systems; CAS TDM/SIP over WebSocket's private wires to bridge legacy private wires for Turret to PC based WebRTC soft trading application); (4) Enterprise audio conferencing application (e.g., ad-hoc and reservation-based conferences; customized conference rooms; schedule recurring audio conferences; display loudest speaker); (5) web conference application (e.g., no software download required; standalone or use in conjunction with CCS's Enterprise Audio Conferencing application); (6) blast notify hot market trends application (e.g., select communication medium for message delivery; schedule recurring dial outs; control speed of dialing out); (7) Traditional Group Dial Conference application (e.g., calls to any landline or cellular phone; bulk uploading of subscribers using CSV files); and (8) enhanced voicemail application (e.g., 100 to 10,000 secure Voicemail boxes; one number service; subscriber web portal; support for TDM and VoIP/SIP trunks).

The NDA[5] is quoted and described at length in the AC (*Id.* at ¶¶ 39, 41, 107-112, 157, 220-21) and generally prohibits the disclosure and use of "confidential and proprietary" information as it is defined in the NDA. (*Id.* at ¶ 39). The parties did not sign a non-compete agreement. (*See generally id.*). The stated "purpose of the engagement between CCS and XOP was to have XOP develop a voice communications product for CCS." (*Id.* at ¶ 41). Plaintiff and Defendants expected to work together to pitch a system to potential clients in the financial industry, using XOP's hardware and software and CCS's "intellectual property underlying the product." (*Id.*). The AC pleads that the parties "agreed in principle that XOP would receive 20% of each license fee, essentially getting a royalty from each sale," (ECF No. 16), but this is not reflected in the NDA or elsewhere. (*See generally* ECF 9-2).

For the next few months, CCS provided business plans and "confidential information" to XOP at Gupta's request. (*Id.* at ¶ 44-53, 57-60). Some of CCS's targets included Corporation One and two other financial services companies (Corporations Two and Three), and IPC. (*Id.* at ¶¶ 42, 53). Corporation One and IPC were both prior employers of McDonough. (*Id.* at ¶¶ 20, 62). CCS asked XOP to provide an original equipment manufacturer ("OEM") agreement in March 2016 to begin the next development phase, but Gupta responded by asking for additional sales and marketing information. (*Id.* at ¶ 52). In April 2016, CCS submitted, at XOP's request, a purchase order for $25,000 with supporting technical use case slides for XOP to develop the CCS "minimum viable product," and again asked for a draft of the OEM agreement. (*Id.* at ¶ 56).

---

[5] Defendant Gupta signed an NDA with CCS February 9, 2016. Defendant XOP signed a separate NDA with CCS at a later date that was backdated to February 1, 2016. Because each agreement made the same promises in the same language, I will refer to them collectively as "the NDA."

By May 2016, the relationship had become fractious, even as the parties began negotiating and exchanging drafts of the OEM agreement to formalize the relationship between XOP and CCS. (*Id.* at ¶ 65-70). Ultimately, the parties did not sign any further agreements, Gupta and XOP ceased all communications with CCS on or after August 3, 2016, and CCS canceled the $25,000 purchase order on September 29, 2016. (*Id.* at ¶ 70).

**B.  Plaintiff's Sharing of "Confidential and Proprietary Information" with XOP and Gupta**

Plaintiff describes its cUCS product as a "secure, dependable platform with all the user friendly, multi-media communications features that a sophisticated party would expect from the latest conferencing suite," that goes "far beyond the industry standard in introducing a new degree of system integration." (*Id.* at ¶ 22). The AC further describes cUCS in terms of what it can do: "[t]he primary function of this multi-application trader voice platform is to unify legacy trading systems with the new-age trader voice systems, introducing a new level of functionality" during disaster recovery events (*Id.* at ¶ 23); it "offers users the option" to be shipped with different hardware so that it can work in many different configurations, depending on the customers' needs and existing communication systems (*Id.* at ¶ 24); provides the ability to route communications securely and to/through multiple routes (*Id.* at ¶ 25); and "has extensive applications" that enable conferencing and other group communications (*Id.* at ¶ 26). In short, cUCS is described as a communications platform that is customizable to the needs and existing communications platforms of Plaintiff's customers. (*Id.* at ¶¶ 28-36).

The AC describes numerous instances where McDonough provided confidential information at Gupta's urging, or worked on the business development project that the NDA was intended to cover. For example, in February 2016, Gupta requested that CCS provide a

business plan to XOP "laying out the potential opportunity in financial markets." (*Id.* at ¶ 44). The business plan was to include "technical requirements as well as detailed examples of potential uses" and projected "market sizes and values of the various product features," (*Id.*), which Plaintiff believed was necessary for XOP to value CCS's "share of the licensing fees," presumably arising from any joint business development project.[6] (*Id.*).

In February and March 2016, CCS provided various categories of information to XOP. At Gupta's request, CCS provided "system use case slides," which "are the starting point for further analysis models and design activities." (*Id.* at ¶ 47). CCS also provided to XOP a "confidential and proprietary" document called "Line Sharing Overview v. 1.0" which "contained both general information and information highly specific to an existing system and its requirements, including, but not limited to, use cases and the types, nature, and extent of the equipment then in use." (*Id.* at ¶ 48). Because of his tenure in the industry, "only McDonough was able to provide" the information contained in this document. (*Id.* at ¶ 49). As a result of McDonough's provision of the "Line Sharing Overview" document, the parties agreed that "there was an initial opportunity to leverage one of the existing features of the XOP product to get into Corporation One and upsell to cUCS once the business was awarded." (*Id.*). Gupta later asked CCS to "update certain icons" in the Line Sharing Overview slides, and further asked CCS to provide some

---

[6] The AC does not plead that a full business plan was provided to Defendants, nor does it plead whether any valuation information or licensing fee was ever discussed or provided.

hardware (apparently an "ITS trader voice test system"[7]) for Gupta to use to "do some development and testing work." (*Id.* at ¶ 50).

Defendants also asked for—and received—the names of several potential customers (Corporations One, Two and Three, and "smaller companies that had existing vendor relationships with Corporation One"), as well as "proprietary technical information relating to features that would be of interest" to Corporation Three. (*Id.* at ¶ 53). In May 2016, CCS provided XOP with additional technical specifications for their product development, as well as at least two additional confidential and proprietary documents: "PW State.doc, . . . to help with SIP information to CAS mapping to support private wires," (*Id.* at ¶ 58) and "CCS cUCS Business Case v1.0," iterations of which included "market problems and solutions overview, volumetrics, market opportunity specifications, and a competition overview including Sycamore/Coriant, all of which were intended to assist Gupta in creating an internal marketing research document for XOP." (*Id.* at ¶ 59).

In May 2016, the parties continued work on a series of slides to support a pitch to Corporation One. (*Id.* at ¶ 64). At around the same time, XOP expressed to CCS concerns it had regarding business it (XOP) was allegedly conducting or proposing to conduct with IPC, a potential competitor of CCS and a former employer of McDonough. (*Id.* at ¶ 62). XOP requested that CCS speak with IPC on their behalf, but CCS declined to do so. (*Id.*). By the summer of 2016, the parties had ceased communications. (*Id.* at ¶¶ 68-70).

---

[7] As written, the AC appears to plead here that CCS provided hardware for Defendants to use for testing and development work, even though Plaintiff earlier pleads that under the NDA, the joint work between CCS and XOP was to use XOP's hardware and software. (*compare* ECF 9 ¶ 50 and ¶¶ 41, 46).

### C. XOP Defendants' Alleged Breach(es) and Wrongdoing

In 2021, five years after the end of the XOP-CCS relationship, XOP is described as a manufacturer of "CAS TDM and VoIP systems, including the Universal Service Node (USN) a converged communications platform enhanced for the financial services trader voice industry." (*Id.* at ¶ 72). CCS alleges, "on information and belief," that XOP's status in the industry and its USN product are "the result of the application of CCS's modifications and use cases for financial systems/trader voice networks applied to XOP's platform." (*Id.*).

Plaintiff asserts that XOP's recent success is due to XOP's and Gupta's misappropriation of CCS's "trade secrets" that were shared under the NDA in 2016. Specifically, CCS points to two press releases by XOP in June 2018 (the "2018 PR") and March 2019 (the "2019 PR") (together, the "Press Releases"), and the award of a "major contract" by Corporation One to XOP in or around September 1, 2020, for a product that was "the equivalent of cUCS," which, "upon information and belief," provides the same or similar functionality that the parties had been discussing in 2016. (*Id.* at ¶¶ 73-82). The AC notes that "99% of the requirements to support SIP private wires were not part of XOP's standard product and none of the Turret Profiles for SIP private wires existed as far as CCS knew based on information provided and conversations had." (*Id.* at ¶ 78.).

### D. Defendant Harding's Alleged Breaches

In addition to the conduct alleged in coordination with XOP and Gupta, Defendant Harding is alleged to have breached his fiduciary duties to CCS by working on behalf of his own and other companies while he worked for CCS, from 2015 to 2017. CCS serves up a veritable alphabet soup of other companies whose work divided Harding's loyalties and/or prevented

him from devoting sufficient time to his work for CCS. (*Id.* at ¶¶ 97-98). Additionally, beginning in early 2014 (and with no identified end date or employer(s)), Harding apparently sold conference solutions to IPC, a competitor of CCS. (*Id.* at ¶ 99).[8]

In addition to claiming that Harding's work for other entities and "beg[inning] a project on Kickstarter" were undisclosed "conflicts of interest" which distracted him from his undefined work for CCS (*Id.* at ¶¶98-99), CCS appears to claim that Harding misappropriated corporate funds by "liberally us[ing CCS credit cards and its credit line] . . . to indulge in luxuries for himself, including payments to multiple hotels and a liquor store, . . . which amounted to thousands of dollars" and which, "upon information and belief," were not appropriate company expenditures. (*Id.* at ¶¶ 101-102). Finally, either because Harding was asked to "step down" from his position as COO of CCS, or because of his "removal" from CCS altogether—the AC is not clear as to the timeline of these events—Harding allegedly "shut down" CCS's credit cards and a line of credit, "in retaliation for not being updated on a live proof of concept being conducted by CCS."[9] (*Id.* at ¶¶ 101-102).

---

[8] CCS alleges that Harding's breaches began "as early as 2015," while simultaneously pleading that Harding was selling products and services to IPC, the "dominant competitor in the U.S. market" as early as January 2014. (*Id.* at ¶¶ 62, 97). It is unclear whether McDonough himself was employed by IPC while Harding was selling products and services to IPC, as the AC only pleads vaguely that McDonough "worked at IPC prior to forming CCS," in April of 2015. (*Id.* at ¶¶ 16, 62).

[9] Although CCS includes a glossary of frequently used terms annexed to its AC (see ECF 9-1), including such terms as "carrier," "Voice over Internet Protocol/VoIP," and "trader," among others, it does not define "live proof of concept," or plead any facts about this dispute with Harding.

### E.   The Claims

Plaintiff brings what would appear to be every conceivable claim stemming from the failed business relationship, totaling at least sixteen (16)[10] against various combinations of Defendants. In short, the claims include: (i) breach of contract, conversion, unjust enrichment, and civil RICO violations (18 U.S.C. § 1962(a)) against XOP and Gupta; (ii) accounting, quantum meruit, and unfair competition against XOP only; (iii) fraudulent misrepresentation, misappropriation of trade secrets under both the common law and the Defend Trade Secrets Act (18 U.S.C. §§ 1832(a)(1) and (a)(5)), tortious interference with prospective contractual relations, conspiracy, and civil RICO violations under §§ 1962(c) and (d) against XOP, Gupta, and Harding; and (iv) breach of fiduciary duty against Harding. For the various claims—and in certain instances introduced as claims themselves—Plaintiff seeks relief in the form of damages, punitive damages, preliminary and permanent injunction, and attorneys' fees.

### F.   Procedural History

Plaintiff filed this lawsuit on June 23, 2021. (ECF 1). Plaintiff filed the AC on July 13, 2021. (ECF 9). XOP Defendants jointly moved to dismiss the AC on November 12, 2021. (ECF 37). On November 14, 2023, the Motion to Dismiss was referred to me for a Report and Recommendation (ECF 48).

---

[10] The AC attempts to plead nineteen claims, three of which are in actuality various types of relief sought, including: (i) declaratory judgment, (ii) injunctive relief, and (iii) attorneys' fees.

III.    **DISCUSSION**

A.    **Standard of Review**

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept all allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). If the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face," the complaint should not be dismissed. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a claim to sufficiently "raise a right to relief above the speculative level," it must be grounded on factual allegations. *Twombly*, 550 U.S. at 555. A claim grounded on mere suspicion is not enough to meet this standard. *Id.* Nor is mere consistency with the facts as pleaded sufficient to cross the line between a possibility and plausibility. *Id.* at 557. "'[L]abels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (internal citation omitted, alteration in original). "'A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *JPMorgan Chase Bank, N.A. v. 29-*

*33 Ninth Avenue, LLC*, 710 F. Supp.3d 259, 277 (S.D.N.Y. 2024) (quoting *Citizens United v.*

*Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018)).

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the

pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would

convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule]

56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y.

2002) (citation omitted). However, "the Court's consideration of documents attached to, or

incorporated by reference in the [c]omplaint, and matters of which judicial notice may be

taken, would not convert the motion to dismiss into one for summary judgment." *Id.* (citations

omitted); *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021); *Maroney v. Woodstream Corp.*, 695 F.

Supp. 3d 448, 453 (S.D.N.Y. 2023). "Where a document is not incorporated by reference, a

court may never[the]less consider it where the complaint 'relies heavily upon its terms and

effect,' thereby rendering the document 'integral' to the complaint[.] . . . For a document to be

integral to the complaint, the plaintiff must 'rel[y] on the terms and effect of a document in

drafting the complaint . . . mere notice or possession is not enough." *U.S. ex rel Foreman v.*

*AECOM*, 19 F.4th 85, 106 (2d Cir. 2021); *see also Dwyer v. Allbirds, Inc.*, 589 F. Supp. 3d 137,

147-48 (S.D.N.Y. 2022) (considering documents attached to defendant's motion to dismiss

where they "formed the factual basis for most of the allegations in the Amended

Complaint"). Matters of which judicial notice may be taken includes information on a party's

publicly available website, as long as the authenticity of the site is not in dispute, but such

information may be considered only for the fact that it was said, not for its truth. *Cotiviti, Inc. v.*

*McDonald*, 19-CV-6559, 2021 WL 2784529 (VSB), at *6 (S.D.N.Y. July 2, 2021).

**B.  Breach of Contract Claims**

Nearly all of Plaintiff's claims arise from XOP and Gupta's alleged access to and use of CCS's intellectual property, which CCS claims it provided under the protection of an NDA. Because Plaintiff fails to sufficiently plead that XOP and Gupta breached their duty under the NDA or that the alleged breach caused Plaintiff's alleged injuries, Plaintiff's breach of contract claim fails.

Under New York law, the elements of a breach of contract claim are 1) the existence of a contract, 2) performance by the party seeking recovery, 3) breach by the other party, and 4) damages suffered as a result of the breach. *See Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011); *Mersen USA EP Corp. v. TDK Electronics Inc.* 594 F. Supp.3d 570, 584 (S.D.N.Y. 2022) (discussing the elements of a breach of contract claim for a nondisclosure agreement).

As to the first element, it is undisputed that the NDA existed. Plaintiff entered into a signed NDA with Gupta on February 9, 2016, and with XOP shortly thereafter which was backdated to February 1, 2016. It is also undisputed that Plaintiff performed as required under the contract: Plaintiff, on numerous occasions, provided "confidential and proprietary" information to XOP Defendants under the NDA. However, Plaintiff has not pleaded sufficient facts to lead to a plausible inference that XOP and Gupta breached the NDA or that damages resulted from the alleged breach.

The NDA covered the parties' exploration of joint marketing opportunities using XOP's "hardware and software" to market to financial trading firms who sought to improve communications with their traders on the floor. (*See* ECF 9 at ¶ 41; *see, e.g.*, ECF 9-1 at 5,

definitions of "trader voice facilities," "trading system," "turret/dealerboard."). Although McDonough may have had more expertise in "trader voice" in 2016, the AC is also clear that XOP Defendants, even at the time they met Plaintiff, were already providing "a traditional voice conference bridge product (both TDM-PRI **and VoIP**) [albeit one] that did not support trader voice or SIP private wires." (ECF 9 at ¶ 38) (**emphasis** added). The AC bases its allegations of breach on XOP's marketing materials, in which XOP claims to provide a product that delivers the functionality that cUCS was intended to provide.

With these parties and the facts as alleged in this AC, Plaintiff has not pleaded breach or causation. Plaintiff has not described, even in general terms, the nature of the confidential and proprietary information that XOP allegedly used and/or disclosed, or how that information was used by XOP. Although their claim may be "consistent" with a scenario in which XOP and/or Gupta used CCS's confidential and proprietary information shared pursuant to and in violation of the NDA, they do not "plausibly suggest[]" that is what in fact occurred. *Twombly*, 550 U.S. at 557—58. Without any pleading of how XOP's product was different after they obtained access to CCS's unidentified confidential and proprietary information, there is no plausible inference that XOP's product was derived from use of CCS's disclosures under the NDA.

First, while there are similarities between the intended functionality of CCS's cUCS product and XOP's USN product (as touted in the Press Releases), both companies were engaged in solving the same problems for the same customers and had been doing so even before they had established a relationship to share information under the NDA. *Exceed Holdings LLC v. Chicago Bd. Options Ex. Inc.*, 17-CV-8078 (RA), 2018 WL 4757961, at *5—6 (S.D.N.Y. Sept. 30, 2018) (dismissing breach of contract claim where plaintiff pleaded that

information was shared pursuant to an NDA but did not "identify what proprietary information was used"). As in *Exceed*, other than similarities in purported functionality, Plaintiff has not identified—even in general terms—what information it provided Defendants that is likely to have been used that would have enabled Defendants to better use or configure their own hardware and software to support their customers' needs. In XOP's 2018 press release, the XOP product is alleged to "support . . . trader voice services such as Hoots and Automatic or Manual Ring Downs (ARD/MRD) which are crucial to voice trading activity," and to "provid[e] . . . SIP/VoIP based conference bridges as part of IPC's network migration towards packet-based technologies." (ECF 9 at ¶ 86). The Court takes judicial notice, however, of the fact that XOP's marketing materials for its USN product touted the same capabilities <u>years before</u> XOP and Gupta received access to CCS's confidential and proprietary information. (ECF 38-1; ECF 41 at 4); *see, e.g.*, *Universal Church, Inc. v. Universal Life Church/ULC Monastery*, 14-CV-5213 (NRB), 2017 WL 3669625, at *7 n.7 (S.D.N.Y. Aug. 8, 2017) ("[C]ourts have taken judicial notice of screenshots taken from the Wayback Machine.") (citing *Distributorsoutlet.com, LLC v. Glasstree, Inc.*, 11-CV-6079 (PKC)(SLT), 2016 WL 3248310, at *2 (E.D.N.Y. June 10, 2016).

CCS's own jargon-filled pleading does not lead to a different inference. At best, Plaintiff describes cUCS's intended capabilities and compares that prospective capability with XOP's touted product capabilities years later. At the time the parties entered into the NDA, XOP had a "voice conference bridge product" over "TDM/PRI or VoIP."[11] (ECF 9 at ¶ 38). Plaintiff identified

---

[11] As defined and used by Plaintiff, TDM/PRI is a standard for providing telecom services to enterprises and offices that can support many calls at once. (ECF 9-1 at ¶ 3). TDM systems are "proprietary phone systems that are hardwired connections from one building to another, and include legacy turrets and/or their legacy Trader Voice Facilities." (*Id.*). VoIP is defined by Plaintiff as "a communication system that converts voice transmissions into data

XOP's product's deficiency at the time to be that it "did not support trader voice or SIP private wires." (*Id.* at ¶ 38).[12] The 2018 PR announced that IPC had selected XOP's voice bridge product, which would allow customers "to seamlessly transition their value-added services from legacy circuit switched networks to VoIP based packet switched networks." (*Id.* at ¶¶ 73-74). This prospective voice bridge product, which would be incorporated by IPC "into its core offerings for financial institutions," is alleged "upon information and belief" to "fully incorporate[] Plaintiff's trade secrets and intellectual property produced during the negotiations in 2016 pursuant to the NDAs." (*Id.* at ¶ 73). Plaintiff's own inchoate[13] pleading admits, however, that XOP already had, as of 2016, a voice bridge product that used VoIP. (*Id.* at ¶ 38). Moreover, XOP had already disclosed to CCS *in May 2016* that it was in discussions with IPC, a company which CCS had "no relationship or business with" [sic] and that IPC or XOP was developing a "Sycamore SPS-1000 replacement." (*Id.* at ¶ 62). It is not plausible to infer that XOP's announcement, in 2018, of a business relationship with IPC to provide a VoIP voice bridge product was the result of incorporating CCS's undefined "intellectual property" and not

---

packets and are [sic] server-based, allowing for better redundancy and easier global distribution than TDM technology." (*Id.* at ¶ 4).

[12] SIP is defined by Plaintiff as "Session Initiation Protocol," a "standard internet protocol for initiating maintaining and terminating real-time interactive user session that can involve multimedia elements such as video, voice, chat, gaming, and virtual reality." (ECF 9-1 at ¶ 3).

[13] In the same paragraph, Plaintiff asserts that IPC: 1) is McDonough's prior employer; 2) had "no relationship or business with" CCS; 3) "was the dominant competitor;" and 4) that business development discussions between XOP and IPC represented a "potential conflict of interest" (in the absence of any noncompete or exclusivity arrangement) that had been "hid[den]" from CCS until May 2016. (ECF 9 at ¶ 62). Similarly, Defendant Harding, who was a former CCS employee who introduced McDonough to Defendants, is alleged to have breached his fiduciary duties to CCS by selling other companies' products and services to IPC and/or selling products and services that competed with CCS. (*Id.* at ¶¶ 97-99).

the result of: (1) the discussions between XOP and IPC that had been disclosed to CCS years earlier and (2) the development of XOP's own 2016 voice bridge product that used VoIP.

The 2019 PR similarly touts that XOP had developed a "replacement system" for SPS-1000, a third-party component which had been discontinued since at least 2016. Plaintiff asserts that it had "explained" to Gupta in 2016 that SPS-1000 was "widely deployed" in the financial sector, and the discontinuation of its manufacture meant that "a software replacement was necessary," and that Gupta had been unaware of a need for new software until CCS explained it to him. (ECF 9 at ¶ 75). Plaintiff further asserts that "once Gupta, and therefore XOP, had this information, upon information and belief, XOP began covertly developing CCS's product and subsequently publicized its despicable, illegal act by issuing a press release, which stated that XOP had a product available which appeared to and did, upon information and belief, fully incorporate CCS's intellectual property and trade secrets." [sic] (*Id.*) Plaintiff admits, however, that as of May 2016, XOP had already disclosed it was doing business or proposing to do business with IPC and that such business included, potentially, "to develop a Sycamore SPS-1000 replacement." (*Id.* at ¶ 62). Moreover, even assuming Gupta had been unaware until sometime before May 2016 that there was a need to develop a software replacement for SPS-1000, the knowledge that a software replacement for SPS-1000—a product that was "widely deployed" in the financial sector—was necessary could not have been confidential and proprietary knowledge or a trade secret belonging exclusively to McDonough and CCS. Moreover, because Plaintiff has not pleaded facts with sufficient specificity to suggest that it was plausible that XOP and/or Gupta breached the NDA by incorporating CCS's confidential and proprietary information, they similarly fail to plead causation.

Without more, Plaintiff's allegations of breach and causation are speculative because they seek to challenge XOP's use of its own hardware and software in configurations unknown to CCS and described to have the same functionality as they had before CCS and XOP entered into the NDA. Thus, Plaintiff's breach of contract claims should be dismissed.

**C. Trade Secret Misappropriation Claims**

Plaintiff's trade secret claims likewise are insufficiently pleaded and should be dismissed. Separately, Plaintiff's trade secret claim under New York law also fails as it is duplicative of the breach of contract claim. To state a claim for trade secret misappropriation under DTSA, a plaintiff must allege (1) that it possessed a trade secret and (2) the defendant misappropriated the trade secret. *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020). The elements under New York law "are fundamentally the same." *Id. See also ExpertConnect, L.L.C. v. Fowler*, 18-CV-4828 (LGS), 2019 WL 3004161, at *7 (S.D.N.Y. July 10, 2019) (holding that sufficiently pleading a DTSA claim also states a claim for misappropriation of trade secrets under New York law).

    *1. DTSA Claim*

    a. Possession of Trade Secret

"Although there is no heightened pleading requirement on actions brought under the DTSA, . . . district courts in this circuit routinely require that plaintiffs plead a misappropriation of trade secrets claim with sufficient specificity to inform defendants of what they are alleged to have misappropriated. *Iacovacci*, 437 F. Supp. at 380 (internal quotations omitted). As discussed below, Plaintiff has not articulated its trade secret(s) with sufficient specificity to survive a motion to dismiss. The category of "trade secrets" is generally narrower in scope than mere

confidential or proprietary information. *See Onyx Renewable Partners L.P. v. Kao*, 22-CV-3720, 2023 WL 405019, at *4 (S.D.N.Y. Jan. 25, 2023) (citing *Sapir v. Rosen*, 20-CV-6191, 2021 WL 4482277 at *5 (S.D.N.Y. Sept. 30, 2021) (holding the "assertion of 'general categories of confidential information,'" such as "proprietary market research and business and development plans" fails to "plead trade secrets with sufficient specificity"); *Sapir*, 2021 WL 4482277 at *6 ("Plaintiffs fail to plead *which* of the numerous categories of documents they describe in their Complaint are trade secrets—as opposed to mere confidential or proprietary information.") (*emphasis* in original).

The majority of the work or information that CCS provided under the NDA—which included a business plan that identified potential business opportunities, a list of target customers (Corporations One, Two, and Three, and other smaller companies), and certain slide decks that provided information to XOP that would enable the parties to prepare product specifications and marketing materials tailored to those customers' needs—do not constitute trade secrets. "[T]he *sine qua non* of whether a customer list constitutes a trade secret lies in whether 'the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products,' or, by contrast, 'the customers are not known in the trade or are discoverable only by extraordinary efforts [and the] customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money." *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 674 (S.D.N.Y. 2022) (cleaned up). Corporation One is described in the AC as McDonough's former employer and (a major investment bank), and IPC was already in discussions with Defendants in May 2016. XOP and Gupta, while technologically obsolete in the

eyes of Plaintiff, have been in the communications technology business since before CCS was created and in discussions with IPC for nearly as long. It would take minimal effort on the part of XOP and Gupta to discover the identity of these entities, if they did not know them already. Indeed, Plaintiff has not pleaded that the identities of Corporations One, Two, and Three or the other smaller companies were unknown to Defendants. Thus, it is not plausible to infer that a list of potential targets which was headed by IPC and Corporation One constituted a trade secret that could only have been known to Plaintiff, even if the facts as pleaded may be consistent with such a theory, as it is equally possible that XOP and Gupta became aware of IPC and Corporation One by their sizable presence in the industry, and the other smaller companies through their relations with IPC and Corporation One. These facts do not cross the line into plausibility.

The same is true of the business plans identified by Plaintiff. For the same reason that the list of potential targets could have reasonably been discerned by XOP and Gupta's own experience in the industry or gleaned from their existing relationships with and knowledge of Corporation One and/or IPC, it is equally plausible that XOP and Gupta would have developed a business plan on their own that was as or more appealing to Corporation One or IPC. Without additional facts in support, the assertion of "general categories of confidential information" such as "proprietary market research and business and development plans" is not sufficient to cross the line into plausibility. *Sapir*, 2021 WL 4482277, at *5.

Nor does the vague list of documents provided by Plaintiff identify a trade secret, including: "proprietary work product, documents, code, works of authorship, programs, manuals, developments, processes, formulae, data, specifications, fixtures, tooling, equipment,

20

supplies, processes, inventions, discoveries, improvements, trade secrets, and know-how." (ECF 9 at ¶ 235). Plaintiff has failed to plead which of these "numerous categories of documents they describe in their complaint are trade secrets—as opposed to mere confidential or proprietary information." *Sapir*, 2021 WL 4482277, at *6. As in *Sapir*, Plaintiff inconsistently refers to such information as "confidential information," (ECF 9 at ¶¶ 233—234), "intellectual property," (*Id.* at ¶ 235), and "trade secrets," (*Id.* at 233—236), conflating the concepts. As the Court aptly noted in *Sapir*, "not all confidential information is considered a protected trade secret," and Plaintiff's insistence on labeling all the information purportedly shared with XOP Defendants as both "confidential" and "trade secrets" does not transmute the status of the information such that it receives trade secret protections. *Sapir*, 2021 WL 4482277, at *6.

For the purposes of this motion to dismiss, Plaintiff may have pleaded the existence of a trade secret in the limited instances where Plaintiff refers to specific named documents. For example, in the AC, Plaintiff describes and names certain documents that were shared with XOP and Gupta under the NDA: "CCS Supervisories TR v1.3, Line Sharing Overview v1.0, PW State.doc, and CCS cUCS Business Case v1.0." (ECF 9 at ¶ 232). While a plaintiff need not plead with such specificity as to identify the actual trade secrets at issue, courts have held that "specifically identified documents" may constitute a trade secret. *Iacovacci*, 437 F. Supp. 3d at 381. Thus, with respect to the named documents only, the AC has adequately pleaded the existence of a trade secret.

### b. Misappropriation

Although Plaintiff may have pleaded the existence of a trade secret in specific named documents identified in the AC, and even if Plaintiff had identified a trade secret in the other

information alleged in the AC, Plaintiff has failed to sufficiently plead that such trade secrets were misappropriated under the NDA. There is no pleading—other than bare conclusory allegations[14]—that XOP's prospective product incorporates or uses any information that only CCS possessed and then disclosed under the NDA.

"The DTSA defines 'misappropriation' to include 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means' or 'disclosure or use of a trade secret of another without express or implied consent' in specific circumstances." *AUA Priv. Equity Partners, LLC v. Soto*, No. 17-cv-8035, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018). Courts recognize three theories of liability under DTSA: "(1) acquisition, (2) disclosure, or (3) use." *Id.*; *Hedgeye Risk Mgmt., LLC v. Dale*, 21-CV-3687, 2023 WL 6386845, at *7 (S.D.N.Y. Sept. 29, 2023). "Use" includes "any effort to avail oneself of a trade secret." *Onyx Renewable Partners L.P.*, 2023 WL 405019, at *5 (citing *KCG Holdings, Inc. v. Khandekar*, 17-CV-3533, 2020 WL 1189302, at *11 (S.D.N.Y. Mar. 12, 2020)).

Plaintiff's opposition does not identify which theory of misappropriation it relies on for its claim of trade secret misappropriation under the DTSA. (ECF 41 at 24-28). It does not appear that Plaintiff relies on a theory of acquisition or disclosure, as the purported trade secrets were shared with explicit consent under the terms of the NDA, and the AC contains no allegations that suggest XOP Defendants shared the alleged trade secrets with any other parties. The Court thus assumes that Plaintiff is relying on a "use" theory of misappropriation. Because the AC

---

[14] Plaintiff alleges that much of the information CCS possessed was kept secret by McDonough "in his head," and also asserts that much of the information was derived from McDonough's years of experience in the industry, including working for IPC and Corporation One. The Court presumes that Plaintiff is not alleging that information in McDonough's head that was derived from his experience at IPC and Corporation One could constitute a trade secret under the DTSA or New York law.

makes not a single factual allegation as to *how* XOP Defendants have used the alleged trade secrets at issue, Plaintiff's trade secret misappropriation claim fails.

Courts have held that use can be presumed where a defendant "retains a plaintiff's employees and launches a competing product shortly thereafter," or where the defendant has viewed trade secrets with the purpose of increasing their own knowledge. *See Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.*, 23-CV-9000, 2024 WL 3835264, at *6 (S.D.N.Y. Aug. 14, 2024); *KCG Holdings, Inc.*, 2020 WL 1189302, at *12. In the absence of such factual scenarios, as is the case here, courts typically require pleadings to contain some indicia of the actual "use" that took place beyond bare allegations that a defendant "used" a trade secret. *Onyx Renewable Partners L.P.*, 2023 WL 405019, at *5 (holding the plaintiff established "use" by pleading the defendant continued to access trade secrets located on his company laptop and personal storage device six weeks after his employment ended). After all, mere possession of a trade secret is insufficient to establish "use," as misappropriation is "rooted in the improper use of trade secrets to gain an advantage over [a] plaintiff." *Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 353 (S.D.N.Y. 2013). Plaintiff has failed to do so.

There is no presumption of use because XOP Defendants did not retain former employees of Plaintiff and subsequently launch a competing product. Additionally, no facts have been pleaded to indicate that XOP Defendants viewed Plaintiff's trade secrets with the intent of furthering their own knowledge; the purported trade secrets were shared between the parties under the terms of the NDA and for the purposes stated under the NDA. The AC further fails to provide any facts that would otherwise indicate XOP Defendants "used" their trade secrets in violation of DTSA. Unlike the plaintiff in *Onyx*, which pointed to an actual incident of use of

trade secrets after the defendant's employment had been terminated, here, Plaintiff fails to provide even the most remote description of how XOP Defendants used the purported trade secrets. Plaintiff does not even begin to link which categories of, or which specific documents, contain trade secrets that Defendant has used in creating the USN product. Plaintiff fails, for instance, to plead that the USN product evidenced by the Press Releases uses any of the information in the specific named documents that contain CCS's trade secrets. Instead, Plaintiff merely makes bold conclusory statements that "[m]ost or much of the aforementioned trade secrets were, upon information and belief, directly converted by XOP and Gupta during the period that they were negotiating with CCS and thereafter" and "there can be no doubt that XOP and Gupta misappropriated the aforementioned highly valuable and confidential information developed by and rightfully belonging to CCS." (ECF 9 at ¶¶ 217—218). Nor does Plaintiff identify how use of their trade secrets would confer a competitive advantage over CCS given that CCS had no product and XOP already had a relationship with their largest competitor, IPC.

      In sum, it is not plausible to infer from these conclusory allegations that Defendants misappropriated or used anything when—years after failed conversations with Plaintiff—Defendants entered into new business relationships to provide the same products with similarly touted capabilities in the same practice area in which they were engaged before the conversations with Plaintiff. For these reasons, Plaintiff has failed to adequately plead their trade secrets were misappropriated and their claims under the DTSA should be dismissed.

2.  *New York Law*

To state a claim for misappropriation of trade secrets under New York law, the Complaint must plausibly allege "(1) that [plaintiff] possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Schroeder v. Pinterest Inc.*, 17 N.Y.S.D.3d 678, 690 (1st Dep't 2015) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999)). New York courts consider six factors: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended in developing the information; [and] (6) the ease or difficulty with which the information could be acquired or duplicated by others." *Rocket Pharmaceuticals, Inc.*, 23-CV-9000 (PKC), 2024 WL 3835264, at *3 (S.D.N.Y. Aug. 14, 2024).

"The requirements are similar for showing a misappropriation of a trade secret under the DTSA and misappropriation under New York common law," and the failure to adequately plead a claim under DTSA results in the same conclusion for a claim pleaded under New York law. *Cf. ExpertConnect*, 2019 WL 3004161, at *6 ("For substantially the same reasons that the Complaint sufficiently pleads a DTSA claim, the Complaint also states a claim for misappropriation of trade secrets under New York law."). Here, the AC fails to plead a DTSA claim, and, for the same reasons, the AC also fails to plead a claim for misappropriation of trade secrets under New York law and should be dismissed.

### 3. The Misappropriation Claim under New York Law Is Duplicative of the Contract Claim

Separately, even if the misappropriation of trade secrets claims under New York law were sufficiently pleaded, it would still fail as it is duplicative of the breach of contract claims. A misappropriation of trade secrets claim cannot rely on the same facts that underlie a breach of contract claim unless the plaintiff can allege that the defendant breached a duty *independent* of those covered under the contract. *See ScentSational Techs., LLC v. PepsiCo, Inc.*, 13-CV-8645 (KMK), 2017 WL 4403308, at *18 (S.D.N.Y. Oct. 2, 2017); *DM Manager LLC v. Fidelity Nat'l Inf. Servs., Inc.*, 23-CV-617 (ER), 2024 WL 1347724, at *8 (S.D.N.Y. Mar. 29, 2024). A claim of misappropriation must "spring from circumstances extraneous to, and not constituting the elements of, the contract, although it may be connected with and dependent upon the contract." *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 745 F. Supp. 2d 343, 353 (S.D.N.Y. 2010) (citation omitted).

Thus, Plaintiff's trade secret misappropriation claim under New York law also fails as it is duplicative of the breach of contract claim under the NDA. The AC directly states that the information that was allegedly misappropriated was subject to the NDA: "there can be no doubt that XOP and Gupta misappropriated the aforementioned highly valuable and confidential information developed by and rightfully belonging to CCS... Regardless[,] ... Defendants XOP and Gupta signed the NDAs and the NDAs by their explicit language protect all of the confidential information that Plaintiff shared with Defendants Harding, Gupta and XOP from use by Defendants for any purpose..." (ECF 9 at ¶¶ 218-219). By Plaintiff's own words, the only duty breached is the duty of nondisclosure under the NDA. The AC contains no facts to suggest that the alleged misappropriation is related to any duty independent of the NDA.

26

Thus, Plaintiff's trade secrets misappropriation claim under New York law is also duplicative of the breach of contract claim and should also be dismissed for this reason.

### D.  The Tort Claims are Duplicative of the Contract Claim and Fail to State a Claim

Plaintiff contends that XOP Defendants are also, or alternatively, liable under a variety of different tort and quasi-contract claims, including (1) unjust enrichment, (2) quantum meruit, (3) conversion, (4) unfair competition, (5) fraudulent misrepresentation, (6) tortious interference with prospective contractual relations, and (7) conspiracy to commit the above. Plaintiff's claims are all barred as duplicative of the breach of contract claim.

Under New York law, "when a valid agreement governs the subject matter of a dispute between parties, claims *arising* from that dispute are contractual," and plaintiffs may not simply "repackage them as sounding in fraud, conversion, and other torts, as well as unjust enrichment, implied and quasi contract, and quantum meruit . . . unless based on a duty independent of the contract," even if the breach of contract claim fails. *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x. 57, 59 (2d Cir. 2011) (*emphasis* added); *see also DM Manager LLC v. Fidelity Nat'l Info. Servs. Inc.*, 23-CV-617, 2024 WL 1347724, at *5 (S.D.N.Y. Mar. 29, 2024). A court may infer that a defendant breaches an independent duty if "the defendant goes beyond a mere breach of the contract and acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff." *Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003).

Plaintiff's unjust enrichment, quantum meruit, conversion, unfair competition, fraudulent misrepresentation, and tortious interference with prospective contractual relations claims are all duplicative of the breach of contract claim and should be dismissed for this

reason. *See Valley Juice Ltd. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d Cir. 1996)

(dismissing unjust enrichment and quantum meruit claims as duplicative of the breach of

contract claim); *AD Rendon Comm's., Inc. v. Lumina Americas, Inc.*, 04-CV-8832, 2007 WL

2962591, at *4 (S.D.N.Y. Oct. 10, 2007) (dismissing conversion claims for same); *Orange Cnty.*

*Choppers, Inc. v. Olaes Enterprises, Inc.*, 497 F. Supp. 2d 541, 558 (S.D.N.Y. 2007) (dismissing

unfair competition claims for same); *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1160

(S.D.N.Y. 1996) (dismissing fraudulent misrepresentation claims for same); *POSCO Energy Co. v.*

*FuelCell Energy, Inc.*, 560 F. Supp. 3d 747, 760 (S.D.N.Y. 2021) (dismissing tortious interference

with prospective contractual relations claims for same).

Even if not duplicative, Plaintiff has failed to state a claim for each tort and quasi-

contract claim, and for the reasons discussed below, should be dismissed.

### 1.  *Unjust Enrichment/Quantum Meruit*

"Under New York law, quantum meruit and unjust enrichment claims may be analyzed

in tandem as a single quasi-contract claim." *Campeggi v. Arche Inc.*, 15-CV-1097, 2016 WL

4939539, at *11 (S.D.N.Y. Sept. 14, 2016); *see also Mid-Hudson Catskill Rural Migrant Ministry,*

*Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). To state a claim for quantum meruit, a

plaintiff must establish "(1) the performance of services in good faith; (2) the acceptance of

those services by the person to whom they are rendered; (3) an expectation of compensation

therefor; and (4) the reasonable value of the services." *Id.* Unjust enrichment requires the

plaintiff to show "the defendant was enriched at the plaintiff's expense and that equity and

good conscience require the plaintiff to recover the enrichment from the defendant." *Giordano*

*v. Thomson*, 564 F.3d 163, 190 (2d Cir. 2009).

Even if Plaintiff had sufficiently pleaded a duty independent of the NDA, which they have not, Plaintiff fails to plead all the elements of the claims. For instance, Plaintiff fails to sufficiently plead an expectation of compensation. The only agreement the parties entered into was the NDA. Plaintiff readily admits that the parties never signed a finalized version of the OEM agreement. (ECF 9 at ¶¶ 69-70). The stated purpose of the NDA was to "identify[] and evaluat[e] business opportunities of mutual interest and potential business cooperation transactions, including discussions around potential business opportunities in Financial Markets." (*Id.* at ¶ 40). From the very terms of the NDA itself, there is no reasonable expectation of compensation for Plaintiff, as neither party could sell a proposed product without the OEM agreement. (*Id.* at ¶ 65). Plaintiff's argument that it "expected to monetize the intellectual property it developed and transferred to XOP" is unavailing, as the potential income from a possible future contract that was never actually entered into cannot serve as the expected compensation of the parties' NDA.

### 2. Conversion

Under New York law, conversion is "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-404 (2d Cir. 2006). Specifically, a plaintiff must show "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *AD Rendon Comm's., Inc.*, 2007 WL 2962591, at *4. With certain exceptions, "only tangible property can be the subject of a conversion action."

*Grgurev v. Licul*, 229 F. Supp.3d 267, 286 (S.D.N.Y. 2017) (quoting *Ancile Inv. Co. v. Archer Daniels Midland Co.*, 784 F.Supp.2d 296, 312 (S.D.N.Y. 2011)).

Plaintiff has not alleged that specific, tangible property has been converted, nor has Plaintiff alleged an exception to the tangible property requirement. *Harris v. Coleman*, 863 F. Supp. 2d 336, 344 (S.D.N.Y. 2012) (discussing an exception where intangible property rights may be subject to a conversion claim if "represented by a tangible manifestation," such as a patent assignment or electronic or paper record). At best, Plaintiff alleges in conclusory fashion that it shared ideas, "know-how," and other information including ideas present only in McDonough's head—i.e., not tangible goods—with XOP and Gupta that enabled the Defendants to develop lucrative business relationships. (ECF 9 at ¶¶ 60, 123).

Second, Plaintiff has not pleaded that it had ownership of the alleged property *before* conversion. In addition to the shared know-how, Plaintiff alleges that CCS failed "to segregate from the net income and other gains of the business CCS's 80% share and presumably using those funds for other purposes, XOP and Gupta have converted a significant but unknown amount of Plaintiff's money." (*Id.* at ¶ 124). Plaintiff derives the 80% figure from an "agree[ment] in principle" that the parties would "build a digital VoIP communications bridge together … and eventually create other products for financial markets." (*Id.* at ¶ 41). None of this came to pass, however, so any expectation of revenues from XOP was purely speculative. Further, a plaintiff can only bring a conversion claim for money they owned "before its conversion." *Traffix, Inc. v. Herold*, 269 F. Supp. 2d 223, 228 (S.D.N.Y. 2003). None of the "money" supposedly converted by XOP was owned by CCS at any point.

Third, Plaintiff has not alleged a derogation of their own rights in the property. Sharing the information at issue under the NDA would not have precluded Plaintiff from using its own information at any time, because the NDA only prevented XOP from using CCS's information (and vice versa); nothing in the NDA prevented any party to the NDA from using its own information to pursue its own business aims. (ECF 9-2).

### 3.  Unfair Competition

"The standard of unfair competition under New York law is a virtual cognate of the federal Lanham Act and is predicated on a theory of misappropriation of a claimant's commercial goodwill." *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*, 331 F. Supp. 2d 247, 255 (S.D.N.Y. 2004). "The essence of both sources of protection is the likelihood that a consuming public would be confused about the source of the allegedly infringing product." *Maj. League Baseball Properties, Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 268 (S.D.N.Y. 2005) (citing *Am. Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 664. (2d Cir. 1979)). "Under New York law, the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets. *Maj. League Baseball Properties, Inc.*, 385 F. Supp. at 268-69. New York recognizes two theories of common-law unfair competition: "palming [or passing off] and misappropriation." *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 225 (S.D.N.Y. 2023). "Palming off . . . is the 'sale of the goods of one manufacturer as those of another.' " *Id.* (quoting *Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 267-68 (E.D.N.Y. 2016). Misappropriation requires a plaintiff to allege " 'that the defendant: (1) "misappropriated the plaintiff[]'s labors, skills, expenditures, or

good will"; and (2) "displayed some element of bad faith in doing so."' " *Id.* (quoting *Barbagollo v. Marcum LLP*, 820 F. Supp. 2d 429, 446 (S.D.N.Y. 2011).

Plaintiff fails to allege that XOP palmed off any of CCS's goods as their own; in fact, Plaintiff explicitly pleads that XOP sold their *own* product, USN. (ECF 9 at ¶¶ 72-73). And for the same reasons that Plaintiff fails to plead a misappropriation of trade secrets, Plaintiff also fails to plead that XOP misappropriated CCS's "labors, skills, expenditures, or good will." The AC does not identify facts that would plausibly suggest that XOP obtained the information by "illicit means" or "fraudulently inducing" Plaintiff to part with it and offers nothing beyond bald conclusory statements that "XOP and Gupta, in bad faith, misappropriated the commercial advantages held by CCS." *Town & Country Linen Corp.*, 556 F. Supp. 3d at 291; (*Id.* at ¶ 180).

### 4.   *Fraudulent Misrepresentation*

"To prove a fraudulent misrepresentation [claim] under New York law, a plaintiff must show that: (1) the defendant made a material false statement; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance." *In re Refco Inc. Securities Litigation*, 826 F. Supp. 2d 478, 522-23 (S.D.N.Y. 2011). "Where the fraud is based on alleged misrepresentations, the complaint must 'specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for those statements.' " *Id.* at 523 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).

Plaintiff also fails to plead the necessary elements of a fraudulent misrepresentation claim. First, the AC fails to plead that XOP Defendants made a false statement. Plaintiff pleads that "Defendants deceptively represented that they were negotiating the terms of an OEM agreement with CCS" and that "[o]nce the decision was made by Defendants to manufacture a competing product using CCS's confidential information, all further communications between CCS and the Defendants were made in the worst of bad faith. (ECF 9 at ¶ 193—94). However, Plaintiff provides no factual basis to support an inference that Defendants' negotiations were deceptive or that they plotted to produce a competing product during the terms of the negotiations. While fraud claims may be based upon information and belief where facts are peculiarly within the opposing party's knowledge, *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 310 (S.D.N.Y. 2009), the Plaintiff must still plead a sufficient factual basis to make an inference of fraud *plausible*. *See, e.g.*, *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 517 (S.D.N.Y. 2016) (holding that plaintiff's allegations of fraud, made upon information and belief, were sufficiently pleaded where plaintiff "describe[d] the allegedly fraudulent scheme and attache[d] two of the fraudulent invoices that clearly show[ed] the purported alterations"). Plaintiff has failed to set forth any factual basis to support any inference of fraud, let alone a plausible one. *See Twombly*, 550 U.S. at 557 (finding that plausibility requires more than consistency with the facts as pleaded). For similar reasons, the AC fails to plead that Defendants intended to defraud Plaintiff.

### 5. *Tortious Interference with prospective contractual relations*

"Under New York law, the elements of a tortious interference [with contract] claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the

third party intentionally and improperly procured the breach of the contract; and (d) that the

breach resulted in damage to the plaintiff." *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir.

1996). In order to state a claim for tortious interference with prospective economic advantage

or prospective contractual relations, the plaintiff must allege that "(1) it had a business

relationship with a third party; (2) the defendant knew of that relationship and intentionally

interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or

improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch*

*v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (describing elements for tortious

interference with prospective economic advantage); *Samsung Display Co. Ltd. V. Acacia*

*Research Corp.*, 14-CV-1353, 2014 WL 6791603, at * 5 (S.D.N.Y. Dec. 3, 2014) (describing

elements for tortious interference with prospective contractual relations).

   Whether Plaintiff intended to bring a claim of tortious interference with *contract* or with

*prospective contractual relations* is not material here because Plaintiff has done neither. Other

than claiming in conclusory terms that McDonough "had a reasonable expectation of economic

advantage," (*Id.* at ¶ 265), and that but for "the wrongful acts of Defendants, it [was]

reasonably probable that CCS would have entered into direct or indirect contractual

relationships with most or all of the companies that XOP entered into contractual relationships

with," (*Id.* at ¶ 309), there is no contract or business relationship alleged with either IPC or

Corporation One, the customers that are the subjects of the Press Releases. Nowhere in the AC

does CCS identify existing contracts or business relationships with IPC or Corporation One or

any other customers that Plaintiff now blames Defendants for stealing.[15] Indeed, CCS explicitly disclaimed any business relationship with IPC, (*see, e.g.*, *Id.* at ¶ 286), and only identified Corporation One as a "target." (*Id.* at ¶ 279 and elsewhere). Additionally, the smaller companies on CCS's target customer list had existing vendor relationships with *Corporation One*, not CCS. (*Id.*). That McDonough previously worked for Corporation One and IPC is insufficient to plead an existing business relationship between CCS and Corporation One or IPC. There is similarly no pleading that Defendants knew about any of McDonough's business relationships or that Defendants "interfered" with the requisite state of mind sufficient to state a claim.

### 6. Conspiracy

It is well settled that New York does not recognize an independent cause of action for civil conspiracy, which may only be asserted "to connect the actions" of separate defendants to an underlying tort. *Cassava Scis., Inc. v. Bredt*, 22-CV-9409 (GHW) (OTW), 2024 WL 555484, at *10 & n.30 (S.D.N.Y. Jan. 3, 2024), *report and recommendation adopted*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024); *see also Eze v. Mangal*, No. 521409/2019, 2020 WL 13469845, at *3 (N.Y. Sup. Ct. Nov. 13, 2020); *Reich v. Lopez*, 38 F. Supp. 3d 436, 460 (S.D.N.Y.), *aff'd*, 858 F. 3d 55 (2d Cir. 2017). As in *Cassava*, I have recommended dismissal of the underlying fraudulent misrepresentation, conversion, and misappropriation of trade secrets claims for failure to state

---

[15] At best, Plaintiff's hyperbole relates to its damages, not to causation or other elements of the claim. *See, e.g.*, (ECF 9 at ¶ 296) ("Defendants are now fearless. They are openly and notoriously bragging about the extraordinary windfall that they are reaping as a result of having defrauded Plaintiff's principal McDonough by means of bullying and deception out of the sweetest fruits of his life's labor. Defendants are enjoying rising and profitable careers each day as McDonough wakes up sick, agonizing over CCS's very survival. Defendants are attempting to seize the first-mover advantage and use it as a dagger plunged deep into the heart and soul of McDonough. A greater economic injustice is hard to imagine.").

a claim and because they are, at best, duplicative of the breach of NDA claim and trade secrets claim. Here, Plaintiff seeks to hold Defendants responsible for what are alleged to be the overt acts of the conspiracy—breach of NDA, theft of trade secrets—and thus, the civil conspiracy claim should be dismissed.[16] *See, e.g., Reich* 38 F. Supp. at 460 ("[T]he damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific overt acts."). While the wheels of justice may turn slowly, if this recommendation is accepted, it is fatal to Plaintiff's civil conspiracy claim because there is no underlying tort perpetrated on Plaintiff by Defendants, nor is there any more than a conclusory allegation of conspiracy.

### E. RICO Claims

Plaintiff asserts civil RICO claims under 18 U.S.C. §§ 1962(a), (c) and (d). Because I find that Plaintiff has failed to plead that Defendants engaged in a pattern of racketeering activity, the civil RICO claims should also be dismissed.

RICO was enacted by Congress in 1970 to "eradicate[e] . . . organized crime in the United States." *In re Tether and Bitfinex Crypto Asset Litigation*, 576 F. Supp. 3d 55, 114—15 (S.D.N.Y. 2021). "Under RICO, organized crime is defined as racketeering activity, a term that

---

[16] Plaintiff has also failed to meet the pleading standard for civil conspiracy. "[T]he charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts." *Reich* 38 F. Supp. at 460. In addition to pleading civil conspiracy, Plaintiff must plead the underlying tort, "plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Id.* at 461. Plaintiff failed to plead the underlying torts and likewise fails to plead an agreement between Defendants; other than Plaintiff's circular assertions of disloyalty, Harding appears only to have introduced McDonough to XOP and Gupta. The agreement between XOP and Gupta is pleaded in similarly conclusory and circular fashion.

'encompass[es] dozens of state and federal statutes' that serve as punishable predicate acts. *Id.* at 115 (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 329—30 (2016). "An individual who commits two or more predicate acts within a ten-year period may violate RICO if 'those predicate offenses are related to one another … and the predicates amount to or pose a threat of continued criminal activity.' " *Id.* (quoting *Elsevier, Inc. v. Grossmann*, 12-CV-5121, 2017 WL 1843298, at *3 (S.D.N.Y. May 8, 2017). In relevant part:

> Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise… Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity. [And Section] 1962(d) makes it unlawful to conspire to violate any of the other [] prohibitions.

*RJR Nabisco*, 579 U.S. at 330.

A plaintiff seeking damages under RICO has two pleading burdens. "First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). This first step requires a showing of four distinct elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001). If successful, a plaintiff must then plead (a) injury to their business or property (b) "by reason" of defendant's violation of Section 1962. *Moss*, 719 F.2d at 17. With respect to section (d) of the RICO statute, which makes conspiracy to commit (a)-(c) unlawful, a failure to adequately plead the requirements under §§ 1962(a)—(c) "necessarily dooms any claim [plaintiff] might assert arising under § 1962(d)." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 658 (S.D.N.Y. 1996).

Here, Plaintiff fails to sufficiently plead a plausible factual basis that XOP Defendants perpetrated the various predicate acts, or the open- or closed-end continuity necessary to show a pattern of racketeering activity. Accordingly, Plaintiff's civil RICO claims should be dismissed.

         1.   *Plaintiff Fails to Allege RICO Predicate Acts*

Assuming for the purposes of this Report and Recommendation that Plaintiff had adequately pleaded elements (1) and (2), Plaintiff's claims still fail because the AC does not provide a factual basis for the conclusory allegation that XOP Defendants engaged in one of the various predicate acts alleged by Plaintiff. *Katzman*, 167 F.R.D. at 655.

To state a claim under RICO, a plaintiff must plead that a defendant committed at least two predicate acts from those specifically listed in 18 U.S.C. § 1961. *Katzman*, 167 F.R.D. at 655. Plaintiff pleads, in conclusory fashion, that Defendants committed "numerous predicate acts [as] part of an open-ended, multi-year scheme of racketeering that, on information and belief, continues through the present." (ECF 9 at ¶ 342). This is merely a restatement of the elements. Plaintiff asserts that Defendants committed: (1) wire fraud by communicating with Plaintiff by phone, e-mail, and text message to defraud CCS by inducing CCS to turn over "highly proprietary customer, technical, and market research information" that was subject to the NDA (*Id.* at ¶ 351); (2) federal criminal money laundering by "strik[ing] business deals or [attempting to] strike deals [with financial institutions] to sell [its USN] products substantially or entirely derived from Plaintiff's trade secrets," (*Id.* at ¶¶ 359-68); and/or (3) misappropriation of trade secrets in violation of the DTSA by stealing CCS's confidential information and trade secrets in violation of the NDA. (*Id.* at ¶¶ 369-88).

As discussed above, Plaintiff has not sufficiently pleaded a DTSA violation. Plaintiff makes only conclusory assertions of wire fraud and has not pleaded facts with particularity from which to plausibly infer that there was a scheme or artifice to defraud; the time, place, manner, or content of the communications; and how they were fraudulent at the time they were made. Fed. R. Civ. P. 9(b); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993). *See also Giuliano v. Fulton*, 399 F.3d 381, 388 (1st Cir. 2005); *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 341—42 (7th Cir. 2019). Even more mystifying is Plaintiff's money laundering predicate. Plaintiff similarly relies on its conclusory allegation that Defendants "stole" CCS's intellectual property, incorporated it into their own USN, and sold it to financial institutions. Because the USN was derived from property "stolen" by wire fraud, Plaintiff asserts that selling it to customers "would be a transaction involving criminally derived property," that, "on information and belief, . . . was a monetary transaction by, through, or to, a financial institution … [that] affected interstate or foreign commerce." (ECF 9 at ¶¶ 360, 363). This is just wrong. Plaintiff has failed to allege that Defendants "stole" or otherwise misappropriated any of Plaintiff's trade secrets, confidential information, or other property.[17] For this reason, Plaintiff's assertion that the sale of XOP's USN constitutes criminal money laundering cannot stand.

### 2. *Plaintiff Fails to Allege a Pattern of Racketeering Activity*

Plaintiff also fails to adequately plead a *pattern* of racketeering activity.

RICO defines "a pattern of racketeering activity" to require at least two acts of racketeering committed within a 10-year period. *DeFalco*, 244 F.3d at 320 (quoting 18 U.S.C.

---

[17] Plaintiff also does not plead that XOP engaged in money laundering by *receiving* and using the proceeds of criminal activity. 18 U.S.C. § 1956(a)(1)(B)(i); *U.S. v. Gotti*, 457 F. Supp. 2d 411, 422 (S.D.N.Y. 2006) ("This section criminalizes transactions designed to vest illegal proceeds with 'the appearance of legitimacy.'").

§ 1961(5)). The predicate acts of racketeering must be "related" and "amount to or pose a threat of continued criminal activity." *H.J. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Although a RICO plaintiff must allege more than a single scheme directed at a single plaintiff, a RICO claim alleging multiple economic injuries to the same victim can be sufficient at the pleading stage. *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 509 (S.D.N.Y. 2007) (collecting cases). "The continuity necessary to prove a pattern can be either 'closed-ended continuity,' or 'open-ended continuity.' " *DeFalco*, 244 F.3d at 320.

As an initial matter, absent a predicate racketeering act, no "pattern" of racketeering can exist. *Katzman*, 167 F.R.D. at 656 (citing *Powers v. British Vita, P.L.C.*, 842, F. Supp. 1573, 1584 (S.D.N.Y. 1994) (" 'Having rejected on the pleadings all of the predicate racketeering acts alleged by Plaintiff to underlie his RICO claim against Defendants, it is axiomatic that Plaintiff has failed to allege "a pattern of racketeering activity" within the RICO statute' "), *aff'd in part, rev'd in part, on other grounds*, 57 F.3d 176 (2d Cir. 1995)).Nonetheless, even if wire fraud or money laundering or a DTSA violation had been sufficiently pled, the AC still fails to sufficiently plead either the closed-ended or open-ended continuity necessary to prove a pattern.

### a. Closed-ended Continuity

Closed-ended continuity is defined as exclusively referring to a series of past criminal conduct extending over a substantial period of time. *See GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1996). The Second Circuit has expressed significant doubt that predicate acts spanning less than two years could ever satisfy the closed-ended continuity requirements of a RICO claim. *Grace Int'l Assembly of God v. Festa*, 797 F. App'x 603, 605 (2d Cir.

2019). Courts are also required to consider "the number and variety of predicate acts, the presence or absence of multiple schemes, and the number of participants and victims." *Id.*

Even if Plaintiff had sufficiently pleaded wire fraud by Gupta's communications with CCS, these acts only span several months in 2016, far less than the two years needed for closed-ended continuity under *Grace Int'l Assembly*, 797 F. App'x at 605 ("'[W]hile the two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern.'") (*emphasis* in original).

### b.  Open-ended Continuity

Open-ended continuity refers to "past criminal conduct coupled with a threat of future criminal conduct." *Grace Int'l Assembly*, 797 F. App'x at 605. There are two ways to show open-ended continuity: "(1) 'where the acts of the defendant or the enterprise [are] inherently unlawful, such as murder or obstruction of justice, and [are] in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement,' … or (2) 'where the enterprise primarily conducts a legitimate business' but there is 'some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity.'" *Id.* "Given the routine use of mail and wire communications in business operations, . . . RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Id.* (internal quotations omitted) (quoting *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014)).

Even if Plaintiff had sufficiently pleaded two predicate acts, they have not sufficiently alleged open-ended continuity. First, Plaintiff has not pleaded facts to lead to any inference (plausible or not) that Defendants are engaged in inherently unlawful acts, such as murder or obstruction of justice, narcotics trafficking, or embezzlement. Plaintiff also fails to plead facts to suggest that the predicate acts it alleges Defendants engaged in (i.e., misappropriation of trade secrets, wire fraud, money laundering) are the regular way of operating the business. Further, the nature of the alleged predicate acts, when closely scrutinized, do not imply a threat of continued criminal activity, and CCS has pleaded no facts that lend to such a conclusion.

The only allegation of future, repeat conduct is XOP's continuing to sell its own product to future customers. This is insufficient to plead open-ended continuity, and holding so would enable any company to hobble a competitor by expanding an alleged non-disclosure violation to a civil RICO claim. *See World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 511 (S.D.N.Y. 2007) ("[A] plaintiff may not rely on the defendants' retention or use of his assets to establish open-ended continuity.' "). Plaintiff's only pleading of a continuing "violation" is XOP's developing business relationships with other customers to sell its own product that was touted to have the same functionality even before the CCS relationship. Plaintiff has both failed to plead a qualifying criminal activity and, as a result, "failed to plausibly [plead] a threat of continuing criminal activity." *See Black v. Ganieva*, 619 F. Supp. 3d 309, 346 (S.D.N.Y. 2022).

   3.  *Plaintiff Fails to State a Claim Under §§ 1962(a), 1962(c), and 1962(d)*

A pattern of "racketeering activity" is a necessary prerequisite under all four sections of the RICO statute. *Katzman*, 167 F.R.D. at 657. Accordingly, Plaintiff's 1962(a), (c), and (d) claims

also fail because Plaintiff has failed to plead Defendants engaged in a pattern of racketeering activity.

### F. Accounting

To state a claim for accounting, a plaintiff must show: "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (quoting *Pressman v. Est. of Steinvorth*, 860 F. Supp. 171, 179 (S.D.N.Y. 1994)). Courts in this district have routinely held that a fiduciary relationship is necessary to state a claim for an accounting, and that mere contractual relationships are not sufficient. *Id.* ("[T]he relationship between [defendant] and [plaintiff was] merely contractual, not fiduciary in nature."); *Diesenhouse v. Social Learning and Payments, Inc.*, 20-CV-7436, 2022 WL 3100562, at n. 10 (S.D.N.Y. Aug. 3, 2022). *See also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 201—2, 207 (2011) (finding contracts that do not specifically outline fiduciary duties as between the parties do not create a fiduciary relationship, and the absence of such relationship bars a claim for accounting). A mutual nondisclosure agreement does not *per se* create a fiduciary relationship. *Gate Technologies, LLC v. Delphix Capital Mkts., LLC*, 12-CV-7075 (JPO), 2013 WL 3455484, at *8 (S.D.N.Y. July 9, 2013).

Because the AC fails to plead that XOP was a fiduciary of Plaintiff and that no adequate legal remedy exists, the claim fails. Here, the relationship between Plaintiff and XOP is merely contractual. The parties signed an NDA. (ECF 9 at ¶ 38). While this contractual relationship was indeed mutual and of a confidential nature, it was not "mutual and confidential" in the sense

that it created a fiduciary relationship as required for a claim of accounting. *Gate Technologies*,

2013 WL 3455484, at \*8. The AC does not plead any facts that suggest that the relationship

between Plaintiff and XOP is anything more than an arms-length NDA.[18] Thus, without more,

the relationship, as pleaded, is merely contractual. *See IMG Fragrance Brands*, 679 F. Supp. at

411. Further, Plaintiff failed to sufficiently plead that it has no adequate legal remedy. The fact

that CCS's alleged damages are "not precisely calculable until it has access to XOP's books and

records" is not sufficient to save Plaintiff's claim, as this could be achieved through discovery if

Plaintiff were able to state a claim. *Id.*; *Addax BV Geneva Branch v. Eastern of New Jersey, Inc.*, 5-

CV-9139 (JSR), 2007 WL 1321027, at \*2 (S.D.N.Y. May 4, 2007). For these reasons, Plaintiff's

accounting claim should be dismissed.

### G.  Requests for Relief Repackaged as Causes of Action

Plaintiff's fourth, fifth, eighteenth, and nineteenth causes of actions allege the following

claims, respectively: (1) declaratory judgement against XOP and Gupta that CCS owns the

intellectual property which was incorporated into the USN; (2) injunctive relief against all

Defendants to cease and desist manufacturing, selling, and supporting the USN product or any

other product that "provides functionality substantially similar to the cUCS;" (3) attorney's fees;

and (4) punitive damages against Defendants. These "claims," however, are requests for relief

improperly pleaded as causes of actions and should be dismissed. *See Chevron Corp. v. Naranjo*,

667 F.3d 232, 244 (2d Cir. 2012) (holding that the Declaratory Judgement Act requires a "valid

legal predicate" and "does not create an independent cause of action" for declaratory

---

[18] The only party to which Plaintiff alleges a fiduciary duty is with Harding.

judgment) (internal quotations omitted); *Bayerische Hypo-Und Vereinsbank AG v. AIG Matched Funding Corp.*, 9-CV-8386 (LTS) (AJP), 2010 WL 692873, at *1 (S.D.N.Y. Mar. 1, 2010) (dismissing declaratory judgment claims as duplicative of a breach of contract claim). *See also Chiste v. Hotels.com*, 756 F. Supp. 2d 382, 407 (S.D.N.Y. 2010) (holding there is no separate cause of action for an injunction); *Reuben H. Donnelley Corp. v. Mark I Marketing Corp.*, 893 F. Supp. 285, 293 (S.D.N.Y. 1995) (dismissing injunction claims for same); *Martin v. Dickson*, 100 Fed. App'x 14, 16 (2d Cir. 2004) ("[T]here is no separate cause of action in New York for punitive damages."); *Jaffe v. Capital One Bank*, 9-CV-4106, 2010 WL 691639, at *10 (S.D.N.Y. Mar. 1, 2010) (holding attorney's fees are "potential forms of relief" and "cannot stand as separate causes of action"); *Amusement Industry, Inc. v. Stern*, 786 F. Supp. 2d 741, 757 (S.D.N.Y. 2011) ("[I]t is settled that 'New York does not recognize an independent cause of action for punitive damages. Instead, a demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action.' ").

### H. Harding's Breach of Fiduciary Duty

Plaintiff's final claim is that Defendant Harding breached a fiduciary obligation to CCS. This claim must also be dismissed for failure to adequately plead a knowing breach of fiduciary duty. However, Plaintiff should be allowed to amend <u>only</u> with respect to Harding's alleged work for direct competitors of CCS and Harding's alleged actions with respect to CCS's credit line and credit cards; based on the facts as alleged, the Court cannot say that any repleading whatsoever would be futile.

The elements of a claim for breach of fiduciary duty in New York are (1) the existence of a duty; (2) a knowing breach of that duty; and (3) damages resulting therefrom. *Johnson v.*

45

*Nextel Comms., Inc.*, 660 F.3d 131, 138 (2d Cir. 2011); *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (2d Dep't 2009). Typically, the statute of limitations for breach of fiduciary duty claims seeking purely monetary relief is three years from the date the plaintiff first suffered loss as a result of the breach. *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009). If an allegation of fraud is "essential to a breach of fiduciary duty claim," or the claim seeks equitable relief, the statute of limitations is six years. *Id.* Where an action involves claims by a corporation against its officers and directors for breach of fiduciary duty, whether current or former, a six-year statute of limitations applies. *Levy v. Young Adult Institute, Inc.*, 103 F. Supp. 3d 426, 435 (S.D.N.Y. 2015); *In re 1st Rochdale Co-op Group, Ltd.*, 7-CV-7852 (DC), 2008 WL 170410, at *3 (S.D.N.Y. 2008).

As an initial matter, it is conceivable that Plaintiff's breach of fiduciary duty claim could be timely under the six-year statute of limitations that applies to claims for breach of fiduciary duty by a corporation against one of its former directors or officers. During his tenure at CCS, Harding assumed several roles, including Chief Operating Officer and Chief Product Officer. (ECF 9 at ¶ 101). Plaintiff sets forth barebones assertions that "CCS discovered that Harding's breaches of fiduciary duty began as early as 2015, and continued through his separation from CCS in March, 2017." (*Id.* at ¶ 97). But Plaintiff does not identify whether Harding owed any fiduciary duty to Plaintiff (or McDonough) before CCS was formed in April 2015, and seems to suggest a "conflict of interest" arising as early as 2014, before Harding's tenure at CCS began. (Compare *id. at* ¶ 97 and ¶ 98-101). Nonetheless, post-2015 acts that occurred in connection with Harding's employment at CCS are probably timely.

It is undisputed that Harding owed a duty to CCS during his tenure as Chief Operating Officer and Chief Product Officer. *In re 1st Rochdale Co-op Group, Ltd.*, 2008 WL 170410, at *3 ("[A] six-year statute of limitations applies to claims on behalf of a corporation against its *officers* and directors for breach of fiduciary duty.") (*emphasis* added). However, as with Plaintiff's numerous other claims, the AC fails to plead with specificity that Harding knowingly breached his fiduciary duty to CCS.

"When a breach of fiduciary duty claim is premised upon fraudulent misconduct, Rule 9(b) applies." *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 358 (S.D.N.Y. 2013). Rule 9(b) imposes a heightened standard for pleading and requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *Levy*, 103 F. Supp. 3d at 442. "Generally, a non-fraud claim will 'sound in fraud' if the claim arose out of events that the pleading describes in terms of fraud or the pleading includes a claim based on fraud, and the non-fraud claim incorporates the fraud allegations. *Levy*, 103 F. Supp. 3d at 442. A breach of fiduciary duty claim may sound in fraud where the underlying conduct alleged has been fraud or the breach is closely linked with fraudulent behavior. *Id.* at 443; *Sheppard v. Manhattan Club Timeshare Ass'n*, 11-cv-4362(PKC), 2012 WL 1890388, at *8 (S.D.N.Y. May 23, 2012).

By Plaintiff's own admission, the purported breaches of Harding's fiduciary duty sound in fraud. (ECF 41 at 22),[19] and Plaintiff's sparse allegations fail to plead a knowing breach of

---

[19] "Additionally, if sounding in fraud, the statute of limitations is six years, not three years. Alternatively, as Defendants acknowledge, the discovery rule may also toll the statute of limitations if it is a fraud-based breach of fiduciary duty claim." (ECF 41 at 22). Each alleged breach is (conclusorily) alleged to be premised upon fraudulent conduct; if Plaintiff were granted leave to amend this claim, it would need to plead particular facts to lead to an inference that these breaches of fiduciary duty sound in fraud and/or that they are breaches of duty that Harding owed to CCS as an officer or director.

fiduciary duty with the requisite particularity required under Rule 9(b). The AC does not explain, for example, whether The Cortland Group was selling products to IPC in competition with CCS, or, if so, that this occurred while Harding worked at CCS. This absence of factual pleading may be fatal to Plaintiff's claim for multiple reasons: if The Cortland Group sold rugs, or cleaning supplies, there would be no conflict that could give rise to a breach; Harding's employment at The Cortland Group predates his employment at CCS, and thus it is unclear whether this "conflict of interest" breached any duty to CCS. Similarly, the AC complains of Harding's roles at Intracom, LMC Systems, and ETS, but the existence of these positions alone is not sufficient to state a claim for breach of fiduciary duty without some explanation how that work breached Harding's duties to CCS.[20] The single sentence that Harding "had a Kickstarter" also, unsurprisingly, does not plead a breach of fiduciary duty, as private fundraising for an unspecified reason does not necessarily raise fiduciary concerns. With respect to Harding's supposedly "failed obligations," the AC fails to allege even a single instance where Harding did in fact fail to meet any of his obligations due to his other positions and loyalties.

Plaintiff's pleading that "Harding's work for a few of these companies was a sales agent selling conference solutions, meaning products directly competitive with CCS's products," also fails, as the AC fails to plead that such activity occurred during his employment at CCS, the extent of his involvement in such sales, or what products were sold in competition with which

---

[20] Harding's failure to step down from his position at ETS may, for instance, give rise to a claim for breach of contract with respect to Harding's employment terms at CCS, instead of a breach of fiduciary duty claim. *See, e.g.*, *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 403 (S.D.N.Y. 2021) ("In other words, a cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand.") (internal quotations omitted). But the AC is silent as to whether Harding was permitted to hold more than one position at once.

CCS products, let alone which of the various companies were competitors of CCS. The AC also does not plead any facts besides the bare allegation that Harding "shut down a credit line" and used CCS's credit line to pay for multiple hotels and at a liquor store. No detail is provided as to when this happened, how much was spent, where the hotels were, or why these actions were not appropriate or in the ordinary course of business. Finally, none of the pleading contains any factual basis to suggest that Harding himself knew that he was breaching his fiduciary duties to CCS. These conclusory allegations are insufficient to survive a motion to dismiss. *See Stern v. General Elec. Co.*, 924 F.2d 472, 477 (2d Cir. 1991) ("In addition, even if we were to consider the statements in paragraph 25, those allegations would fail under [Rule 9(b)] because they are made upon 'information and belief' and do not identify with particularity the facts upon which the belief is founded.).

For these reasons, I recommend that Plaintiff's breach of fiduciary duty claims against Defendant Harding be dismissed with leave to amend <u>only</u> as to Harding's alleged work for direct competitors of CCS and Harding's alleged actions with respect to CCS's credit line and credit cards, during the time Harding was employed as an officer or director of CCS.[21]

---

[21] Even if the claims were sufficiently pleaded under Rule 9(b), the Court has reason to suspect that the breach of fiduciary duty claims may not give rise to sufficient damages to satisfy the amount in controversy requirement needed for this Court to exercise subject matter jurisdiction under diversity jurisdiction. 28 U.S.C. § 1332. Plaintiff has alleged (again, in conclusory fashion) potential recovery of more than $75,000 as a result of Harding's various alleged breaches of fiduciary duty. However, the AC is notably devoid of any facts that allow the Court to infer the monetary value of Plaintiff's claims except for one sentence: "Upon information and believe, none of Harding's charges, which amounted to *thousands of dollars*, were appropriate company expenditures." (ECF 9 at ¶ 102) (*emphasis* added). The Court declines to take up the question of whether the AC is insufficient, as pleaded, to show that the amount recoverable meets the jurisdictional threshold but suggests that if Plaintiff chooses to file a second amended complaint, Plaintiff must plead with particularity to demonstrate the amount in controversy exceeds $75,000. *See Scherer v. Equitable Life Assurance Society of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) ("To overcome the face-of-the-complaint presumption, the party opposing jurisdiction must show 'to a legal certainty' that the amount recoverable does not meet the jurisdictional threshold.").

**IV.     CONCLUSION**

For the foregoing reasons, I respectfully recommend that Defendants' motions to

dismiss (ECF 37) be **GRANTED** with leave to amend as to Plaintiff's breach of fiduciary duty

claims only. If Plaintiff does file a second amended complaint, he must plead with <u>specificity</u>

when the alleged actions occurred, why CCS has reason to believe that Harding's actions were a

breach and how Harding knew or should have known they were a breach, what damages CCS

sustained as a result, and <u>facts</u>—not conclusions—to support all the elements of a breach of

fiduciary duty claim. Plaintiff is again reminded that plopping "upon information and belief"

before a conclusory statement does not transform that conclusion into a factual allegation.

**V.     OBJECTIONS**

In accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

fourteen (14) days (including weekends and holidays) from receipt of this Report to file written

objections. *See also* FED. R. CIV. P. 6. A party may respond to any objections within fourteen (14)

days after being served. Such objections, and any responses to objections, shall be addressed to

the Honorable Paul G. Gardephe, United States District Judge. Any requests for an extension of

time for filing objections must be directed to Judge Gardephe.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir. 1983).

Respectfully submitted,

_____s/ Ona T. Wang_____

Dated:  September 25, 2024                                    **Ona T. Wang**
        New York, New York                          United States Magistrate Judge